# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED HEALTHCARE SERVICES, INC., <br><br>                            Plaintiff, <br><br>     vs. <br><br> SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; G&W LABORATORIES, INC.; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; MYLAN N.V.; PERRIGO NEW YORK, INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; and WOCKHARDT USA LLC, <br><br>                            Defendants. | Civil Action No. <br><br><br> **COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     JURISDICTION AND VENUE ........................................................... 12

III.    THE PARTIES ..................................................................................... 14

    A.  Plaintiff UHS ................................................................................ 14

    B.  Defendants .................................................................................... 17

IV.     FACTUAL BACKGROUND ............................................................... 23

    A.  Factual Support For The Allegations ........................................... 23

    B.  The Generic Drug Market ............................................................ 36

        1.  The Hatch-Waxman Act ........................................................ 36

        2.  The Importance Of Generic Drugs ........................................ 37

        3.  Players In The Drug Distribution System ............................. 38

            a.   Manufacturers/Suppliers ............................................. 38

            b.   Wholesalers/Distributors ............................................. 41

            c.   Group Purchasing Organizations (GPOs) .................... 41

            d.   Pharmacies & Retailers ............................................... 42

        4.  The Cozy Nature Of The Industry And Opportunities For Collusion ........ 43

            a.   Trade Association And Customer Conferences ............... 43

            b.   Industry Dinners And Private Meetings ........................ 44

        5.  The Overarching Conspiracy Between Generic Drug Manufacturers – *Playing Nice In The Sandbox* ...................... 47

            a.   The General "Fair Share" Understanding ........................ 47

            b.   Once Each Competitor Had Its Fair Share, It Was Time To Increase Prices ........ 63

            c.   Generic Drug Price Spikes Since 2013 ............................ 64

    C.  The Illegal Schemes ..................................................................... 65

        1.  Generic Topical Products—An Overview .............................. 68

        2.  The Early Days—Collusion From 2009 To Early 2012 ............ 70

            a.   Key Relationships Among Generic Topical Manufacturers ........ 70

               1)   Fougera/Perrigo/Taro .......................................... 71

               2)   Actavis And Taro/Perrigo ..................................... 73

3)      Sandoz/Taro ............................................................. 73

     i.      Carbamazepine ER Tablets.............................. 75

     ii.      Imiquimod Cream ........................................... 77

         a)      Perrigo Entry (April 2010) ...................... 78

         b)      Sandoz Entry (February 2011) ................ 83

         c)      Taro Entry (July 2011) ........................... 86

     iii.      Triamcinolone Acetonide Cream and Ointment.............. 93

     iv.      Adapalene Cream .............................................. 95

     v.      Betamethasone Dipropionate Lotion ............................. 101

     vi.      Clotrimazole Betamethasone Dipropionate Cream and Lotion .............................................................. 103

         a)      March And April 2011—Actavis Raises Prices And Fougera And Taro Follow ............................. 104

         b)      Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox ........................................... 108

         c)      Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013 ........................... 110

     vii.      Fluocinonide Solution ...................................... 112

         a)      Fougera Raises Prices In May 2011 And Taro Follows ........................................... 112

         b)      Fougera Raises Prices In February 2012 And Taro Follows ........................................... 114

     viii.      Erythromycin Base/Ethyl Alcohol Solution .................. 117

     ix.      Nystatin Ointment ........................................... 126

4)      G&W And Its Relationships .................................. 132

     i.      G&W/Fougera................................................ 133

         a)      Metronidazole Cream and Lotion .......................... 135

         b)      Calcipotriene Solution............................ 140

         c)      Fluocinolone Acetonide Cream and Ointment...... 142

         d)      Betamethasone Valerate Lotion ............................. 146

         e)      Metronidazole .75% Gel ........................ 149

ii. G&W/Glenmark ............................................................... 157

a) Ciclopirox Cream—April 2012 ............................ 158

5) Additional Collusive Relationships ......................................... 165

i. Lidocaine Ointment ......................................................... 166

3. Focus On Price Increases Intensifies—Collusion From Late 2012 – 2016 .......................................................................................... 169

a. Shifts In The Market Foster Collusion ............................................. 169

1) Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value ................................... 170

2) Key Relationships Emerge And Existing Relationships Strengthen .......................................................................... 171

i. Sandoz/Taro ...................................................... 172

a) CW-3's Relationships With Aprahamian And H.M. Of Taro .............................................. 172

b) CW-4's Relationship With D.S. Of Taro ............. 176

ii. CW-3's Relationship With T.P. Of Perrigo ................... 177

iii. Perfetto's Relationship With Boothe Of Perrigo ........... 179

3) Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors .................................................. 179

b. Taro Emerges As A Leader Among Generic Topical Manufacturers ................................................................................. 181

1) Increased Focus On Fair Share And Price Increases ............. 181

i. Setting the Stage For Future Collusion—Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed .......................................................... 186

a) Desonide Lotion .................................................... 187

b) Ciclopirox Shampoo .............................................. 191

c) Betamethasone Valerate Ointment ........................ 194

ii. Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap .......................................................... 197

a) Nystatin Triamcinolone Cream and Ointment ...... 198

b) Fluocinonide Ointment .......................................... 208

iii

        c)   Lidocaine Ointment ............................................... 212

   iii.   Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013 ........................................................................ 216

        a)   Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases ................................. 217

        b)   Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases ...................................................... 225

   iv.   Building Upon Early Successes—Taro's Continued Collusion Over The Ensuing Years ................................. 233

        a)   Alclometasone Dipropionate Ointment ................ 233

        b)   Fluocinonide Solution ............................................ 238

        c)   Taro's August 2013 Price Increases ...................... 241

        d)   Triamcinolone Acetonide Paste ............................ 244

        e)   Acetazolamide Tablets .......................................... 245

        f)   Desonide Ointment ................................................ 253

        g)   Taro's June 2014 Price Increases .......................... 258

           a.   Carbamazepine ER Tablets and Clobetasol Propionate ................................................... 266

           b.   Hydrocortisone Valerate Cream ......................... 274

           c.   Phenytoin Sodium ER Capsules ........................ 276

        h)   Econazole Nitrate Cream ....................................... 281

        i)   Fluocinonide .1% Cream ....................................... 284

        j)   Metronidazole 1% Gel ........................................... 291

        k)   Clotrimazole Cream ............................................... 296

        l)   Ketoconazole Cream and Fluocinonide Gel ......... 299

           a.   Ketoconazole Cream ...................................... 300

           b.   Fluocinonide Gel ............................................ 305

c.   Sandoz And Its Other Relationships ............................................. 309

   1)   Collusion Between Sandoz And Perrigo ............................... 310

i.     Bromocriptine Mesylate Tablets ..................................... 311

ii.    Adapalene Cream ............................................................ 318

iii.   Calcipotriene Betamethasone Dipropionate Ointment ... 325

iv.   Tacrolimus Ointment ...................................................... 334

v.    Methazolamide Tablets ................................................... 338

2)   Collusion Between Sandoz And Glenmark ........................... 342

i.     Fluticasone Propionate Lotion (60ml) ............................ 343

ii.    Desoximetasone Ointment .............................................. 352

a)   Sandoz Entry (September 2012) ........................... 352

b)   Glenmark Entry (September 2013) ....................... 355

3)   Collusion Between Sandoz And Aurobindo .......................... 359

i.     Oxacillin Sodium and Nafcillin Sodium Injectable Vials ................................................................................ 360

ii.    Cefpodoxime Proxetil Oral Suspension and Tablets ...... 364

iii.   Pioglitazone HCL Metformin HCL Tablets ................... 369

4)   Collusion Between Sandoz And Rising ................................. 377

i.     Griseofulvin Microsize Tablets ...................................... 377

5)   Collusion Between Sandoz And Mallinckrodt ...................... 385

i.     Methylphenidate HCL .................................................... 386

6)   Collusion Between Sandoz and Upsher-Smith ...................... 394

i.     Chlorpromazine HCL ...................................................... 394

ii.    Cholestyramine ............................................................... 395

7)   Sandoz's Collusion With Greenstone ................................... 397

i.     Clindamycin Phosphate .................................................. 397

a)   The First Coordinated Price Increase (60ml Solution – Fougera And Greenstone) .................... 398

b)   The Second Coordinated Increase (October 2012 – All Formulations – Sandoz And Greenstone) .......................................................... 401

c)   New Entrants On Clindamycin Solution – Perrigo And Taro – Do Not Significantly Erode Pricing .................................................................. 406

d) The Third Coordinated Price Increase (2014—All Formulations Except Solution—Sandoz And Greenstone) ........................................................ 418

ii. Latanoprost Drops ........................................... 419

iii. Eplerenone Tablets ......................................... 429

d. G&W And Its Other Relationships ............................... 430

1) Collusion Between G&W And Perrigo ................................ 433

i. Halobetasol Propionate Cream and Ointment ............... 434

a) The First Coordinated Price Increase – September 2012 ..................................................... 434

b) The Second Coordinated Price Increase – March/April 2013 ..................................... 438

c) Sandoz Launches Halobetasol Cream ................... 439

d) Taro Launches Halobetasol Cream and Ointment 446

ii. Prochlorperazine Maleate Suppositories ....................... 449

iii. Ciclopirox Solution ........................................ 452

iv. Hydrocortisone Acetate Suppositories (Anucort HC) .... 458

2) Collusion Between G&W And Actavis ................................ 464

i. Promethazine HCL Suppositories ................................... 465

3) Collusion Between G&W And Glenmark ........................... 475

i. Ciclopirox Cream and Mometasone Furoate ................. 476

4) Collusion Between G&W And Lupin .................................... 483

i. Ethambutol HCL Tablets ............................................... 483

4. The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct ...................................................................... 490

a. Defendant Taro And Defendant Perrigo's Profits Increased Over 1300% From 2008 To Early 2016 .................................................. 490

1) Defendant Taro .................................................... 490

2) Defendant Perrigo ................................................ 492

b. Other Defendants' Revenues And Profits Also Multiply From 2008 To Early 2016 ...................................................................... 494

5. Price Increases Slow Dramatically After Government Investigations Commence ............................................................................... 495

    D.   Consciousness of Guilt ................................................................. 496

V.     THE GENERIC DRUG INDUSTRY WAS SUSCEPTIBLE TO COLLUSION ........................................................................................ 499

VI.    DEFENDANTS' SCHEME WAS EFFECTIVE AND IS ONGOING................ 501

VII.   DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACIES .......................................................................... 502

VIII. MARKET EFFECTS AND ANTITRUST INJURY ............................. 502

IX.    FRAUDULENT CONCEALMENT .................................................... 504

X.     TRADE AND COMMERCE............................................................ 510

XI.    LEGAL CLAIMS FOR RELIEF AND CAUSES OF ACTION ......................... 511

      FIRST CLAIM FOR RELIEF .................................................... 511

      SECOND CLAIM FOR RELIEF ................................................. 513

      THIRD CLAIM FOR RELIEF ................................................... 515

      FOURTH CLAIM FOR RELIEF ................................................ 520

XII.   PRAYER FOR RELIEF ............................................................ 523

XIII. JURY DEMAND ...................................................................... 524

United HealthCare Services, Inc. ("Plaintiff" or "UHS") files this Complaint under the antitrust laws of the United States and Minnesota, and the other state laws identified herein, against each of the above-captioned Defendants (collectively "Defendants"), and alleges as follows:

## I.   <u>INTRODUCTION</u>

1.     This is a civil action against Defendants for violating federal and state laws by conspiring to fix, increase, stabilize, or maintain prices of generic pharmaceutical drugs. This Complaint follows on and supplements the two actions filed by UHS on January 16, 2019 in *United HealthCare Services, Inc. v. Actavis Holdco U.S., Inc., et al.*, 19-cv-00121-WMW-TNL (D. Minn.) and on October 11, 2019 in *United HealthCare Services, Inc. v. Teva Pharmaceuticals USA, Inc., et al.*, 19-cv-02696-JNE-TNL (D. Minn.)—both of which were transferred by the United States Judicial Panel on Multidistrict Litigation to the Eastern District of Pennsylvania for centralized pretrial proceedings as part of *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (16-md-2724-CMR). Those two actions are currently pending as Case Nos. 19-cv-00629-CMR (E.D. Pa.) and 19-cv-05042-CMR (E.D. Pa.), respectively.[1] UHS hereby

---

[1] By this Complaint, UHS asserts claims primarily arising from certain facts and drugs alleged in the most recent action by various States Attorneys General (the "States") filed on June 10, 2020 (*State of Connecticut, et al. v. Sandoz, Inc., et al.*, No. 3:20-cv-00802-SRU (D. Conn.), transferred and currently pending as No. 2:20-cv-03539-CMR (E.D. Pa.) and part of MDL 2724) ("the States' June 10, 2020 Complaint")—which is the latest chapter in the States' ongoing investigation into widespread anticompetitive collusion throughout the generic pharmaceutical industry.  The allegations set forth below are based on information currently available to UHS.  UHS has not yet been able to access and

asserts claims relating to overcharges for the following generic drugs/products (or, "drugs

at issue"), including all dosages, strengths, and formulations (unless otherwise specified):

| | | |
|---|---|---|
| Adapalene Cream | Clindamycin Phosphate Lotion | Metronidazole .75% Gel |
| Alclometasone Dipropionate Cream | Clindamycin Phosphate Solution | Metronidazole 1% Gel |
| Alclometasone Dipropionate Ointment | Clotrimazole Cream | Metronidazole Cream |
| Ammonium Lactate Cream | Clotrimazole Betamethasone Dipropionate Cream | Metronidazole Lotion |
| Ammonium Lactate Lotion | Clotrimazole Betamethasone Dipropionate Lotion | Mometasone Furoate Cream |
| Betamethasone Dipropionate Cream | Desoximetasone Ointment | Mometasone Furoate Ointment |
| Betamethasone Dipropionate Lotion | Eplerenone Tablets | Mometasone Furoate Solution |
| Betamethasone Valerate Cream | Erythromycin Base/Ethyl Alcohol Solution | Nafcillin Sodium Injectable Vials |
| Betamethasone Valerate Lotion | Ethambutol HCL Tablets | Nystatin Triamcinolone Cream |
| Betamethasone Valerate Ointment | Fluocinolone Acetonide Cream | Nystatin Triamcinolone Ointment |
| Bromocriptine Mesylate Tablets | Fluocinolone Acetonide Ointment | Oxacillin Sodium Injectable Vials |
| Calcipotriene Betamethasone Dipropionate Ointment | Fluticasone Propionate Lotion | Phenytoin Sodium ER Capsules |
| Calcipotriene Solution | Griseofulvin Microsize Tablets | Pioglitazone HCL Metformin HCL Tablets |
| Carbamazepine ER Tablet | Halobetasol Propionate Cream | Prochlorperazine Maleate Suppositories |
| Cefpodoxime Proxetil Oral Suspension | Halobetasol Propionate Ointment | Promethazine HCL Suppositories |
| Cefpodoxime Proxetil Tablets | Hydrocortisone Acetate Suppositories | Tacrolimus Ointment |
| Chlorpromazine HCL | Hydrocortisone Valerate Cream | Terconazole Cream |
| Cholestyramine | Imiquimod Cream | Triamcinolone Acetonide Cream |
| Ciclopirox Cream | Latanoprost Drops | Triamcinolone Acetonide Ointment |
| Ciclopirox Shampoo | Lidocaine Ointment | Triamcinolone Acetonide Paste |
| Ciclopirox Solution | Methazolamide Tablets | |
| Clindamycin Phosphate Cream | Methylphenidate HCL | |
| Clindamycin Phosphate Gel | Methylphenidate HCL ER | |

review all information and records. UHS reserves the right to amend this Complaint based
on discovery or further proceedings.

2.     While this Complaint alleges facts and claims as to the above drugs, Defendants' unlawful scheme and overarching conspiracy also extends to other drugs, including those addressed in UHS's January 16, 2019 and October 11, 2019 Complaints (referenced above).[2]

3.     Plaintiff UHS, together with its subsidiaries and affiliates, is the single largest health insurance carrier and services provider in the United States, administers pharmaceutical drug benefits on behalf of millions of Americans, and through its affiliated mail-order and specialty retail pharmacies is also a direct purchaser of the generic pharmaceuticals at issue.

4.     As has been recently uncovered, the generic pharmaceutical industry for many years has operated pursuant to an understanding among generic manufacturers not to compete with each other and to instead settle for what these supposed competitors refer to as "fair share," which is an explicit reference to a market sharing and price-fixing agreement. Rather than compete on price to gain market share, Defendants systematically communicated with one another directly to suppress competition and maintain anticompetitively high prices.

---

[2] UHS does not by this Complaint assert legal claims for relief in connection with the individual drugs that are already the subject of claims in its two prior complaints. Thus, although asserted in the States' June 10, 2020 Complaint, UHS does not herein seek relief in connection with overcharges paid for the following drugs (and any formulations thereof): Acetazolamide, Clobetasol, Desonide, Econazole, Fluocinonide, Ketoconazole, and Nystatin.  Allegations concerning such drugs are included in the factual discussion below for support and relevant context of Defendants' overarching conspiracy and larger pattern of collusive conduct.

5.      Evidence now reveals that collusion has been rampant since at least 2009 through at least early 2016, including among manufacturers of generic topical products,[3] and others. Manufacturers of generic topical products typically face higher barriers to entry because technical hurdles associated with demonstrating bioequivalence to branded products are more time consuming and expensive, and manufacturing costs are high compared to other types of generic drugs.

6.      The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical product market, creating an environment that is ripe for collusion. Many topical products have only two or three competitors. As a result, the sales and pricing executives at these companies know each other well and have used those business and personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

7.      Indeed, the larger and more prominent manufacturers—such as Defendants Taro, Perrigo, Fougera (now Sandoz), and Actavis—had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases. In order to maintain these unlawful agreements, the competitors stayed in nearly constant communication—meeting regularly at trade shows and

---

[3] Topical products include drugs that are administered by means of contact, most often with an external body surface, including creams, lotions, gels, ointments, and solutions.

customer conferences and communicating frequently by phone and text message to reinforce their understandings.

8.      These understandings were not limited to just the largest manufacturers. Other manufacturers—including all the Defendants named in this Complaint—understood the rules of the road and took the necessary steps to limit competition among them.

9.      Once the competitors had their "fair share" of a particular drug market, it was time to increase prices.  Indeed, it was generally understood that when a competitor increased prices, the other competitors would either decline to bid for the business or would bid high so as not to take advantage of the price increase. Typically, the competitor would then follow with a comparable price increase of its own.

10.     Although these manufacturers have been colluding on price increases since at least 2009, the size and frequency of those increases grew exponentially in 2013 and 2014. During that time period, the prices of hundreds of generic drugs—including many at issue in this Complaint—skyrocketed without explanation, causing costs to purchasers and payors to double, triple, or even increase by 1,000% or more. Generic drug manufacturers represented publicly that the significant price increases were due to a myriad of lawful factors, such as industry consolidation, FDA- mandated plant closures, or elimination of unprofitable generic drug product lines.

11.     However, these reasons were far from the truth—which was unlawful collusion. Several structural and personnel changes among generic topical manufacturers

fostered and facilitated their anticompetitive agreement(s), and increased opportunities
for coordination between competitors. And coordinate they did.

12.     For example, in July 2012, Defendant Sandoz finalized its purchase of
Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent
manufacturer of generic topical products. Sandoz publicly touted that the purchase
positioned it "as the new #1 in generic dermatology medicines both globally and in the
U.S."

13.     As a result of the acquisition, all of Fougera's sales executives lost their
jobs—except for one executive who is now cooperating with the States' investigators
(referred to herein as CW-3). Because of Sandoz's size, and the fact that it was an active
participant in many different product markets, many competitors reached out to CW-3
when they learned he had transitioned to Sandoz because they viewed it as a strategic
opportunity to collude on overlapping products. For example, a then senior executive at
Defendant Glenmark, Mitchell Blashinsky, approached CW-3 at an industry event in
August 2012 and explicitly told him ███████████████ and ███████

███████████ [4]

14.     Over the ensuing years, CW-3 would leverage his competitor
relationships—including his contacts at many of the other Defendants—to prove his

[4] Redactions are made to certain information in this Complaint pursuant to the protective
orders entered by the Court in MDL No. 2724.  Upon transfer of this action to that Court
(as a tag-along action under the JPML's Transfer Orders for MDL No. 2724), UHS will
submit to the MDL Court the unredacted version of this Complaint.

worth to Sandoz management by using those relationships to allocate customers and increase prices on dozens of products. His competitor contacts included Blashinsky (Glenmark), Ara Aprahamian (Taro, Actavis), and Walter Kaczmarek (Fougera, Mallinckrodt[5]), but there were many others. Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time. CW-3 maintained this direct evidence of anticompetitive conduct in a notebook—of which there are two volumes—that his colleague (also cooperating with the States' investigation) referred to hereafter as CW-1, coined the ▮▮▮▮▮▮▮▮▮▮ Various excerpts from the notebooks are referred to throughout this Complaint to support the allegations herein.

15.     Then, in the months following the Fougera acquisition, three key Actavis executives—Douglas Boothe, Michael Perfetto, and Aprahamian—left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products. Boothe became an executive at Defendant Perrigo and Perfetto and Aprahamian became executives at Defendant Taro. These former colleagues—turned competitors—would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlapping products.

16.     Defendants wasted no time working together to implement changes designed to improve their financial bottom line. For example, although Taro had been

---

[5] Co-conspirator Mallinckrodt is not a Defendant to this action.  References to Mallinckrodt herein collectively include Mallinckrodt Inc., Mallinckrodt plc, and Mallinckrodt LLC.

successful in implementing collusive price increases in the past, in 2013 and 2014 it took price increases that would be much more significant. These increases caught the attention of other generic drug manufacturers across the industry. Indeed, one sales executive at a generic manufacturer remarked in an internal e-mail that ██████████████

████████████████████████████████████████████████████

████████████████     To that, his colleague responded ████████████████

████████████████████████████████████████████████

████████████████

17.    For example, in June 2014, Taro initiated significant price increases on more than a dozen different drug products. As a result of the June 2014 increases, Credit Suisse analysts increased their price target for Taro and its parent company, Defendant Sun Pharmaceuticals, from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that Taro's competitors had consistently followed the increases and prices remained high:

> **#1: Have previous price increases sustained for Taro?**
> Taro has approval for ~140 ANDAs in the US and we have already seen Taro taking price increase in more than 30 of these products. Some of these products we have highlighted in Fig 1. It is important to note (1) there have been multiple instances of price increase in these products and (2) there has been no roll-backs of prices even once so far in the last three years.

| Figure 1: Taro has not rolled back price increase so far | | | |
|---|---|---|---|
| Product | Price increase since Mar-11 | # of instances of price increase | Remarks |
| Nystatin triam - Cream | 59x | 5 | No roll backs |
| Nystatin triam - Ointment | 45x | 5 | No roll backs |
| Clomipramine | 27x | 1 | No roll backs |
| Clobetasol Propionate - Cream | 21x | 2 | No roll backs |
| Clobetasol Propionate - Ointment | 18x | 2 | No roll backs |
| Fluocinonide - Cream | 17x | 3 | No roll backs |
| Fluocinonide - Liquid Lotion | 8x | 3 | No roll backs |
| Nystatin - Cream | 12x | 2 | No roll backs |
| Desonide Cream | 11x | 2 | No roll backs |
| Hydrocortisone Val - Ointment | 8x | 7 | No roll backs |
| Acetazolamide | 5x | 3 | No roll backs |
| Ketocanazole | 2x | 1 | No roll backs |

Source: Price Rx, Credit Suisse estimates.

18.    Defendant Taro's success in implementing price increases depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had fostered with their contacts at competitor companies—both with manufacturers of topical products and beyond. These included Boothe, Blashinsky, Kurt Orlofski (G&W), and Erika Vogel-Baylor (G&W), but there were others. Numerous examples of how this collusion unfolded with respect to specific products is discussed in detail below.

19.    The price increases taken by manufacturers of generic topicals and other products during this time period resulted in the accrual of significant profits. Indeed, for example, between 2008 and 2016, Defendants Taro and Perrigo both saw their profits from the sale of generic topical products increase by over 1300%. The other Defendants profited handsomely from this conduct as well. Defendants knew that their conduct was unlawful and often chose to communicate in person or by cell phone, in an attempt to avoid creating a written record of their illegal conduct.

9

20.     The State of Connecticut initiated a non-public investigation in July 2014 into suspicious pharmaceutical price increases. Over time, the investigation expanded to include the conduct alleged herein, and Connecticut was joined in its efforts by more than 50 additional states and U.S. territories. The allegations in this Complaint are based primarily on the publicly available information and evidence that UHS has gleaned from the States' investigation. UHS understands the States' investigation to date has included: (1) the review of many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of the Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged herein.

21.     As a result of the information and evidence developed to date, UHS alleges that the Defendants participated in an overarching conspiracy, the effect of which was to minimize, if not thwart, competition across the generic drug industry. The overarching conspiracy was effectuated by a series of conspiracies that affected and continue to affect the market for the generic drugs identified in this Complaint (and beyond).

22.     Defendants consistently and systematically, over a period of several years, engaged in contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to the markets for the dozens of different generic drugs at issue in this Complaint.

10

23.     UHS focuses here on the role of these named Defendants and their participation in and agreement with this overarching conspiracy and with respect to the generic drugs identified herein. The Complaint describes conspiracies regarding the sale of specific drugs, and how these specific conspiracies are also part of the larger overarching conspiracy. UHS continues to investigate the scope of the overarching conspiracy and additional conspiracies, involving these and other generic drug manufacturers, and regarding other drugs not identified in this Complaint.

24.     Defendants' illicit agreements have raised prices, maintained artificially inflated prices, thwarted Congress's goal to lower the prices of drugs, and thus frustrated the potential of the industry to deliver great value to UHS and others that pay for pharmaceuticals.

25.     As a result of the conduct discussed in this Complaint, purchasers and healthcare payors including UHS paid substantially inflated and anticompetitive prices for various generic pharmaceutical drugs, and the Defendants illegally profited from their unlawful conduct.

26.     UHS seeks a finding that the Defendants' actions violated federal and state antitrust laws, among others; damages against Defendants, jointly and severally; a permanent injunction preventing the Defendants from continuing their illegal conduct and remedying the anticompetitive effects caused by their illegal conduct; disgorgement of the Defendants' ill-gotten gains; civil penalties; attorneys' fees and costs; and other relief as a result of Defendants' violations of law.

## II.   **JURISDICTION AND VENUE**

27.    This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and

26, and 28 U.S.C. §§ 1331 and 1337. Plaintiff asserts claims for relief under Section 1 of

the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§

15, and 26. This Court has jurisdiction over the state law claims alleged in this action

pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust

claims as to form part of the same case or controversy. Such supplemental or pendant

jurisdiction will also avoid unnecessary duplication and multiplicity of actions, and

should be exercised in the interests of judicial economy, convenience, and fairness.

28.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and

28 U.S.C. § 1391. During the relevant time period (at least 2011 to the present),

Defendants resided, transacted business, and/or were found or had agents in the United

States, including this District. During the alleged time period, Defendants marketed, sold

and/or shipped the generic drugs at issue in a continuous and uninterrupted flow of

interstate commerce in the United States, including in this District. Defendants' conduct

had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the

United States, including in this District. Defendants engaged in an unlawful conspiracy to

artificially increase prices for the generic drugs at issue that was directed at and had the

intended effect of causing injury to persons residing in, located in, or doing business

throughout the United States, including in this District, and each Defendant is otherwise

subject to the service-of-process provisions of 15 U.S.C. § 22. Throughout the time

period alleged herein, there was a continuous and uninterrupted flow of invoices and

other documents essential to the sale and provision of the generic drugs at issue transmitted interstate between and among offices of Defendants and their customers throughout the United States.

29.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated below:

(a)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)     Defendants are amenable to service of process because, as alleged in this Complaint, each inhabits, transacts business in, or is found in this District. Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising, and/or selling generic drugs throughout the United States, including in this District;

(c)     Defendants are amenable to service of process because, as alleged in this Complaint, each Defendant belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in or from this District including, without limitation, selling one or more generic drugs at artificially inflated prices;

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A)

of the Federal Rules of Civil Procedure and the long-arm statute of the

State in which this Federal Court sits because, inter alia, and as alleged in

this Complaint, each Defendant has transacted business in this District,

each Defendant has contracted to supply services or things in this District,

and because the District's long-arm statute extends jurisdiction to the

limits of due process and each Defendant has sufficient minimum contacts

with the District to satisfy due process; and/or

(e)     Based on the allegations in this Complaint, Defendants are subject to the

general and specific personal jurisdiction of this Court because they have

purposefully directed their contacts and conspiratorial conduct at the

United States (including the forum District) and have purposefully availed

themselves of the laws of the United States. As alleged in this Complaint,

each Defendant, either directly, or indirectly through their subsidiaries,

engaged in price-fixing activities and anticompetitive conduct that were

intended to have, and did have, direct, substantial and reasonably

foreseeable effects on commerce throughout the United States, including

this District.

## III.     THE PARTIES

### A.  Plaintiff UHS

30.     Plaintiff UHS is a corporation organized and existing under the laws of

Minnesota with its principal place of business in Hennepin County, Minnesota. It is a

wholly owned subsidiary of UnitedHealth Group, Incorporated, which is also headquartered in Minnetonka, Minnesota.

31.     UHS is engaged in servicing prescription drug managed care programs provided to members and beneficiaries under insurance plans offered by UHS's subsidiaries and affiliates, which, together, constitute the largest single health insurance carrier and services provider in the United States, and serve some 70 million individual insureds ("UnitedHealthcare Insureds").[6] UHS is the centralized and primary contracting entity responsible for payments made for pharmaceutical drugs dispensed to UnitedHealthcare Insureds throughout the country. From its headquarters in Hennepin County, Minnesota, UHS negotiated and executed contracts with Pharmacy Benefit Managers ("PBMs") on behalf of itself and its health plan subsidiaries and affiliates ("UnitedHealthcare Plans"), and during the relevant time period, was (and is) contractually responsible for the payments made under those contracts, including for generic drugs dispensed to UnitedHealthcare Insureds during the relevant time period.

32.     UHS is the parent company of, or otherwise an affiliate/related company to, each of the UnitedHealthcare Plans, which issue health insurance to UnitedHealthcare Insureds, including for coverage of prescription drug costs. The UnitedHealthcare Plans issue insurance to UnitedHealthcare Insureds covering prescription drugs in the form of (1) fully insured commercial ("Commercial") plans; (2) Medicare plans; and (3)

_____

[6] For purposes of this Complaint, UnitedHealthcare Insureds do not include those members of self-insured health plans, also known as self-funded or Administrative Services Only ("ASO") customers.

Medicaid plans. The UnitedHealthcare Plans provide these prescription drug insurance benefits to UnitedHealthcare Insureds in all 50 states, the District of Columbia, and Puerto Rico. These UnitedHealthcare Plans are listed in the attached Exhibit A.

33.     UHS is also an affiliate and the assignee of OptumRx Group Holdings, Inc., OptumRx, Inc., OptumRx Holdings, LLC, and their wholly owned pharmacy subsidiaries as pertaining strictly to the purchases made for or arising out of the business of the pharmacy subsidiaries (collectively, "Pharmacy Assignors"). Pharmacy Assignors buy prescription drugs and dispense them to prescribed consumers, on a mail-order or specialty retail pharmacy basis. Pharmacy Assignors have purchased substantial quantities of the generic drugs at issue directly from drug manufacturers, including Defendants and/or their co-conspirators, and have assigned to UHS their claims and the rights to obtain all recoveries arising out of such direct purchases and the matters alleged in this Complaint.

34.     By this Complaint, UHS seeks recovery for all unlawful overcharges incurred in connection with paying for generic drugs dispensed to UnitedHealthcare Insureds, including all those receiving insurance or health benefits from any of the UnitedHealthcare Plans (or their predecessors or successors). UHS also seeks recovery for all unlawful overcharges incurred in connection with direct purchases made by Pharmacy Assignors.

35.     UHS is the proper entity to pursue all forms of relief, including damages, for all injury and losses incurred as alleged in this Complaint. Nonetheless, out of an abundance of caution, and to further assure the Court that there is no potential for any

duplicative indirect purchaser/payor recovery, UHS has obtained assignments from the UnitedHealthcare Plans, conveying to UHS any claims and rights to recoveries they may have in connection with the matters alleged in this Complaint. UHS hereby asserts those assigned claims in the alternative to the claims of UHS, to the extent that the UnitedHealthcare Plans are found to be sole owners of any claims that are non-duplicative to those of UHS. Accordingly, to the extent that the Court were to find such assignments from the UnitedHealthcare Plans are required for any claims, all subsequent references to "UHS" include both itself and its assignor UnitedHealthcare Plans, unless expressly indicated otherwise.

### B. **Defendants**

36.    Defendant Sandoz, Inc. ("Sandoz") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business at 100 College Road West, Princeton, New Jersey. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. At all times relevant to the Complaint, Sandoz has marketed and sold generic pharmaceuticals in this District and throughout the United States.

37.    Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its U.S.-based generic pharmaceutical business. Unless addressed individually, Fougera and Sandoz are collectively referred to herein as "Sandoz." At all

times relevant to the Complaint, Sandoz marketed and sold generic pharmaceuticals in this District and throughout the United States.

38.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc. – the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals) – was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC, among others. Actavis Holdco is a wholly owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

39.     Defendant Actavis Pharma, Inc. is a Delaware corporation with its principal place in Parsippany, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

40.     Defendant Actavis Elizabeth LLC ("Actavis Elizabeth") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Elizabeth, New Jersey. It is a wholly owned subsidiary of Actavis Holdco and is a research, development, and manufacturing entity for Actavis generic operations. Unless addressed individually, Actavis Holdco, Actavis Pharma, Inc., and Actavis

18

Elizabeth are collectively referred to herein as "Actavis." At all times relevant to the
Complaint, Actavis has marketed and sold generic pharmaceuticals in this District and
throughout the United States, and each entity has participated in the conspiracy alleged in
this Complaint, either on its own or through its owned and controlled
subsidiaries/affiliates, and knowingly received proceeds of the unlawful conduct.

41.     Defendant Amneal Pharmaceuticals, Inc. ("Amneal Inc.") is a corporation
organized and existing under the laws of the state of Delaware, with a principal place of
business in Bridgewater, New Jersey. It is the parent company of Defendant Amneal
Pharmaceuticals, LLC.

42.     Defendant Amneal Pharmaceuticals, LLC ("Amneal LLC") is a Delaware
limited liability company with its principal place of business in Bridgewater, New Jersey.
Unless addressed individually, Amneal Inc. and Amneal LLC are collectively referred to
herein as "Amneal." At all times relevant to the Complaint, Amneal marketed and sold
generic pharmaceuticals in this District and throughout the United States.

43.     Defendant Aurobindo Pharma U.S.A., Inc. ("Aurobindo") is a corporation
organized and existing under the laws of the State of Delaware with its principal place of
business in Dayton, New Jersey. At all times relevant to the Complaint, Aurobindo
marketed and sold generic pharmaceuticals in this District and throughout the United
States.

44.     Defendant Bausch Health Americas, Inc. (formerly known as Valeant
Pharmaceuticals International, Inc.) is a Delaware corporation with its U.S. headquarters
located in Bridgewater, New Jersey.

19

45.     Bausch Health US, LLC (formerly known as Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. Bausch Health US is registered with the Minnesota Secretary as a foreign corporation and maintains a registered agent in Minnesota. Unless addressed individually, Bausch Health Americas, Inc. and Bausch Health US, LLC are collectively referred to herein as "Valeant." At all times relevant to the Complaint, Valeant marketed and sold generic pharmaceuticals in this District and throughout the United States.

46.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. At all times relevant to the Complaint, G&W marketed and sold generic pharmaceuticals in this District and throughout the United States.

47.     Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business in Mahwah, New Jersey. At all times relevant to the Complaint, Glenmark marketed and sold generic pharmaceuticals in this District and throughout the United States.

48.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett marketed and sold generic pharmaceuticals in this District and throughout the United States.

49.     Defendant Lupin Pharmaceuticals, Inc. ("Lupin") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Baltimore, Maryland. Lupin is a wholly owned subsidiary of Lupin Ltd., an Indian company with its principal place of business in Mumbai, India. At all times relevant to the Complaint, Lupin marketed and sold generic pharmaceuticals in this District and throughout the United States.

50.     Defendant Mylan Inc. is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in Canonsburg, Pennsylvania.

51.     Defendant Mylan Pharmaceuticals Inc. ("Mylan Pharma") is a corporation organized and existing under the laws of the West Virginia with its principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc.

52.     Defendant Mylan N.V. is a Dutch corporation with its principal place of business and global headquarters at 1000 Mylan Boulevard, Canonsburg, Pennsylvania. Mylan N.V. is the direct parent corporation and owner of Mylan Inc. and the ultimate parent and owner of Mylan Pharma. Unless addressed individually, Mylan Pharma, Mylan Inc., and Mylan N.V. are collectively referred to herein as "Mylan." At all times relevant to the Complaint, Mylan has marketed and sold generic pharmaceuticals in this District and throughout the United States, and each entity has participated in the conspiracy alleged in this Complaint, either on its own or through its owned and controlled subsidiaries/affiliates, and knowingly received proceeds of the unlawful conduct. In addition, during the time period relevant to this Complaint, Defendant Mylan

N.V. purposefully directed its activities at the United States (including the forum state) and also purposefully derived the benefit of conspiracy proceeds taken from the United States (including the forum state).

53.     Defendant Perrigo New York, Inc. ("Perrigo") is a corporation organized and existing under the laws of Delaware with its executive offices in Allegan, Michigan and its primary business location in Bronx, NY. It is a subsidiary of Perrigo Company, plc, an Irish company with its principal place of business in Dublin, Ireland. At all times relevant to the Complaint, Perrigo has marketed and sold generic pharmaceuticals in this District and throughout the United States.

54.     Defendant Sun Pharmaceutical Industries, Inc. (f/k/a Caraco Pharmaceutical Laboratories, Ltd.) ("Sun") is a corporation organized and existing under the laws of Michigan with its principal place of business in Cranbury, New Jersey. Sun is a wholly owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Defendant Taro Pharmaceutical USA, Inc. At all times relevant to the Complaint, Sun marketed and sold generic pharmaceuticals in this District and throughout the United States.

55.     Defendant Taro Pharmaceuticals USA, Inc. ("Taro") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Hawthorne, New York. At all times relevant to the Complaint, Taro marketed and sold generic pharmaceuticals in this District and throughout the United States.

56.     Defendant Teligent, Inc. (formerly known as IGI Laboratories, Inc.) ("Teligent") is a corporation organized and existing under the laws of Delaware with its principal place of business in Buena, New Jersey. Defendant Teligent was known as IGI Laboratories, Inc. until 2015. At all times relevant to the Complaint, Teligent sold generic pharmaceuticals in this District and throughout the United States.

57.     Defendant Wockhardt USA LLC ("Wockhardt") is a limited liability company organized and existing under the laws of Delaware with its principal place of business in Parsippany, New Jersey. At all times relevant to the Complaint, Wockhardt has marketed and sold generic pharmaceuticals in this District and throughout the United States.

## IV.   **FACTUAL BACKGROUND**

### A.      **Factual Support For The Allegations**

58.     The allegations in this Complaint are supported and corroborated by facts and evidence that includes but is not limited to those set forth below.

59.     During the course of their investigation, the States have issued over 30 subpoenas to various generic drug manufacturers, individuals, and third parties, and have collected over 8 million documents.

60.     The States have also issued hundreds of subpoenas to various telephone carriers and have obtained phone call and text message records for numerous companies and individuals throughout the generic pharmaceutical industry.

61.    During the course of their investigation to date, the States have also
obtained valuable cooperation from several individuals. Some of those cooperating
witnesses include:

a.    A former senior pricing executive at Defendant Sandoz during the time
period relevant to this Complaint [referred to herein as CW-1];

b.    A former sales and marketing executive at Rising Pharmaceuticals, Inc. and
senior sales executive at Sandoz during the time period relevant to this
Complaint [referred to herein as CW-2];

c.    A former sales executive at Defendant Fougera, and then senior sales
executive at Sandoz, during the time period relevant to this Complaint
[referred to herein as CW- 3];

d.    A former senior sales executive at Sandoz during the time period relevant
to this Complaint [referred to herein as CW-4];

e.    A former senior executive at Defendant Glenmark during the time period
relevant to this Complaint [referred to herein as CW-5]; and

f.    A former senior sales executive at Fougera and Defendant Aurobindo
during the time period relevant to this Complaint [referred to herein as CW-
6].

g.    In addition, the States have disclosed that, in the course of their
investigation, they have obtained contemporaneous handwritten notes taken
by CW-3 during the time period relevant to this Complaint, containing
direct evidence of his collusion with several competitors. CW-3 maintained

24

these notes in a two-volume notebook that his colleague, CW-1, referred to as the ▮▮▮▮▮▮ (referred to herein as the "Notebook"). The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors. CW-3 took these notes chronologically between 2009 and 2015. In 2012 and 2013, the notes are fairly comprehensive; however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices. CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notes. CW-3 generally traveled with the Notebook and did not hide it from people, including competitors. Indeed, competitors often joked with him about his "little black books." References to the Notebook will be discussed throughout this Complaint to support the allegations herein.

62.     Other primary individual participants who conspired and undertook unlawful acts on behalf of Defendants in the scheme(s) alleged in this Complaint include (but are not limited to) the following:

a.     Ara Aprahamian ("Aprahamian") is an individual residing in Bardonia, New York. Aprahamian worked at Defendant Actavis as Director, Pricing and Contracts from August 2010 through March 2013. From March 2013 through August 2018, Aprahamian was Vice President of Sales and Marketing at Defendant Taro Pharmaceuticals USA, Inc.

25

b.  Mitchell Blashinsky ("Blashinsky") is an individual residing in Monroe
Township, New Jersey. Blashinsky worked for Defendant Taro
Pharmaceuticals USA, Inc. from January 2007 through May 2012 as Vice
President of Marketing for Generics. From June 2012 through March 2014,
Blashinsky was Vice President of Sales and Marketing at Defendant
Glenmark Pharmaceuticals Inc., USA.

c.  Douglas Boothe ("Boothe") is an individual residing in Chester, New
Jersey. Boothe worked for Defendant Actavis from August 2008 through
December 2012 as Chief Executive Officer. From January 2013 through
July 2016, Boothe served as Executive Vice President and General
Manager, Pharmaceuticals at Defendant Perrigo New York, Inc.

d.  James (Jim) Grauso ("Grauso") is an individual residing in Ramsey, New
Jersey. Grauso worked at Defendant G&W as Vice President of Sales and
Marketing from January 2010 through December 2011. Grauso worked at
Defendant Aurobindo as Senior Vice President, Commercial Operations
from December 2011 through January 2014. Since February 2014, Grauso
has been employed as the Executive Vice President, N.A. Commercial
Operations at Defendant Glenmark.

e.  Walter Kaczmarek ("Kaczmarek") is an individual residing in Longboat
Key, Florida. Kaczmarek worked for Defendant Fougera as Senior
Director, National Accounts; Vice President, National Accounts; and
Senior Vice President, Commercial Operations from November 2004

through November 2012. Kaczmarek worked for co-conspirator
Mallinckrodt as Vice President - General Manager; and President, Multi-
Source Pharmaceuticals from November 2013 through August 2016.

f.  Armando Kellum ("Kellum") is an individual residing in Huntingdon
Valley, Pennsylvania. At all times relevant to the Complaint, Kellum was
the Vice President, Sales and Marketing at Defendant Sandoz.

g.  Kurt Orlofski ("Orlofski") is an individual residing in Mountain Lakes,
New Jersey. Orlofski was the President of Defendant G&W from
September 2009 through December 2016.

h.  Mike Perfetto ("Perfetto") is an individual residing in Conklin, New York.
Perfetto worked for Defendant Actavis from August 2003 through January
2013 as Vice President, Sales and Marketing. Beginning in January 2013,
Perfetto worked for Defendant Taro Pharmaceuticals USA, Inc. as its Chief
Commercial Officer.

i.  Erika Vogel-Baylor ("Vogel-Baylor") is an individual residing in Milford,
New Jersey. At all times relevant to the Complaint, beginning in July 2011,
Vogel-Baylor worked for Defendant G&W as Vice President, Sales and
Marketing.

j.  John Wesolowski ("Wesolowski") is an individual residing in Delton,
Michigan. Since February 2004, Wesolowski has worked for Defendant
Perrigo as Senior Vice President of Commercial Operations.

63.     In addition to the States' investigation, the U.S. Department of Justice ("DOJ") has launched a criminal investigation into the generics industry, which remains active and has resulted in numerous charges, guilty pleas, and settlements against numerous manufacturers, including multiple Defendants to this Complaint. While some of those actions may pertain to particular drugs beyond those directly at-issue in this Complaint, UHS describes them here to provide relevant context and further demonstrate Defendants' unlawful conduct and the highly collusive environment in which they operated.

64.     On December 12, 2016, the DOJ filed criminal charges against Jeffrey Glazer (the former CEO of Heritage) and Jason Malek (the former president of Heritage). Both Glazer and Malek later pleaded guilty to violations of Section 1 of the Sherman Act for their participation in conspiracies to fix prices, rig bids, and allocate customers for glyburide and doxycycline. The Hon. Barclay Surrick of the U.S. District Court for the Eastern District of Pennsylvania determined that there was a factual basis for both Glazer's and Malek's pleas and convicted each individual of a felony violation of the Sherman Act.

65.     Since the charges against Glazer and Malek, the DOJ's ongoing criminal investigation into the generic pharmaceutical drug industry has resulted in additional charges against seven generic drug manufacturers: Heritage, Rising, Sandoz, Apotex, Glenmark, Taro, and Teva. Additionally, Armando Kellum and Ara Aprahamian were also charged criminally in their individual capacities.

66.     On May 30, 2019, DOJ charged Heritage with participating in a conspiracy
to fix prices of glyburide and reached a deferred prosecution agreement with Heritage to
resolve that charge. In that agreement, Heritage admitted, accepted, and acknowledged
that it is responsible under United States law for the acts of its officers, directors,
employees, and agents as charged in the Information.

67.     Heritage further admitted that, from in or around April 2014 and continuing
until at least December 2015, Heritage, through certain of its officers and employees,
including certain of its high-level personnel, participated in a conspiracy with other
persons and entities engaged in the production and sale of various generic pharmaceutical
products, a purpose of which was to suppress and eliminate competition by allocating
customers and fixing and maintaining prices in the United States. To further the
conspiracy, Heritage, through certain of its officers and employees, including certain of
its high-level personnel, engaged in discussions with co-conspirators. During these
discussions, agreements were reached to allocate customers, rig bids, and fix and
maintain the prices in the United States.

68.     In December 2019, co-conspirator Rising Pharmaceuticals LLC reached a
deferred prosecution agreement with DOJ in which Rising agreed that, between April
2014 and September 2015, it knowingly entered into and engaged in a conspiracy to
suppress and eliminate competition by agreeing to allocate customers for and to stabilize,
maintain, and fix prices of benazepril HCTZ sold in the United States. Rising further
admitted that it (a) discussed the allocation of and agreed to allocate customers located in
the United States; (b) provided or received specific non-public prices paid by the

allocated customers to the existing supplier; (c) submitted offers to and declined requests

to submit offers from customers in accordance with the agreement reached; and (d) sold

and accepted payment for benazepril HCTZ in the United States at collusive and

noncompetitive prices.

69.     On February 4, 2020, Ara Aprahamian was indicted by a Grand Jury for

criminal violations of the Sherman Act. Aprahamian participated in a conspiracy between

Sandoz, Taro, and other conspiring companies, the purpose of which was to suppress and

eliminate competition by agreeing to allocate customers and rig bids for, and stabilize,

maintain, and fix prices of, generic drugs sold in the United States.

70.     On February 14, 2020, Armando Kellum pled guilty to DOJ charges that he

participated in a conspiracy with Sandoz, Taro, and other co-conspirators, the purpose of

which was to suppress and eliminate competition by agreeing to allocate customers and

rig bids for, and stabilize, maintain and fix prices of, generic drugs sold in the United

States between at least as early as March 2013 and continuing until at least June 2015.

71.     On March 2, 2020, DOJ charged Sandoz with a four-count Information

alleging four separate violations of the Sherman Act. Count 1 of the Information charged

that Sandoz conspired with Taro to suppress and eliminate competition by agreeing to

allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic

drugs sold in the United States, from at least as early as March 2013 and continuing until

at least December 2015. Count 2 of the Information charged that Sandoz conspired to

suppress and eliminate competition with Kavod Pharmaceuticals LLC (f/k/a Rising

Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.), by agreeing to allocate

customers for, and stabilize, maintain, and fix prices of, benazepril HCTZ sold in the United States, from at least as early as April 2014 and continuing until at least September 2015. Count 3 of the Information charged that Sandoz conspired with Perrigo to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015. Count 4 of the Information charged that Sandoz conspired with Teva to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as July 2013 and continuing until at least December 2015.

72.     Sandoz reached a deferred prosecution agreement with DOJ to resolve these charges in which Sandoz Inc. admitted that it is responsible for the acts of certain of its current and/or former employees that give rise to the charges in the Information. Under that agreement, Sandoz Inc. further admitted that, from in or about March 2013 and continuing until in or about December 2015, Sandoz, through certain of its officers and employees, including an individual within high-level personnel, conspired with other persons and entities engaged in the production and sale of generic drugs to suppress and eliminate competition by allocating customers, rigging bids, and increasing and/or maintaining prices for certain generic drugs sold in the United States.

73.     Sandoz, through certain of its officers and employees, including an individual within high-level personnel, engaged in discussions with co-conspirators involved in the production and sale of certain generic drugs that competed with Sandoz

products. During these discussions, agreements were reached with co-conspirators to allocate customers, rig bids, and/or stabilize, maintain, and fix the prices of certain generic drugs sold in the United States.

74.     Sandoz further admitted that, from in or about March 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, with Defendant Taro.

75.     Sandoz further admitted that, from in or about April 2014 and continuing until in or about September 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers for, and/or stabilize, maintain, and fix prices of, benazepril HCTZ with Kavod Pharmaceuticals LLC (f/k/a Rising Pharmaceuticals, LLC, f/k/a Rising Pharmaceuticals, Inc.). Benazepril HCTZ sold by Sandoz and its co-conspirators, as well as payments for benazepril HCTZ, traveled in interstate commerce.

76.     Sandoz further admitted that, from in or about July 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including desonide ointment, with Defendant Perrigo.

77.     Sandoz further admitted that, from in or about July 2013 and continuing until in or about December 2015, Sandoz Inc. conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including tobramycin inhalation solution, with Defendant Teva Pharmaceuticals USA, Inc.

78.     On May 6, 2020, DOJ charged Defendant Apotex with participating in a conspiracy, the purpose of which was to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin in the United States between May 2013 and December 2015.

79.     On May 7, 2020, Apotex entered into a deferred prosecution with DOJ to resolve that charge. Apotex admitted that, under United States law, it is responsible for the acts of certain of its current and/or former employees that give rise to the DOJ charges. Apotex further admitted that, from May 2013 and continuing until at least December 2015, Apotex, through certain of its current and/or former employees, conspired with other persons and entities engaged in the sale of generic drugs to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin sold in the United States.

80.     On July 14, 2020, a Grand Jury charged Defendant Glenmark with criminal violations of the Sherman Act. Glenmark, Apotex, Teva, and other co-conspirators knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of pravastatin and other generic drugs sold in the United States.

81.     On July 23, 2020, DOJ charged Defendant Taro with conspiring with Sandoz Inc. to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as March 2013 and continuing until at least December 2015; and with conspiring with Defendant Teva to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from at least as early as May 2013 and continuing until at least December 2015.

82.     On July 23, 2020, Taro reached a deferred prosecution agreement with DOJ to resolve these charges. In that agreement, Taro acknowledged that under United States law, it is responsible for the acts of its officers, directors, employees, and agents that give rise to the DOJ charges. Ara Aprahamian was one of the "officers, directors, employees, and agents" for which Taro acknowledged and accepted legal responsibility. Taro further admitted that, from in or about March 2013 and continuing until in or about December 2015, through certain of its officers and employees, including Ara Aprahamian, Taro U.S.A.'s Vice President of Rx Marketing, and beginning in April 2014, Taro U.S.A.'s Vice President of Sales and Marketing, conspired with other individuals and entities engaged in the manufacture and sale of generic drugs to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of certain generic drugs sold in the United States in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

83.     Taro further admitted that from in or about March 2013 and continuing until in or about December 2015, it conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, various generic drugs in the United States, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, with Sandoz; Armando Kellum, Sandoz's Senior Director of Pricing and Contracts, and beginning in November 2013, Sandoz's Vice President of Contracting and Business Analytics; and other individuals.

84.     Taro further admitted that, from in or about May 2013 and continuing until in or about December 2015, Defendant Taro conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs in the United States, including etodolac immediate release and extended release and carbamazepine tablets and chews, with Teva.

85.     On August 25, 2020, a Grand Jury superseded the Indictment issued against Glenmark and also charged Teva. In this Second Superseding Indictment, the Grand Jury identified as co-conspirators Apotex, Taro, Sandoz, and also various entities and individuals both known and unknown to the grand jury. The Grand Jury established that, between May 2013 and December 2015, Teva, Glenmark, and their co-conspirators knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to increase and maintain prices of various generic drugs sold in the United States (including pravastatin, carbamazepine, clotrimazole, etodolac, fluocinonide, warfarin, tobramycin, nadolol, temozolomide, and others).

B.      **The Generic Drug Market**

1.      **The Hatch-Waxman Act**

86.     In 1984, Congress enacted the Drug Price Competition and Patent Term

Restoration Act, commonly known as the "Hatch-Waxman" Act. Its intention was to

balance two seemingly contradictory interests: encouraging drug innovation, and

promoting competition between brand and generic drugs in order to lower drug prices. To

encourage innovation, Hatch-Waxman gave branded drug manufacturers longer periods

of market exclusivity for newly-approved products; this increased the financial returns

for investment in drug research and development.

87.     To promote price competition, the law established a new regulatory

approval pathway for generic products to help ensure that generic drugs became available

more quickly following patent expiration. To gain approval for a new drug, drug

manufacturers must submit a new drug application ("NDA") to the United States Food

and Drug Administration ("FDA") showing that the new drug is safe and effective for its

intended use. Developing a new drug and obtaining an NDA can take many years and

cost tens or hundreds of millions of dollars.

88.     The Hatch-Waxman Act encouraged faster approval for generic versions of

brand-name drugs through the use of "abbreviated new drug applications" ("ANDAs").

These applications rely on the safety and efficacy evidence previously submitted by the

branded drug manufacturer, permitting generic manufacturers to avoid conducting costly

and duplicative clinical trials.

89.    Hatch-Waxman succeeded in both of its goals. Since the law was passed in 1984, generic drugs have moved from being less than 20% of prescriptions filled in the United States to nearly 90% of prescriptions filled. At the same time, innovation has continued to lead to many new and helpful drugs.

## 2.    The Importance Of Generic Drugs

90.    Like their branded counterparts, generic drugs are used in the diagnosis, cure, mitigation, treatment, or prevention of disease and, thus, are integral components in modern healthcare, improving health and quality of life for nearly all people in the United States. In 2015, sales of generic drugs in the United States were estimated at $74.5 billion dollars. Today, the generic pharmaceutical industry accounts for nearly 90% of all prescriptions written in the United States.

91.    A branded drug manufacturer that develops an innovative drug can be rewarded with a patent granting a period of exclusive rights to market and sell the drug. During this period of patent protection, the manufacturer typically markets and sells its drug under a brand name, and the lack of competition can permit the manufacturer to set its prices extremely high.

92.    Once the brand-name drug's exclusivity period ends, additional firms that receive FDA approval are permitted to manufacture and sell "generic" versions of the brand-name drug. As generic drugs enter the market, competition typically leads to dramatic reductions in price. Generic versions of brand-name drugs are priced lower than the brand-name versions. Under most state laws, generic substitution occurs automatically, unless the prescriber indicates on the prescription that the branded drug

must be "dispensed as written." As additional manufacturers enter a particular drug

market, competition pushes the price down much more dramatically. Often, the price of a

generic drug will end up as low as 20% of the branded price or even lower. For this

reason, generic drugs have long been referred to as one of the few "bargains" in the

United States healthcare system.

93.     Where there is genuine competition, the savings offered by generics drugs

over their brand-name equivalents provide tremendous benefits to purchasers and health

care payors.

### 3.     Players In The Drug Distribution System

94.     The United States prescription drug distribution system includes entities

that are involved at various levels before prescription drugs are ultimately dispensed or

delivered to end users and paid for by end payors.

### a.     Manufacturers/Suppliers

95.     Drug manufacturers are the source of the prescription drugs in the

pharmaceutical supply chain. Unlike branded drug manufacturers, generic manufacturers

typically do not develop new drug therapies, but instead manufacture generic drugs that

can be substituted (often automatically under state law) for the branded drug after

expiration of the brand's exclusivity. Generic pharmaceuticals can be manufactured in a

variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, and

creams. A manufacturer seeking to sell a "new drug" in the United States (including

generic versions of previously approved drugs) must obtain approval from the FDA,

which evaluates many factors, including drug safety, efficacy, raw material suppliers, manufacturing processes, labeling, and quality control.

96.     Generic drug manufacturers operate manufacturing facilities and compete with each other to sell the generic drugs they produce to wholesalers, distributors, and in many cases, directly to retail pharmacy chains, mail-order and specialty pharmacies (such as UHS' Pharmacy Assignors), and hospital chains.

97.     Generic drug manufacturers also sell some of their drugs through auctions to different purchasers in the supply chain, e.g., group purchasing organizations, retail pharmacies and supermarket chains with pharmacies.

98.     In marketing their generic drugs, manufacturers often do not attempt to differentiate their products because, primarily, a generic drug is a commodity. Consequently, competition is dictated by price and supply. As a result, generic drug manufacturers usually all market the drug under the same name, which is the name of the active ingredient (e.g., Acetazolamide).

99.     Drug suppliers include the manufacturers themselves, as well as other companies that have agreements to sell or distribute certain generic pharmaceutical drugs manufactured by another company. The Defendants in this action are all drug manufacturers and suppliers who compete with one another for the sale of generic pharmaceutical drugs which are ultimately sold and dispensed throughout the United States.

100.    Drugs sold in the United States may be manufactured either domestically or abroad. Many manufacturers that produce drugs for the United States market are owned

by, or are themselves, foreign companies. Generic drugs may be manufactured by the same companies that manufacture brand-name drugs (even in the same factories), or may come from companies that manufacture generics exclusively. Drug manufacturers typically sell their products through supply agreements negotiated with their customers.

101.    Generic manufacturers report certain benchmark or list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"); these sometimes serve as benchmarks, but given the different characteristics of different buyers and the nature of individual negotiations, a manufacturer will frequently supply the same generic drug at several different prices depending on the customer or type of customer.

102.    Defendants in this case are among the largest generic pharmaceutical manufacturers in the industry. Each has a broad portfolio of generic drugs which it sells to distributors, retailers, and group purchasing organizations, many of whom have a nationwide presence. Competitors for particular pharmaceutical products vary given the shifting pharmaceutical landscape as drugs lose exclusivity, and as manufacturers decide to enter or exit an existing drug market.

103.    The generic pharmaceutical portfolios of the Defendants run the gamut of indications, servicing a wide range of health needs. These include potentially less common health problems such as human immunodeficiency virus (HIV) treated with Lamivudine/Zidovudine and long-term kidney disease treated by Paricalcitol, as well as more commonplace conditions such as high blood pressure treated with medications including Clonidine-TTS Patch, Irbesartan, Moexipril HCL, and Enalapril Maleate, high

40

cholesterol treated with medications such as Fenofibrate, Pravastatin, or Niacin ER, and

attention deficit hyperactivity disorder (ADHD) treated by Dexmethylphenidate or

Amphetamine/Dextroamphetamine.

104.    Taken together, Defendants' direct customers (including Pharmacy

Assignors) and indirect payors (including UHS) purchase and/or pay for a wide range of

generic pharmaceutical products, in enormous volumes. Defendants' business plans and

strategies for their broad portfolios focus on the nationwide supply and demand chain.

### b.    Wholesalers/Distributors

105.    Wholesalers and distributors purchase pharmaceutical products from

manufacturers and distribute them to a variety of customers, including some pharmacies,

hospitals, long-term care and other medical facilities. Some wholesalers sell to a broad

range of customers while others specialize in sales of particular products (e.g., biologic

products) or sales to a particular type of customer (e.g., nursing homes).

106.    Wholesalers and distributors have similar business models, but distributors

typically provide more services to their customers. Some of the largest wholesalers and

distributors of generic drugs include AmerisourceBergen Corporation ("ABC"), Cardinal

Health, Inc. ("Cardinal"), H.D. Smith, LLC ("HD Smith"), McKesson Corporation

("McKesson") and Morris & Dickson, LLC ("Morris & Dickson").

### c.    Group Purchasing Organizations (GPOs)

107.    Group purchasing organizations ("GPOs") are membership-based entities

that negotiate with manufacturers, wholesalers, and distributors on behalf of a large group

of purchasers. GPOs leverage their buying power to obtain better prices and terms for

their members, and assist buyers in trade relations and contract management with sellers. GPOs have formed to serve state and local governments, hospital groups, retail pharmacies, and supermarket chains. Some of the GPOs who sell large volumes of Defendants' generic products for distribution nationwide include Vizient (formerly Novation), Premier, Inc. ("Premier"), Intalere (formerly Amerinet), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP") and Econdisc Contracting Solutions ("Econdisc").

### d.      Pharmacies & Retailers

108.    Pharmacies are the final step on the pharmaceutical supply chain before drugs physically reach the consumer or insured, and are paid for by health insurance third-party payors (such as UHS). There are several types of pharmacies, including chain and independent retail pharmacies, pharmacies in supermarkets and other large retail establishments, and specialty and mail-order pharmacies (such as UHS's Pharmacy Assignors). When a retail pharmacy or supermarket chain purchases generic drugs on a large enough scale, manufacturers often agree to contract with them directly. In addition to UHS's Pharmacy Assignors, retailers large enough to purchase drugs directly from manufacturers include companies such as Rite Aid Corporation ("Rite Aid"), CVS Health ("CVS"), The Walgreen Company ("Walgreens"), Wal-Mart Stores, Inc. ("Walmart"), Target Corporation, and Publix Super Markets, Inc. ("Publix").

### 4.   The Cozy Nature Of The Industry And Opportunities For Collusion

109.   The generic drug market is structured in a way that allows generic drug manufacturers, including but not limited to the Defendants, to interact and communicate with each other directly and in person, on a frequent basis.

### a.  Trade Association And Customer Conferences

110.   Some customers of the Defendants (including large wholesalers and distributors) hold multi-day conferences throughout the year in various locations throughout the United States. Generic drug manufacturers from across the United States are invited to attend.

111.   Additionally, the Defendants and other generic drug manufacturers attend various industry trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA") (now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association for Accessible Medicines), and the Efficient Collaborative Retail Marketing Company, LLC ("ECRM"), in a variety of locations throughout the United States.

112.   At these conferences and trade shows, sales representatives from many generic drug manufacturers, including the Defendants, interact with each other and discuss their respective businesses and customers. Many of these conferences and trade shows include organized recreational and social events such as golf outings, lunches, cocktail parties, and dinners that provide additional opportunities to meet with

competitors. Defendants use these opportunities to discuss and share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies, and pricing terms in their contracts with customers.

113.   These trade shows and customer conferences provide generic drug manufacturers, including the Defendants, with ample opportunity to meet, discuss, devise, and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs.

### b. Industry Dinners And Private Meetings

114.   Many generic drug manufacturers, including several of the Defendants, are headquartered in close proximity to one another in New Jersey or eastern Pennsylvania, giving them additional opportunities to foster connections and meet and collude. At least forty-one (41) different generic drug manufacturers are concentrated between New York City and Philadelphia, including, among others, Defendants Actavis, Aurobindo, Breckenridge, Dr. Reddy's, Glenmark, Lannett, Par, Sandoz, Taro, Teva, Wockhardt, Zydus, and non-Defendant co-conspirator Greenstone LLC ("Greenstone").[7]

115.   High-level executives of many generic drug manufacturers get together periodically for what some of them refer to as "industry dinners." For example, in January 2014, at a time when the prices of numerous generic drugs were reportedly soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in

---

[7] At this time, UHS does not assert any legal claims or seek recovery against Greenstone.

Bridgewater, New Jersey. Executives from Defendants Actavis, Aurobindo, Lannett, and Perrigo (including Douglas Boothe), in addition to executives from many other generic manufacturers, were invited to this particular dinner.

116.    At these industry dinners, one company is usually responsible for paying for all of the attendees. For example, in a group e-mail conversation among competitors in December 2013, one of the participants joked: "You guys are still buying for Mark and I, right?" The response from another executive: "Well . . . I didn't think the topic would come up so quickly but . . . we go in alphabetical order by company and [a generic drug manufacturer not identified in this Complaint] picked up the last bill. . . . PS. . . . no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

117.    Other groups of competitors gather routinely for golf outings, where they have the opportunity to spend several days at a time together without interruption. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, for example, high-level executives from Defendants Actavis, Amneal, Lannett, Wockhardt, and others were invited to a gathering at a Country Club in Bowling Green, Kentucky where they would play golf all day and socialize at night.

118.    Some generic pharmaceutical sales representatives also get together regularly for what they refer to as a "Girls Night Out" ("GNO"), or alternatively "Women in the Industry" meetings or dinners. During these events, the sales representatives meet with their competitors and discuss competitively sensitive information.

119.    Many "Women in the Industry" dinners were organized by A.S., a

salesperson from non-Defendant Heritage Pharmaceuticals, Inc. who resides in the State

of Minnesota. Other participants in these meetings were employees of generic drug

manufacturers located in Minnesota, or salespeople residing in the area. However, out of

town sales representatives were also aware of these dinners and were included when in

the area. For example, in November 2014, Tracy Sullivan, a sales executive at Defendant

Lannett, sent A.S. a text message asking "[w]hen is your next industry women event? I'm

due for a trip out there and I'd love to plan for it if possible...." A.S. responded: "There is

an XMas [sic] party at Tanya's house on Dec 6th. Yes that is a Saturday. We do it about

once a quarter and usually it is during the week -- this was an exception."

120.    Sometimes dinners were also planned around visits of out-of-town

competitors. As A.S. stated in organizing one such dinner:

> Sorry if the meeting/dinner invite is a little short notice, but [K.N., a
> National Account Representative at Dr. Reddy's] will [be] in MN on
> Sept 29th and it would be a great time for everyone to get together!
> So much has been happening in the industry too -- we can recap all
> our findings from NACDS [trade show] over a martini or glass of
> wine! :) Plus the food is super Yummy!

Representatives from Defendant Perrigo among others, were also invited to this

particular dinner.

121.    Several different GNOs were held in 2015, including: (1) at the ECRM

conference in February (involving Lannett, Valeant, and Greenstone, among others); and

(2) in Baltimore in May (involving Defendants Lupin and G&W); and (3) at the NACDS

conference in August (involving Defendant Valeant, among others).

46

**5.    The Overarching Conspiracy Between Generic Drug
Manufacturers –** *Playing Nice In The Sandbox*

**a.  The General "Fair Share" Understanding**

122.    The overarching conspiracy among generic manufacturers—which ties

together all of the agreements on individual drugs identified in this Complaint—is an

agreed-upon code that each competitor is entitled to its "fair share" of the market,

whether that market is a particular generic drug, or a number of generic drugs.

123.    Coined "fair share," the term is generally understood as an approximation

of how much market share each competitor is entitled to, based on the number of

competitors in the market, with a potential adjustment based on the timing of entry. Once

a manufacturer has achieved its "fair share," it is generally understood that the competitor

will no longer compete for additional business. The common goal or purpose of this

overarching agreement is to keep prices high, avoid price erosion, and serve as the basis

for further supra-competitive price increases.

124.    This overarching agreement is widespread across the generic drug industry

and is broader than the Defendant manufacturers named in this Complaint. UHS focuses

here on the role of these named Defendants and their participation in, and agreement

with, this overarching conspiracy. This Complaint describes conspiracies regarding the

sale of specific drugs, and how these specific conspiracies are also part of the larger

overarching conspiracy.

125.    The exact contours of this "fair share" understanding, which has been in

place for many years (and pre-dates any of the specific conduct detailed herein), has

evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person. These in-person meetings gave the Defendants the opportunity, and the cover to, have these conversations and reach these agreements, without fear of detection.

126.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

127.    Indeed, the Defendants spoke with each other, when needed, hundreds or even thousands of times to ensure adherence to the overarching conspiracy. Because it would be too voluminous to list the total number of calls among all the Defendants, the following graphic shows, by way of example, the interlocking web of communications and relationships between executives at several of the Defendants and their key competitors. Each line in the graphic demonstrates that at least one phone call or text message was sent between those executives (identified by their initials) while they were

competitors. For many of these executives, there were hundreds of calls and texts with competitors, but the volume of those communications is not captured by this graphic.



128.   Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

129.   Similarly, when a generic drug manufacturer is the first to enter a particular drug market on an exclusive basis it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.

130.   For example, in April 2010, Defendant Perrigo was entering the Imiquimod Cream market where Defendant Fougera had been exclusive. D.K., a senior Fougera executive, sent an internal e-mail stating that ███████████████████████ and explained that ████████████████████████████████████████

████████████████████████████████ When L.B., another senior executive, questioned why Perrigo would be satisfied with 35-40% of the market, D.K. responded,

████████████████████████████████████████████

████████████████

131.   Similarly, Defendant Taro created a graphic representation of this industry-wide understanding, considering both the number of competitors and their order of entry to estimate what its "fair share" should be in any given market:

**Market Share - Fair Unit Share assumptions**
Order of Entry Grid
Number of Competitors

|  | Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
|  | 2 |  | 40% | 35% | 30% | 25% | 25% | 25% |
|  | 3 |  |  | 20% | 20% | 20% | 20% | 20% |
|  | 4 |  |  |  | 15% | 15% | 15% | 15% |
|  | 5 |  |  |  |  | 10% | 10% | 10% |
|  | 6 |  |  |  |  |  | 10% | 10% |
|  | 7 |  |  |  |  |  |  | 10% |
| Total |  | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

132.    Taro used these principles to guide its behavior when communicating with its competitors regarding specific drugs. One example involved Lidocaine Ointment—a product where Taro was entering the market as a third entrant. In an internal launch summary from April 2013, Taro described the ███████████ as ███████████ ███████████████████████████████████ and stated that Taro had targeted 20-25% share and had achieved 26.3% share. Further, Taro had matched ████ ███████████████████████████ which it stated was ████████ ███████████████████████ As was their typical practice, Taro executives spoke with their competitors—CW-3, a Sandoz senior sales executive, and E.B., a senior sales and marketing executive at Hi-Tech—in advance of Taro's entry to ensure that the company met its target market share through agreements to allocate specific customers.

133.    Although these general parameters are well-known, there is no precise method for apportioning "fair share." This is because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in any given year and must be revised when there are new entrants. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

134.    This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." Similarly, when

Defendant Glenmark was entering the market for Fluocinonide .1% Cream in July 2014 and had achieved its "fair share" on the product, one Glenmark sales executive remarked to another:

> We are set for now. We have hit our share goals and surpassed the sales goals.
>
> Hogs get fat, Pigs get slaughtered

To that, his colleague responded:

> LOL. I agree. Oink!

135. This scheme to minimize competition and allocate "fair share" is typically implemented as follows. First, Defendants allocate the market for an individual drug based on the number of competitors and the timing of their entry so that each competitor obtains an acceptable share of the market. Then, the competitors agree on ways to avoid competing on price and, at times, significantly raise price. This pattern is frequently followed even in the absence of direct communication between the competitors, demonstrating the universal code of conduct agreed to by Defendants.

136. This "fair share" understanding has been particularly effective when a new competitor enters the market—a time when, in a free-functioning, competitive market for generic drugs, prices would be expected to go down. The new competitor will either approach or be approached by the existing competitors. Indeed, new and existing entrants know that they can call each other, as necessary, to discuss how to implement the "fair share" agreement to an expanded number of competitors. As a result of these

communications, existing competitors will agree to "walk away" from a specific customer or customers by either refusing to bid or submitting a cover bid. These agreements to allocate specific customers between incumbents and new entrants means that the new competitor's transition into the market is seamless; the new entrant is ceded market share and immediately charges a supra-competitive price. The competitors then continue this process of dividing up customers until the market reaches a new artificial equilibrium. Defendants and their co-conspirators refer to this as a "stable" market.

137.    "Fair share" principles also dictate how generic drug manufacturers respond when a competitor experiences supply issues. If a manufacturer's supply disruption is temporary, its competitors will refrain from using the disruption to win that manufacturer's business from the customers it can no longer supply or taking any other action that might upset the agreed-upon fair share arrangement. By contrast, if the disruption is for a longer term, the competitors will divide up customers until each player achieves a revised "fair share" based on the number of players remaining in the market.

138.    For example, in July 2013, a retail pharmacy customer e-mailed Defendant Taro stating that one of Defendant Mylan's products was on back order and asked Taro to bid for the business. Aprahamian sent an internal e-mail stating: "Not inclined to take on new business . . . Wholesalers have product, let them pull from there temporarily and we can certainly review if shortage persists. Don't want to overreact to this product. Not sure how long Mylan is out."

139.    Similarly, in November 2014, Defendant G&W learned that Defendant Sandoz was having temporary supply problems on Fluocinolone Acetonide Cream.

Rather than take Sandoz' customers, G&W decided to offer them one-time buys █████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Vogel-Baylor

reasoned that G&W wanted ████████████████████████████ and that ████

█████████████████████████████████████████████████████████

████████

140.    When a generic manufacturer participates in this scheme, and prices stay
high, this is viewed as "playing nice in the sandbox." As D.K., a senior Fougera
executive, explained in an internal e-mail from July 2011 regarding sales of Imiquimod
Cream: ████████████████████████████████████████████████

████████████████████

141.    Similarly, when a generic manufacturer is "playing nice in the sandbox," it
is generally referred to as a "responsible" or "rational" competitor. For instance, in May
2013, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail to
J.G., the CEO of Sandoz, stating: "My sense is that Sandoz is viewed by customers and
competition as a respectful/responsible player in the market, which we should be proud of
and has taken years to develop. I would be very careful [not] to destroy this through
behavior that is too aggressive or desperation."

142.    Sandoz, in turn, uses that same terminology to refer to its competitors that
are acting in accordance with "fair share" principles. For example, in internal company
presentations throughout 2014, Sandoz consistently referred to Defendant Actavis as a
"responsible competitor" and to Defendant Taro as a "very responsible price competitor."

54

143.   Adherence to the rules regarding "fair share" is critical to maintaining high prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not participate (and thus behave in accordance with) the larger understanding, it can lead to unwanted competition and lower prices. In the relatively few instances where a competitor prioritizes gaining market share over the larger understanding of maintaining "fair share," that competitor is viewed as "irresponsible," and may be spoken to by competitors.

144.   Defendants were always cognizant of these principles which constantly guided their behavior. For example, in October 2015, McKesson e-mailed Taro with the opportunity to bid on several products. L.P., a corporate accounts manager at Taro, sent an internal e-mail asking: ████████████████████████████████████████

████████████████████████████████ A.L., a Taro pricing executive, responded,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

145.   "Fair share," "playing nice in the sandbox," and similar terminology have become part of the industry lexicon, and thus part of the larger understanding among Defendants. Generic drug manufacturers actively and routinely monitor their fair share and that of their competitors, as well as discuss market allocation amongst each other within the context of agreements on specific drugs, as set forth more fully below.

146.   For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have its "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| From: | Kellum, Armando |
|---|---|
| Sent: | Tuesday, July 02, 2013 12:31 AM |
| To: | |
| Subject: | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

147.   Further, in June 2013, G&W declined to bid on Halobetasol Propionate Cream at a customer because G&W did not want lower ███████████████████ ███████ A.G., a sales executive at G&W, e-mailed Vogel-Baylor asking: ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Vogel-Baylor responded: ████ ███████████████████████

148.   The "fair share" agreement is not limited to any one individual product market; those principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. For example, in August 2013, Sandoz created a ████████████████████████████████ which came █████████████████ when Sandoz was ██████████████████████ ██████████████ and was █████████████████████████

56

█████████████████████████████   The database allowed Sandoz to analyze

whether taking share from a competitor in one product market would cause that

competitor to retaliate in another product market where the competitors overlapped.

Sandoz measured the ████████████████ on whether the competitor had its ████

████ in the other product markets.

149.   Further, in October 2013, CW-1, a senior pricing executive at Sandoz, sent

an internal e-mail, including to Kellum, stating that Sandoz had decided not to bid at a

large retail customer on two products on which it overlapped with Mylan. CW-1

explained his reasoning as follows: "We have been running up against Mylan a lot lately

(Nadolol/Benaz/Hctz) and fear blowback if we take any more products at this moment.

Trying to be responsible in the sandbox." Further, in June 2014, Sandoz again chose not

to bid on a product at a Mylan customer out of concern that Mylan would retaliate. As

CW-1 explained: "I do not want to pursue, I believe this is due to a Mylan increase. We

have a lot of products crossing over with Mylan right now, I do not want to ruffle any

feathers."

150.   As these examples make clear, the agreement among generic manufacturers

transcends product markets as these companies make decisions not only based on what

impact their actions will have in a given product market, but also on how those actions

will impact other product markets where the competitors overlap, and any future markets

where they might eventually compete.

151.   In fact, as explained in more detail below, certain Defendants had separate

long-standing agreements with some of their key competitors in the dermatology sector to

limit competition on any products on which the companies overlapped. For instance,
Sandoz had agreements going back many years with Defendants Taro and Perrigo that
they would not poach each other's customers and would follow each other's price
increases on overlapping products.

152.    Defendant G&W had similar understandings with its key competitors Taro
and Perrigo. For instance, in February 2012, Vogel-Baylor exchanged e-mails with her
supervisor, Orlofski, regarding responding to the annual McKesson One Stop RFP.
Vogel-Baylor stated that she was waiting for McKesson ███████████████████████

████████████████████████████████████████ Once she confirmed the incumbents,

she conveyed that information to Orlofski who replied: ██████████████████████

████████████████████████████████████████████████████████████

████████████████████ As discussed in more detail below, shortly thereafter, Vogel-
Baylor would strike up a relationship with CW-5, a senior executive at Glenmark, and
begin communicating and colluding with that company in earnest as well.

153.    Further, in June 2014, Sandoz created a ████████████████████
that was specifically designed to track Sandoz's market share with respect to dermatology
products. As T.O., a Sandoz marketing executive, described in an internal e-mail:

████████████████████████████████████████████████████████████

████████████████████████ Similarly, in November 2015, Sandoz compiled a
spreadsheet containing various product opportunities which contained comments
demonstrating its agreements with certain competitors, such as: ████████████████

████████ and ████████████████ or ████████████████

58

154.  It was also common for these manufacturers to communicate about, and collude on, multiple products at any given time, regardless of whether the competitors were currently in the market for those products. For example, in April 2013, while speaking with T.P., a sales executive at Perrigo, CW-3, a Sandoz senior sales executive, took the following notes in his Notebook concerning nine (9) different products that Perrigo had recently increased prices on:



CW-3 later conveyed that information to Kellum in an e-mail stating: ███████

████████████████████████████████████████████████

Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate Cream. As discussed in more detail below, Sandoz would re-enter that market a few months later, in December 2013, and match competitor pricing.

155. Similarly, in April 2013, Orlofski of G&W asked his colleague Vogel-Baylor to run a report listing ██████████████████████████████ Vogel-Baylor responded: ████████████████████████████████████████████

██████████████████████████ Orlofski answered: ████████████████

156. Indeed, unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Sandoz was looking to implement a ████████████ that involved temporarily delisting ten (10) products on which it overlapped with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price. One product included in this strategy was Econazole Nitrate Cream. As discussed more fully below, Sandoz exited the market in July 2013, Taro and Perrigo raised prices in November 2014, and Sandoz re-entered in January 2016 at the higher price.

157. This interdependence between generic manufacturers is further demonstrated by the countless examples of generic manufacturers sharing sensitive information with competitors as a matter of course. There is now evidence of generic manufacturers routinely communicating and sharing information with each other about bids and pricing strategy. This includes forwarding a bid package received from a customer to a competitor, either on his/her own initiative, at the request of a competitor, or by contacting a competitor to request that the competitor share that information.

158.    As just one example, in June 2012, Jim Grauso, then a senior executive at Defendant Aurobindo, forwarded a customer's bid request for multiple products to Orlofski, his former colleague at G&W. The request included Prochlorperazine Maleate Suppositories—a product that G&W manufactured, but Aurobindo did not.

159.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors. For example, in August 2010, CW-6, then a senior sales executive at Fougera, sent the following e-mail regarding ▆▆▆▆▆▆▆▆ to his supervisor, Kaczmarek:

| | |
|---|---|
| From: | ▆▆▆▆▆▆▆ |
| Sent: | Wednesday, August 04, 2010 7:05 PM |
| To: | Walt Kaczmarek |
| Subject: | WAC Increase Intel |

Here is what others have agreed to:

Barr (when they existed) – had it for MCK, days unsure.
Breckenridge – CAH - 30 day credit or buy in.  MCK – 60 days credit or buy in.
Caraco – Yes, 45 days credit.
Corepharma – did not sign agreement, but would have agreed to 30 days max.
G&W – Yes, 90 days credit on multi-source items. 30 days on exclusives.
Glenmark – Yes,  30 day buy-in.
Lupin – No to both CAH and MCK.
Perrigo – did not agree to any protection.
Teva – No.
West Ward – No.  All open PO's cancelled.
Zydus – Net company with CAH/MCK.  WAC increase not relevant.

160.    Before sending this e-mail, CW-6 had spoken that same day with his contacts at several of the competitors listed, including Grauso, then a senior sales executive at Defendant G&W, T.P., a sales executive at Defendant Perrigo, D.C., a sales executive at Defendant Glenmark, M.R., a sales executive at West-Ward

Pharmaceuticals, and V.M., a sales executive at Core Pharma LLC. These calls are

detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

161.   Defendants understood that what they were doing was illegal and took steps

to cover up evidence of the overarching conspiracy. For example, in May 2014, a large

customer received a bid on Betamethasone Dipropionate Lotion and gave Taro an

opportunity to bid to retain the business. A.L., a pricing executive at Taro, sent an internal

e-mail stating: "FS ok, will not protect." E.G., a Taro sales executive, responded,

"explain FS, (Fair Share)?" Aprahamian replied:

> No emails please. Phone call, ████ let's discuss.

162.   To avoid creating a potentially incriminating paper trail, Kellum of Sandoz

routinely admonished colleagues for putting information that was too blatant in e-mails,

understanding that it could lead to significant legal exposure for both the company and

the individuals involved. Similarly, handwritten notes from an internal Sandoz business

review presentation from May 2017—after the States' investigation was well

underway—read: "Avoid Fair Share terminology on slides – underdeveloped or overdeveloped is better."

163.    It bears noting that the examples referenced in this Section, and in the allegations that follow, include only illustrative examples of the types of conduct described. Indeed, to date, many of the Defendants have made only limited document productions, including Defendants Actavis, Amneal, Glenmark, Lannett, Lupin, Mylan, Perrigo, and Wockhardt.

### b. Once Each Competitor Had Its Fair Share, It Was Time To Increase Prices

164.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given product market. Once the competitors were satisfied that they had their "fair share," they often turned to increasing prices. So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. Indeed, it was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase. Often, the competitor would then follow with a comparable price increase of its own.

165.    The concept of "fair share" and price increases went hand in hand. For example, and as discussed in more detail below, Defendant Sandoz's ongoing understandings with Defendants Taro and Perrigo that they would follow each other's price increases was predicated on the agreement that the follower would not poach the

leader's customers after the increase. Indeed, Aprahamian of Taro often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid."

166.   It is important to note that generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons—including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties—could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that it would not seek to take advantage of a competitor's price increase by stealing market share.

167.   Further, because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of a price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### c. Generic Drug Price Spikes Since 2013

168.   Against this industry backdrop, the prices for many generic drugs skyrocketed in 2013 and 2014. According to one report, "[t]he prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July

2014." A separate analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the Wholesale Acquisition Cost ["WAC"] price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

169.   These increases in 2013 and 2014 were massive compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|          | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|----------|------|---------------------------|------------------------------|-----------------------------|
|          | 2010 | 3820 | 125 | 260 |
|          | 2011 | 4265 | 255 | 409 |
|          | 2012 | 4071 | 223 | 433 |
|          | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

170.   A January 2014 survey of 1,000 members of the National Community Pharmacists Association found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

### C.   The Illegal Schemes

171.   As alleged above, while drug-specific agreements involve those Defendants that marketed and sold the particular drug, each Defendant, including the Defendants who did not manufacture the particular drug involved in each drug-specific agreement, was also a party to the broader, overarching conspiracy to abide by the "fair share" agreement covering all of the drugs that are the subject of this Complaint. From this broad

agreement among all Defendants sprang additional agreements among the manufacturers relating to each of the individual drugs. The purpose and effect of all of these agreements was to lessen competition in the markets for each drug and throughout the industry.

172.   For ease of reference, the individual product conspiracies alleged in this Complaint involve the following drugs and conspiring manufacturers:

| Drugs | Manufacturers |
| --- | --- |
| Adapalene Cream | Perrigo, Sandoz |
| Alclometasone Dipropionate Cream | Glenmark, Sandoz, Taro |
| Alclometasone Dipropionate Ointment | Glenmark, Sandoz, Taro |
| Ammonium Lactate Cream | Actavis, Perrigo, Taro |
| Ammonium Lactate Lotion | Actavis, Perrigo, Taro |
| Betamethasone Dipropionate Cream | Sandoz, Taro |
| Betamethasone Dipropionate Lotion | Perrigo, Sandoz, Taro |
| Betamethasone Valerate Cream | Sandoz, Taro |
| Betamethasone Valerate Lotion | G&W, Sandoz |
| Betamethasone Valerate Ointment | Actavis, Sandoz |
| Bromocriptine Mesylate Tablets | Mylan, Perrigo, Sandoz |
| Calcipotriene Betamethasone Dipropionate Ointment | Perrigo, Sandoz |
| Calcipotriene Solution | G&W, Sandoz |
| Carbamazepine ER Tablet | Sandoz, Taro |
| Cefpodoxime Proxetil Oral Suspension | Aurobindo, Sandoz |
| Cefpodoxime Proxetil Tablets | Aurobindo, Sandoz |
| Chlorpromazine HCL | Sandoz, Mylan, Upsher-Smith |
| Cholestyramine | Sandoz, Par, Upsher-Smith |
| Ciclopirox Cream | G&W, Glenmark, Perrigo |
| Ciclopirox Shampoo | Actavis, Perrigo, Sandoz |
| Ciclopirox Solution | G&W, Perrigo, Sandoz |
| Clindamycin Phosphate Cream | Greenstone, Sandoz |
| Clindamycin Phosphate Gel | Greenstone, Sandoz |
| Clindamycin Phosphate Lotion | Greenstone, Sandoz |
| Clindamycin Phosphate Solution | Perrigo, Greenstone, Sandoz, Taro |
| Clotrimazole Cream | Glenmark, Sandoz, Taro |
| Clotrimazole Betamethasone Dipropionate Cream | Actavis, Sandoz, Taro |
| Clotrimazole Betamethasone Dipropionate Lotion | Sandoz, Taro |

| Desoximetasone Ointment | Glenmark, Sandoz, Taro |
|---|---|
| Eplerenone Tablets | Greenstone, Sandoz |
| Erythromycin Base/Ethyl Alcohol Solution | Perrigo, Sandoz, Wockhardt |
| Ethambutol HCL Tablets | G&W, Lupin |
| Fluocinolone Acetonide Cream | G&W, Sandoz |
| Fluocinolone Acetonide Ointment | G&W, Sandoz |
| Fluticasone Propionate Lotion | Glenmark, Perrigo, Sandoz |
| Griseofulvin Microsize Tablets | Sandoz, Rising |
| Halobetasol Propionate Cream | G&W, Perrigo, Sandoz, Taro |
| Halobetasol Propionate Ointment | G&W, Perrigo, Taro |
| Hydrocortisone Acetate Suppositories | G&W, Perrigo |
| Hydrocortisone Valerate Cream | Perrigo, Taro |
| Imiquimod Cream | Perrigo, Sandoz Taro |
| Latanoprost Drops | Greenstone, Sandoz, Valeant |
| Lidocaine Ointment | Sandoz, Taro |
| Methazolamide Tablets | Perrigo, Sandoz |
| Methylphenidate HCL | Actavis, Mallinckrodt, Sandoz, Sun |
| Methylphenidate HCL ER | Actavis, Mallinckrodt, Sandoz, Sun |
| Metronidazole .75% Gel | G&W, Sandoz, Taro |
| Metronidazole 1% Gel | Sandoz, Taro |
| Metronidazole Cream | Actavis, G&W, Sandoz |
| Metronidazole Lotion | Actavis, Sandoz |
| Mometasone Furoate Cream | G&W, Glenmark |
| Mometasone Furoate Ointment | G&W, Glenmark |
| Mometasone Furoate Solution | G&W, Glenmark |
| Nafcillin Sodium Injectable Vials | Aurobindo, Sandoz |
| Nystatin Triamcinolone Cream | Sandoz, Taro |
| Nystatin Triamcinolone Ointment | Sandoz, Taro |
| Oxacillin Sodium Injectable Vials | Aurobindo, Sandoz |
| Phenytoin Sodium ER Capsules | Amneal, Mylan, Sun, Taro |
| Pioglitazone HCL Metformin HCL Tablets | Aurobindo, Mylan, Sandoz |
| Prochlorperazine Maleate Suppositories | G&W, Perrigo |
| Promethazine HCL Suppositories | Actavis, G&W, Perrigo |
| Tacrolimus Ointment | Perrigo, Sandoz |
| Terconazole Cream | Actavis, Sandoz, Taro |
| Triamcinolone Acetonide Cream | Perrigo, Sandoz |
| Triamcinolone Acetonide Ointment | Perrigo, Sandoz |
| Triamcinolone Acetonide Paste | Taro, Rising |

### 1.    Generic Topical Products—An Overview

173.    Topical products include any drug that is administered by means of contact, most often with an external body surface. Topical products come in a variety of dosage forms, including creams, gels, lotions, ointments, shampoos, and solutions. Although topical products are mostly dermatology-related, they can also be used to treat other conditions such as pain and allergies.

174.    Topical products are a niche market segment within the generic pharmaceutical industry. Historically, there have been fewer generic manufacturers that have focused on selling topical products than "conventional" generic drugs such as oral solids (e.g., pills). This is because manufacturers of generic topical products typically face higher barriers to entry, including technical hurdles relating to proving bioequivalence—which must be shown through multiple clinical trials. Further, once a manufacturer obtains FDA approval, topical products often require higher levels of investment in manufacturing to produce the various dosage forms involved.

175.    Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Defendants Taro, Perrigo, and Fougera (now Sandoz). Indeed, between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment. Several other manufacturers make up the remaining third, including Actavis, Mylan, Teva, G&W, Glenmark and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

| Figure 15: Ranks have changed in the Derma generic market with Taro now at #1 | | | | | |
|---|---|---|---|---|---|
| Value market share | Jun-07 | Jun-08 | Jun-09 | Jun-10 | Jun-11 | Jun-12 |
| Taro | 19% | 18% | 20% | 17% | 17% | 25% |
| Perrigo | 22% | 22% | 21% | 19% | 24% | 21% |
| Fougera | 26% | 24% | 22% | 23% | 23% | 16% |
| Actavis | 3% | 4% | 4% | 4% | 6% | 9% |
| Mylan | 0% | 0% | 0% | 7% | 5% | 4% |
| Teva | 7% | 6% | 6% | 5% | 5% | 3% |
| Novartis | 2% | 2% | 2% | 2% | 2% | 3% |
| Glenmark | 0% | 0% | 0% | 0% | 2% | 2% |
| G & W | 0% | 0% | 0% | 0% | 0% | 2% |
| Prasco | 0% | 0% | 1% | 1% | 2% | 1% |
| Spear Derm | 1% | 1% | 3% | 3% | 2% | 1% |
| Hi-Tech | 1% | 1% | 1% | 1% | 1% | 1% |
| Pfizer | 1% | 1% | 1% | 1% | 1% | 1% |
| Wockhardt | 4% | 3% | 2% | 2% | 1% | 1% |
| Others | 14% | 18% | 17% | 13% | 9% | 8% |
| Derma generic mkt ($mn) | 779 | 837 | 955 | 1,230 | 1,740 | 2,510 |

*Source: IMS Health, Credit Suisse*

176.    Similarly, the following chart from an internal Sandoz presentation details a consistent picture for 2014:

## Sandoz & Competitor (Dermatology) Market Share Trend

| Company | MAT Mar 2014 Sales Market Share | MAT Mar 2014 Sales $ | MAT Mar 2014 Sales Growth | MAT Mar 2014 Units | MAT Mar 2014 Units Growth | MAT Mar 2014 Sales Market Share |
|---|---|---|---|---|---|---|
| TARO | 20% | $859,306,940 | 6.33% | 21,495,208 | -9.57% | 18% |
| PERRIGO | 18% | $789,858,446 | 45.85% | 31,560,652 | -3.72% | 26% |
| SANDOZ | 16% | $688,861,246 | 28.65% | 17,921,060 | -1.86% | 15% |
| MYLAN | 8% | $327,728,600 | 85.33% | 1,498,117 | 40.52% | 1% |
| ACTAVIS | 5% | $236,726,320 | -8.72% | 7,638,311 | -11.25% | 6% |
| ALL OTHER | 34% | $1,465,532,194 | 62.93% | 41,092,544 | 30.61% | 23% |

Source: IMS SMART MVP Solutions, NSP Mar 2014, MAT Dollars and Units, Generic and Dermatology

177.    The limited number of manufacturers of generic topical products has created an environment that is ripe for collusion. Many topical products have only two or

three competitors which increases the likelihood that any market allocation or price fixing agreement will succeed. In addition, sales and pricing executives at many of the prominent generic topical manufacturers are very familiar with their counterparts at competitor companies because of the extensive product overlap between them. This personal familiarity among sales executives has led to greater opportunities to collude— which those executives have taken advantage of by consistently communicating and agreeing with each other to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

### 2.    The Early Days—Collusion From 2009 To Early 2012

#### a.  Key Relationships Among Generic Topical Manufacturers

178.    The key manufacturers of generic topical products during this early time period—Fougera (and later Sandoz), Perrigo, Taro, and Actavis—had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases. These competitors met with each other regularly at trade shows and customer conferences—in addition to speaking frequently by phone—and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common. The following Section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to specific products.

### 1)     Fougera/Perrigo/Taro

179.    CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

180.    Upon moving to Fougera, CW-6 was instructed by his supervisor, Walter Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did. This practice—facilitating anticompetitive conduct through a third competitor—was pervasive throughout the industry.

181.    During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences. At these events, he would regularly discuss competitively sensitive topics with his competitors. CW-6 was also a prolific communicator by phone and exchanged thousands of calls and text messages with his competitors. After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

182.    CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two

were communicating, it was to coordinate behavior on products where Fougera and

Perrigo overlapped. CW-6 and T.P. regularly met at trade shows and customer

conferences and discussed competitively sensitive topics. The goal of these conversations

was always to keep prices as high as possible. CW-6 and T.P. also spoke often by phone.

For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at

least three hundred and two (302) phone calls.

183.   CW-6 also had a collusive relationship with H.M., a sales executive at

Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and

customer conferences, as well as by phone. During these conversations, the competitors

coordinated customer allocation and price increases on products where Fougera and Taro

overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least

eighty-six (86) phone calls.

184.   There were several products where all three companies—Fougera, Perrigo,

and Taro—sold a particular drug. In these instances, CW-6 would facilitate the

communications, passing messages from one competitor to the other to ensure the

anticompetitive agreement was understood by all three competitors. This was necessary

because T.P. and H.M. did not have an independent relationship and relied on CW-6 to

serve as a conduit to effectuate their collusion on overlapping products.

185.   During this early time period, T.P. and H.M. were acting at all times at the

direction of, or with approval from, their superiors, including Wesolowski of Perrigo and

Blashinsky of Taro.

### 2)   Actavis And Taro/Perrigo

186.   Michael Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Mitchell Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Defendant Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

187.   Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped. Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

188.   During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

### 3)   Sandoz/Taro

189.   CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012). At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence. Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

190.   CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships. CW-4 viewed providing this information as a way to demonstrate value to the company. CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz. When

CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

191.    CW-4 had a longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

192.    In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

193.    After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other. This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

194.    In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. Between January 2011 (which is as far back as phone records have been obtained) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

195.    During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro.

196.    The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2009 and early 2012.

### i.    Carbamazepine ER Tablets

197.    Carbamazepine ER, also known by the brand name Tegretol XR, is a drug prescribed for the prevention and control of seizures, for the relief of nerve pain, and for the treatment of certain mental and mood disorders such as bipolar disorder and schizophrenia.

198.    Shortly after their high-level conversation in 2009 about Taro's and Sandoz's respective views on competition and market-share, D.S. of Taro and CW-4 had the opportunity to put their understanding into practice as Taro and Sandoz both prepared to enter the market for Carbamazepine ER.

199.    Taro received FDA approval in late March 2009 to enter the Carbamazepine ER market as the first-to-file generic. A few months later, in June 2009, Sandoz received approval to launch as the authorized generic (the "AG"). As the AG, Sandoz would not be required to wait until the end of Taro's 180-day exclusivity period to enter the market.

200.    Not only was Carbamazepine ER a high-volume, lucrative branded product for Sandoz's parent company, Novartis, but Novartis had also given Sandoz late notice

that it would be entering as the AG. As a result, Sandoz's sales and marketing executives felt a great deal of pressure to secure market share within a short time frame.

201.    As the Taro launch grew close, R.T., a senior marketing executive at Sandoz, pressured CW-4 to obtain information from Taro about its impending launch. Confident that their recent conversation meant that D.S. would readily provide such information, CW-4 reached out to him.

202.    During one call in a series of phone calls between the two, D.S. informed CW-4 that Taro had sent offers to Wal-Mart, Walgreens, and SUPERVALU. Consistent with "fair share" principles and the fact that Taro would be the first to enter the market, D.S. told CW-4 that Taro's goal was to secure 50%-60% market share and that it would be pursuing other smaller customers as well. CW-4 understood from that conversation that Sandoz should not compete for the customers that D.S. had identified, and that by identifying those specific customers Sandoz would, in turn, know which customers it should target. As requested, CW-4 reported this information directly to R.T. at Sandoz.

203.    Based on those conversations, Taro and Sandoz were able to enter the market with little competition, initially leaving generic pricing nearly as high as pricing for the branded drug.

204.    After the initial launch, CW-4 and D.S. continued to discuss and share competitively sensitive information about Carbamazepine ER. For example, when Taro was delayed in launching the 100mg formulation, Novartis put pressure on R.T. and others at Sandoz to get information about Taro's launch. R.T., in turn, asked CW-4 to obtain the information.

205.    After exchanging several text messages in January 2010, D.S. informed CW-4 that Taro would not be launching the 100mg formulation because Taro was having trouble filling orders on the other strengths and needed the raw material for those other strengths (which were more profitable for Taro).

206.    Through 2011, Sandoz refused to challenge for Taro's customers with respect to Carbamazepine ER. For example, on January 5, 2011, CVS provided Sandoz with a list of product opportunities for Sandoz to bid on, including Carbamazepine ER. CW-2, then a senior sales executive at Sandoz, was hesitant, and asked his colleagues if there was any appetite to compete for the business. The purpose for pursuing CVS, he opined, would be ███████████████████████████████████████████████ ███████████████████████     He added: █████████████████████████

207.    M.M., a Sandoz marketing executive, responded that pursuing CVS was tempting given that Taro's market share was higher than Sandoz's, but supply issues created short-term obstacles. Further, the executive concluded that challenging for the business at CVS would ████████ the market and erode pricing. As a result, Sandoz declined to bid on the Carbamazepine XR business at CVS.

### ii.    Imiquimod Cream

208.    Imiquimod Cream, also known by the brand names Aldara and Zyclara, is a topical medication used to treat actinic keratosis, or precancerous growths on the skin. Imiquimod Cream was a high-priced, large volume drug that provided a significant source of revenue for its manufacturers. In 2012, the annual market for Imiquimod Cream in the United States exceeded $200 million.

209.    On February 25, 2010, Fougera received FDA approval to market Imiquimod Cream. At that time, Fougera was the only generic manufacturer in the market and it used that as an opportunity to set a high price for the product.

### a)    *Perrigo Entry (April 2010)*

210.    Less than two months later, on April 13, 2010, Perrigo announced that it would be the AG for Imiquimod Cream. That same day, D.K., a senior Fougera executive, sent the following e-mail to Kaczmarek, also a senior Fougera executive:

| From: | |
| Sent: | Tuesday, April 13, 2010 12:18 PM |
| To: | Walt Kaczmarek |
| Subject: | Re: New imiquimod pricing model |

I think its clear we need to keep:

1) Walgreens
2) CAH
3) McKesson

Let Perrigo have:

1) CVS
2) ABC
3) W or RA

211.    Later that same day, Kaczmarek called CW-6, a senior sales executive at Fougera, and they spoke for nearly four (4) minutes. CW-6 hung up and immediately called T.P., a sales executive at Perrigo, and they spoke for nearly nine (9) minutes. When CW-6 hung up with T.P., he promptly called Kaczmarek back. That call lasted less than one (1) minute.

212. It is rare that the entry of a generic competitor would cause prices to actually increase—but it did so in this case. Three days later, on Friday April 16, 2010, in advance of Perrigo's entry into the market, Fougera increased its WAC pricing for Imiquimod Cream. That same day, CW-6 called T.P. The call lasted more than two (2) minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they ultimately spoke for more than six (6) minutes. Immediately after hanging up with Kaczmarek, CW-6 called T.P. back. The call lasted one (1) minute.

213. The next business day, Monday April 19, 2010, Perrigo sent an internal e-mail stating that ███████████████████████████████████████████████████

███████████████████ As a result of the increase, Perrigo's WAC pricing would end up even slightly higher than Fougera's.

214. That same day, John Wesolowski, a senior executive at Perrigo, called T.P. and they spoke for nearly six (6) minutes. This set off another rush of communications between T.P. of Perrigo and CW-6 of Fougera, with each of them concurrently reporting the results of those communications to their superiors, Wesolowski and Kaczmarek. These calls, which all occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:04:44 | 0:05:51 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:16:56 | 0:00:26 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:34:36 | 0:03:48 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:39:16 | 0:07:13 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:48:29 | 0:03:42 |

| 4/19/2010 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:52:43 | 0:03:16 |
| 4/19/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:54:33 | 0:08:49 |
| 4/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 16:56:29 | 0:06:39 |

215.    The following week, between April 24 and April 27, 2010, the NACDS

held its annual meeting in Palm Beach, Florida. Several executives from Fougera and

Perrigo were in attendance, including Kaczmarek, D.K., and CW-6 from Fougera and

Wesolowski and S.K., senior executives from Perrigo.

216.    Fougera and Perrigo executives were speaking about Perrigo's launch

throughout the conference. On April 26, 2010, T.P. and CW-6 spoke by phone for seven

(7) minutes. Immediately after that call, CW-6 hung up and called Kaczmarek, speaking

for four (4) minutes.

217.    Similarly, on April 27, 2010, D.K. e-mailed Kaczmarek while they were

still at the NACDS meeting, stating that he needed █████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████

218.    On April 28, 2010, Perrigo officially entered the Imiquimod Cream market

and published WAC pricing that was slightly higher than Fougera's. That same day, D.K.

e-mailed Fougera executives with an update regarding his conversations at the NACDS

meeting. With respect to Imiquimod Cream, D.K. stated, ██████████████████████

████████████████████████████████████████████ D.K explained that Fougera

gave up McKesson and ABC to Perrigo because ███████████████████████████████

████████████████████████████ D.K. also noted that he was pleased that Perrigo has

████████████████████████████████████████████ CW-3, a

sales executive at Fougera, expressed confusion that Fougera had lost ABC's business.

Kaczmarek explained that ███████████████████ CW-3 replied: ██████████████

████████████████

219.   On April 30, 2010, a senior Fougera executive, L.B., demanded an urgent

explanation from D.K. as to why Fougera was willing to give up both McKesson and

ABC. D.K. reminded L.B. that it was inevitable that Perrigo would take some of the

market. D.K. also explained: █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ D.K. stated

that Perrigo's share would likely settle in the range of 30-40% █████████████

██████████████████████████████████████████

██████████

220.   Consistent with fair share principles and the prior discussions between the

competitors, by April 30, 2010 Fougera had given up more than ten (10) of its Imiquimod

customers to Perrigo.

221.   On May 16, 2010, Fougera was preparing an internal presentation regarding

Imiquimod Cream, which included a statement that ████████████████████

████████████ While reviewing the presentation, L.B. challenged D.K. about the

statement, asking ████████████████████████████████████

███████████████████████████ D.K. assured L.B. ███████████████

█████████████████████████████████████████████████

222.   The next day, on May 17, 2010, CW-6 and T.P. exchanged at least six calls, including one lasting more than six (6) minutes, likely to confirm (again) the agreement in place between the two competitors.

223.   Several months later, on September 8, 2010, CW-6 circulated a press release to the Fougera sales team announcing that Perrigo had received its own ANDA approval to market generic Imiquimod Cream. Previously, Perrigo had been selling the AG through a license with a branded manufacturer. That same day, CW-6 called T.P. That call lasted less than a minute. T.P. called CW-6 back almost immediately, and they spoke for more than two (2) minutes.

224.   On September 27, 2010, CW-6 gave a presentation to Fougera's parent company titled ▮▮▮▮▮▮▮▮▮▮▮▮ during which he noted that Fougera had given up Imiquimod share to Perrigo and that, with regard to the larger fair share understanding, Fougera is ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮ Later that year, in November 2010, CW-6 also noted in his monthly recap that ▮▮▮▮▮▮▮▮▮▮ in the Imiquimod market.

225.   Fougera also continued to monitor the status of other competitors' plans to enter the Imiquimod market. For example, on February 7, 2011, a Glenmark employee called CW-6, and they spoke for four (4) minutes. Later that day, CW-6 sent the following e-mail to Kaczmarek and D.K. regarding Imiquimod Cream:



226.   Pleased that Fougera would not be facing any imminent competition from

Glenmark, D.K. replied:

**From:**
**Sent:**                    Monday, February 07, 2011 6:38 PM
**To:**                       ████████████ Walt Kaczmarek
**Subject:**              RE: Imiquimod

If true, I will kiss you

████████
Sr. Vice President, General Manager
Nycomed US Inc

### b)   *Sandoz Entry (February 2011)*

227.   Although Fougera was fortunate that Glenmark had no near-term plans to

enter the Imiquimod Cream market, another competitor—Sandoz—did receive FDA

approval on February 28, 2011 to launch the product. That same day, CW-6 of Fougera

and T.P. of Perrigo exchanged at least five (5) calls, including two calls lasting two (2)

minutes each.

228.   On March 1, 2011, one of Fougera's customers, NC Mutual, also e-mailed

CW-3, a sales executive at Fougera, to tell him that Sandoz was launching Imiquimod.

The NC Mutual employee further noted: ████████████████████████████

■ CW-3 promptly forwarded the e-mail to Kaczmarek. That same day, CW-6 called T.P. and they spoke for more than three (3) minutes.

229.    When Sandoz entered the market, it did so seamlessly—initially taking comparable share from the existing competitors Fougera and Perrigo.

230.    For example, in late February and early March, Sandoz made offers to ABC, a Perrigo customer, and Rite Aid, a Fougera customer. In total, the customers accounted for approximately 13% of the Imiquimod Cream market (ABC at 8% and Rite Aid at 5%).

231.    On March 3, 2011, Fougera declined to bid to retain the Rite Aid business and gave up its primary position to Sandoz. The next day, on March 4, 2011, Kellum of Sandoz followed up with S.G., a sales executive at Sandoz, stating, ███████████████

███████████████████████████████████ Later that day, Perrigo followed suit and declined to bid to retain the ABC business. That same day, CW-6 called T.P. and they spoke for four (4) minutes. A few minutes later, Kaczmarek called CW-6 and they spoke for nearly five (5) minutes.

232.    Around this same time, Taro was also starting to make plans to enter the market. Between March 6 and March 10, 2011, representatives from Fougera, Perrigo, Sandoz, and Taro were all in attendance together at the ECRM Retail Pharmacy Generic Pharmaceutical Conference in Champions Gate, Florida. These representatives included CW-6 from Fougera, T.P. from Perrigo, CW-4 and Kellum from Sandoz, and H.M. and D.S., sales executives from Taro.

233.   On March 7, 2011, while at the ECRM conference, CW-4 of Sandoz and D.S. of Taro spoke on the phone for four (4) minutes. Later that day, Kellum, CW-4's boss, sent an internal e-mail from ECRM stating that he had ███████ Taro may be entering the Imiquimod Cream market.

234.   Also, while at the ECRM conference, CW-6 of Fougera and T.P. of Perrigo spoke once by phone on March 9, 2011. The call lasted one (1) minute.

235.   By March 9, 2011, Sandoz had acquired approximately 13% of the Imiquimod Cream market and Kellum recommended that they ████████████████

████████████████████████████████ referred to a consortium composed of HEB, Ahold, Schnucks, and Giant Eagle. These were Perrigo customers, and Sandoz intended to seek some of their Imiquimod business ████████████

████████████████████████████████████

████████ Those customers were the only additional customers whose business Sandoz was seeking. To that end, Kellum conveyed to S.G., a sales executive at Sandoz, that ███

████████████████████████████████████

████████████████████████████ Ultimately, on March 17, 2011, Perrigo conceded the consortium business to Sandoz.

236.   On March 10, 2011, Kellum provided additional color for his recommendation that Sandoz only go after smaller Fougera customers moving forward:

| From: | CN=Armando Kellum/OU=GX/O=Novartis |
|---|---|
| Sent: | Thursday, March 10, 2011 7:30 AM |
| To: | CN=▮▮▮▮OU=GX/O=Novartis@PH |
| Subject: | Re: Imiquimod Update - *ABC orders released today* |
| Attach: | EmbeddedImage0001.gif, EmbeddedImage0002.gif |

Thanks ▮▮▮ both Perrigo and Fougera have been reasonable (as have we) and
that is why the market is still good. At some point it will be noisy and
annoying if we keep picking and picking.

AK

### c)    *Taro Entry (July 2011)*

237.    A month or so later, on April 15, 2011, Taro received FDA approval to
market Imiquimod Cream. Taro immediately began coordinating its entry with
competitors. On April 17, 2011, D.S. of Taro and CW-4 of Sandoz exchanged two calls,
with one call lasting twelve (12) minutes. Within an hour of ending the second call, CW-
4 called her supervisor, Kellum, and they spoke for five (5) minutes. The next day, on
April 19, 2011, D.S. called CW-4 again. The call lasted one (1) minute.

238.    On these calls, D.S. conveyed to CW-4 that Taro had gotten FDA approval
for Imiquimod Cream but advised that Taro would not formally launch until June. D.S.
also told CW-4 that Taro had already received a pre-commitment from Econdisc, a large
GPO customer, and now would only go after smaller customers. CW-4 understood that
D.S. shared this information with her so that she knew Taro would not attack Sandoz at
large customers and, if it did compete for smaller customers, it was only to obtain its fair
share of the market. CW-4 also understood that Sandoz should not compete for the
Econdisc business.

239.    The next day, on April 20, 2011, CW-4 shared this competitive intelligence
with R.T., a senior sales and marketing executive at Sandoz:

86



240.    Perrigo and Fougera were also simultaneously coordinating how they

would react to Taro's entry. For example, on April 18, 2011, Kaczmarek informed the

Fougera sales executives that Taro had received FDA approval to market Imiquimod

Cream and asked, ████████████████████ This set off a flurry of

communications that same day between CW-6 of Fougera and T.P. of Perrigo, who were

both concurrently reporting to, and taking direction from, their supervisors, Kaczmarek

and Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:17:23 | 0:00:27 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 16:43:08 | 0:04:09 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 16:56:57 | 0:02:44 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 17:00:05 | 0:00:08 |
| 4/18/2011 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:08:22 | 0:03:25 |
| 4/18/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 21:41:15 | 0:06:03 |

241.    Three days later, on April 21, 2011, CW-6 decided to reach out to Taro

directly and called H.M., a sales executive at Taro. The two men spoke for eight (8)

minutes. Upon hanging up, CW-6 called Kaczmarek. The call lasted one (1) minute. First thing the next morning, CW-6 sent a text message to T.P. of Perrigo.

242.   By early July 2011, Taro was finally starting to enter the Imiquimod Cream market. On July 5, 2011, T.P. of Perrigo reached out to CW-6 of Fougera. The call lasted only two (2) minutes, but it set off another rush of communications among the three competitors—Perrigo, Fougera, and Taro—to make sure they were on the same page regarding Taro's entry. These calls, which all occurred within the span of approximately fifteen (15) minutes, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 9:12:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:13:00 | 0:01:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:18:00 | 0:06:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:23:00 | 0:02:00 |
| 7/5/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:25:00 | 0:02:00 |

243.   At the same time, D.S. of Taro was coordinating with CW-4 of Sandoz. On July 7, 2011, D.S. of Taro called CW-4 of Sandoz. The call lasted two (2) minutes. CW-4 returned the call and they spoke for sixteen (16) minutes. A few hours later, CW-4 called D.S. and they spoke for another four (4) minutes.

244.   On July 14, 2011, CW-6 of Fougera called H.M. at Taro again and they spoke for nine (9) minutes. As soon as CW-6 hung up he called his boss, Kaczmarek, and the two spoke for five (5) minutes. Later that day, Kaczmarek e-mailed the Fougera sales team stating, ████████████████████████████████████████

████████████████████

88

245.    On July 26, 2011, a customer, MedCo, informed Perrigo that it had received a competitive offer for Imiquimod Cream and asked if Perrigo could match the price. MedCo declined to disclose who made the offer. This sparked another flurry of phone communications starting first thing the next morning between Perrigo, Taro and Fougera, as detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 5:52:47 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:19:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:39:00 | 0:01:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:40:00 | 0:05:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:55:00 | 0:01:00 |
| 7/27/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 7:00:17 | 0:00:25 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:27:00 | 0:08:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 7:40:00 | 0:04:00 |
| 7/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:06:05 | 0:04:17 |

246.    The next day, on July 28, 2011, Perrigo declined to bid to retain the MedCo business. That same day, CW-6 of Fougera called T.P. of Perrigo. The call lasted one (1) minute. T.P. returned the call and they spoke for six (6) minutes.

247.    On August 8, 2011, D.S. of Taro called CW-4 of Sandoz again. They ultimately spoke for seventeen (17) minutes. On that call, D.S. informed CW-4 that Taro had officially been awarded the Econdisc business and the secondary position at Cardinal and that Taro could not support any more customers. CW-4 understood this to mean that the market would remain strong with no price erosion and Sandoz would not have to relinquish any additional customers to Taro. Later that evening, on August 8, 2011, CW-4 passed this competitive intelligence along internally at Sandoz:

89



From: ███
Sent: 08/08/2011 05:40 PM EDT
To: ███
Cc:
Subject: Imiquimod

Just to let you know, Taro launched about 2 weeks ago. They have Econdisc and
then secondary position on Cardinal...that's all they can take on.

Regards.

248.   On August 19, 2011, Hannaford—a retail pharmacy customer—advised

CW-6 that it had received a competitive offer for Imiquimod Cream, but similarly would

not identify which competitor made the offer. Thereafter, CW-6 spoke several times with

T.P. of Perrigo and H.M. of Taro, in an effort to discover which competitor made the

offer. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:07:00 | 0:02:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:09:00 | 0:01:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:10:00 | 0:06:00 |

249.   During those calls, CW-6 was able to confirm that Taro had in fact made

the offer. Later that day, CW-6 sent the following e-mail to Kaczmarek:

From: ███
Sent:        Friday, August 19, 2011 3:00 PM
To:          Walt Kaczmarek
Subject:     Hannaford Imiquimod - Taro hit

Walt,

Hannaford has an offer on imiquimod.  The buyer would not tell me which company or price point.  Hannaford has moves 1100 units annually. I have confirmed it
was Taro.

250.   An hour-and-a-half later, CW-6 followed up with Kaczmarek asking:

| From: | ████████████ |
| --- | --- |
| Sent: | Friday, August 19, 2011 4:28 PM |
| To: | Walt Kaczmarek |
| Subject: | Hannaford Imiquimod |
| Attachments: | Hannaford Imiquimod vs. Taro.xlsx |

Do you want to let Hannaford go to Taro? I think we should let them walk.

████████████

**National Accounts Executive**

251.   Kaczmarek ultimately agreed, and Fougera gave up the customer to Taro.

252.   The goal of these communications between the various competitors on Imiquimod Cream—Fougera, Perrigo, Sandoz, and Taro—was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors. The results were highly successful.

253.   The next day, on August 20, 2011, D.K., a senior executive at Fougera, sent an e-mail to other senior Fougera executives regarding Imiquimod Cream stating, ████

████████████████████████████████████████████████

████████████████████████████████████████████████

254.   Throughout September 2011, H.M. of Taro, CW-6 of Fougera, and T.P. of Perrigo spoke several times by phone during which they discussed, among other things, Taro's new capacity to take on additional market share for Imiquimod Cream and how that should be accommodated in the market. As always, CW-6 and T.P. kept their supervisors, Kaczmarek and Wesolowski, informed of the content of those conversations. Some of these calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
| --- | --- | --- | --- | --- | --- | --- |
| 9/21/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 6:22:00 | 0:01:00 |

| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:24:00 | 0:04:00 |
|---|---|---|---|---|---|---|
| 9/21/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 6:49:00 | 0:02:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:46:00 | 0:03:00 |
| 9/23/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:31:14 | 0:12:10 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:23:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:29:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:39:00 | 0:03:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 12:46:00 | 0:04:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:49:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:12:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:19:00 | 0:01:00 |
| 9/26/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 13:26:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 5:48:00 | 0:03:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:50:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:16:00 | 0:04:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:46:35 | 0:05:01 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:05:00 | 0:03:00 |
| 9/27/2011 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:42:00 | 0:01:00 |
| 9/27/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:24:00 | 0:01:00 |

255.    After this series of calls, on September 30, 2011, Kaczmarek e-mailed other

Fougera sales executives, including D.K., to advise them that Taro had made an offer for

Imiquimod Cream at Wal-Mart, a Fougera customer. Kaczmarek explained that ███████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Kaczmarek reluctantly recommended that Fougera give up Wal-Mart's business and ███████████████████████ Kaczmarek noted that, if Fougera defended Wal-Mart's business, Taro would likely just go after other customers at lower and lower prices ████████████████ On the other hand, if Fougera gave up Wal-Mart, Taro would hopefully ████████████████████ s███████████████████████████ D.K. agreed with Kaczmarek's recommendation and Fougera ultimately ceded the business to Taro in order to keep the market stable.

256.   The goal of these communications between the various competitors on Imiquimod Cream—Fougera, Perrigo, Sandoz, and Taro—was always to avoid competition and minimize the price erosion that would typically come with the entry of new competitors. The results were highly successful.

### iii.   Triamcinolone Acetonide Cream and Ointment

257.   Triamcinolone Acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Triderm, is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes. Triamcinolone Acetonide is available as both a cream and an ointment.

258.   As of July 2010, Fougera and Perrigo were the only generic manufacturers in the market for both Triamcinolone Acetonide Cream and Ointment. They took advantage of their already ongoing collusive relationship to raise prices on both products.

259.   On July 1, 2010 and again on July 20, 2010, Fougera raised WAC prices
for various sizes and formulations of both the cream and the ointment. CW-3, a sales
executive at Fougera, later described these price increases as a ███████████." On
July 21 and July 30, 2010, Perrigo increased its own WAC prices on the same products to
comparable levels.

260.   In the days leading up to, and surrounding these increases, CW-6 of
Fougera and T.P. of Perrigo exchanged at least eight (8) calls. These calls are detailed in
the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 6/30/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:29:36 | 0:00:59 |
| 7/1/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:32:00 | 0:00:04 |
| 7/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:43:00 | 0:00:07 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 12:19:10 | 0:00:59 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:22:47 | 0:04:38 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:27:29 | 0:00:04 |
| 7/22/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 18:28:03 | 0:03:23 |
| 7/29/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 11:37:26 | 0:00:33 |

261.   After the price increases, both companies adhered to their understanding
not to poach the other's customers or improperly take advantage of the price increase by
seeking additional market share.

262.   For example, on July 30, 2010, a Perrigo customer, ABC, provided Fougera
an opportunity to bid on its Triamcinolone Acetonide business because of Perrigo's price
increase. CW-3 of Fougera e-mailed Kaczmarek, his supervisor, stating, ███████████

███████████████████████████████████

███████████████████████████████████████████████████

███████████████ N ███████████

263.   That same day, Kaczmarek called CW-6. The call lasted two (2) minutes.

CW-6 then called T.P. of Perrigo and they spoke for three (3) minutes. CW-6 hung up

with T.P., called Kaczmarek back, and they spoke for five (5) minutes. Immediately upon

hanging up, Kaczmarek responded to CW-3's e-mail, with a copy to CW-6. Confident

that the agreement with Perrigo was strong, Kaczmarek stated, ███████████████████

███████████████████████   At the same time, T.P. called his supervisor,

Wesolowski, and they spoke for five (5) minutes.

#### iv.   Adapalene Cream

264.   Adapalene Cream, also known by the brand name Differin, is a retinoid

used to treat severe acne.

265.   On July 6, 2010, Fougera received FDA approval as the first-to-file generic

for Adapalene Cream. Two weeks later, on July 20, 2010, Fougera entered the market

and published WAC pricing.

266.   Fougera quickly realized, however, that it would not be alone in the market

for long, and that Perrigo would soon emerge as a competitor. On August 9, 2010,

Kaczmarek e-mailed D.K., a senior executive at Fougera, regarding █████████████

██████ stating: "Walgreens and Cardinal [are] reporting contact from Perrigo as AG –

████████████████████████████████   Similarly, a few weeks later, on

August 30, 2010, D.K. informed other Fougera executives: █████████████████████

████████████████████████████████████████████████████

█████████████ Several Perrigo representatives attended NACDS, including T.P., Wesolowski, and S.K., a senior Perrigo executive.

267.   On September 27, 2010, CW-6 of Fougera called T.P. of Perrigo. The call lasted less than one (1) minute. Minutes later, T.P. called CW-6 back and they spoke for three (3) minutes.

268.   Two days later, on September 29, 2010, Kaczmarek informed D.K. that Perrigo would be shipping Adapalene Cream in two (2) weeks and sending out offers to customers starting that day. D.K. passed that information along to other senior Fougera executives.

269.   On October 1, 2010, M.A., a marketing executive at Fougera, e-mailed D.K. to inform him that there had been no publicly reported changes in the Adapalene market. D.K. responded: ███████████████████████████

████████

270.   Between October 5 and October 7, 2010, CW-6 of Fougera and T.P. of Perrigo exchanged several calls. Shortly after hanging up with T.P., CW-6 called his supervisor Kaczmarek to report on his conversations. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/5/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 15:52:49 | 0:00:04 |
| 10/5/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 15:53:18 | 0:03:26 |
| 10/5/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:07:16 | 0:00:05 |
| 10/7/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:44:57 | 0:00:40 |
| 10/7/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:53:16 | 0:00:57 |
| 10/7/2010 | Voice | CW-6 | Incoming | Kaczmarek, | 16:56:59 | 0:10:40 |

| | | (Fougera) | | Walt (Fougera) | | |
|---|---|---|---|---|---|---|

271.   On October 8, 2010, D.K. e-mailed Kaczmarek with a subject line

██████████ stating: ████████████████ That same day, Kaczmarek called CW-6

and they spoke for two (2) minutes. After that call, CW-6 again exchanged several calls

with T.P. of Perrigo. After hanging up with CW-6, T.P. immediately called his

supervisor, Wesolowski. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

272.   CW-6 of Fougera and T.P. of Perrigo continued to exchange calls in the

days leading up to Perrigo's launch of Adapalene Cream. As before, CW-6 and T.P.

continued to keep their supervisors, Kaczmarek and Wesolowski, informed of their conversations. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:53:56 | 0:01:00 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:16 | 0:00:08 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:55:46 | 0:05:04 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:01:36 | 0:00:03 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:33:46 | 0:00:36 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 11:46:18 | 0:15:02 |
| 10/14/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 15:58:59 | 0:01:40 |
| 10/19/2010 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 16:37:08 | 0:00:58 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:49:32 | 0:12:42 |
| 10/19/2010 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 17:10:46 | 0:04:14 |
| 10/21/2010 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 13:03:06 | 0:02:35 |
| 10/21/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:05:59 | 0:00:00 |

273.   On October 25, 2010, Perrigo entered the Adapalene Cream market and published WAC pricing that matched Fougera's WAC pricing exactly. That same day, CW-6 and T.P. spoke again for nearly four (4) minutes.

274.   From the outset, and consistent with fair share principles, Fougera understood and agreed that it needed to give up 40% of its share of the market to Perrigo. CW-6 of Fougera and T.P. of Perrigo also discussed which customers Fougera would give up. For example, the day after Perrigo's entry, on October 26, 2010, CW-6 and T.P. spoke at least four times. Shortly after the last of those calls, CW-6 sent the following e-mail to Kaczmarek regarding ███████████████████ stating:

**From:**
**Sent:**      Tuesday, October 26, 2010 8:42 PM
**To:**      Walt Kaczmarek
**Subject:**      Adapalene cream - ones to dismiss

I suggest we look to give up the following accounts:

Publix
Rite Aid
Super Value
Kroger
Cardinal
NC Mutual
CVS ($70)

275.   Fougera wasted no time in acting on CW-6's recommendations and ceding significant share to the new entrant, Perrigo. Perrigo, in turn, focused specifically on the list of customers provided by CW-6. For example, on October 25, 2010, Publix informed Fougera that it had received a competitive offer for Adapalene Cream and offered Fougera the opportunity to retain the business. The next day, on October 26, 2010, S.H., a Fougera sales executive, declined to bid stating,

276.   Also on October 25, 2010, NC Mutual informed Fougera that it had received a competitive offer for Adapalene Cream. On October 28, 2010, CW-3 forwarded the request to Kaczmarek asking: Kaczmarek responded in the affirmative. Later that day, CW-3 responded to NC Mutual stating:

277.   On October 26, 2010, Rite Aid advised Fougera that it had received a competitive bid for Adapalene Cream. Consistent with the plan, on November 2, 2010, Fougera ceded the account to Perrigo, telling the customer: █████████████████ ███████ and reasoning that ██████████████████████████

278.   On October 29, 2010, Kroger informed CW-3 that it had received a competitive offer from Perrigo for Adapalene Cream. CW-3 forwarded the e-mail to Kaczmarek asking: ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████ Kaczmarek responded: ████████████████████

████████████████████████████████████████████████████████

██████████████████████ CW-3 would later acknowledge in his October 2010 monthly recap that the decision not to match Perrigo's offer was a ████████████ meant ██ ███████████████████████ to the new entrant, Perrigo.

279.   Further, by the end of October 2010, Fougera had also given up Cardinal's Adapalene Cream business to Perrigo.

280.   The agreement operated successfully for both Fougera and Perrigo. Fougera was impressed that Perrigo had behaved responsibly by keeping prices high and focusing on the agreed-upon customers as it entered the market for Adapalene Cream. As D.K. noted in an internal e-mail, ████████████████████████████████████

████████████████████████████████████████████████████ He stated further, ██████████████████████████████████

### v.   Betamethasone Dipropionate Lotion

281.   Betamethasone Dipropionate Lotion ("Betamethasone Dipropionate" or "Beta Dip"), also known by the brand name Diprolene, is a topical steroid used to treat inflammation caused by allergic reactions, eczema, and psoriasis.

282.   In 2010, Fougera, Perrigo, and Teva were the only three competitors in the market for Betamethasone Dipropionate.

283.   On December 16, 2010, CW-6 of Fougera e-mailed Kaczmarek to inform him that Teva was exiting the market, leaving Fougera and Perrigo as the only competitors. With a strong collusive understanding firmly in place between Fougera and Perrigo at that point, Kaczmarek was thrilled with the news and immediately suggested that Fougera take advantage of Teva's departure by increasing pricing on the product:

**From:** Walt Kaczmarek
**Sent:** Thursday, December 16, 2010 9:51 AM
**To:** ▮
**Cc:** ▮
**Subject:** FW: Beta Dip Lotion (not augmented)

Let's add this one to the beta party!  Current WAC is $6.50, that will need to go up significantly.  Thinking $40 or so.

Walt Kaczmarek
Vice President, National Accounts

284.   Also on December 16, 2010, Perrigo held an internal meeting to discuss increasing pricing on Betamethasone Dipropionate. Notes from that meeting stated: ▮ ▮ That same day, T.P. of Perrigo and CW-6 of Fougera exchanged several calls. After hanging up with T.P., CW-6 called Kaczmarek to update him on their discussions. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/16/2010 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Fougera) | 8:58:29 | 0:00:25 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:12:49 | 0:05:32 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:18:34 | 0:01:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 9:20:00 | 0:03:51 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:24:02 | 0:05:03 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 10:00:24 | 0:01:08 |
| 12/16/2010 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 10:34:32 | 0:01:04 |

285.    After this series of phone calls, Perrigo also decided to raise prices—and did so even before Fougera. On January 4, 2011, Perrigo increased its WAC pricing for Betamethasone Dipropionate by 504% to $37.50. That same day, T.P. called CW-6 and they spoke for seven (7) minutes. Just minutes after hanging up, CW-6 again called Kaczmarek. The call lasted one (1) minute.

286.    Three days later, on January 7, 2011, the Fougera sales team held a conference call during which they discussed the upcoming increase on Betamethasone Dipropionate, among other products. That same day, T.P. called CW-6 and they spoke for four (4) minutes. Over the course of the day, the two competitors would exchange several more calls and CW-6 would continue to keep Kaczmarek apprised of his discussions. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:02:00 | 0:04:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 9:48:35 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:21:00 | 0:01:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:22:00 | 0:01:00 |

| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 11:17:00 | 0:02:00 |
|----------|-------|----------------|----------|----------------|----------|---------|
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 13:45:31 | 0:00:00 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Incoming | Kaczmarek, Walt (Fougera) | 14:56:11 | 0:00:14 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:00:53 | 0:20:39 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 16:00:36 | 0:04:27 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 16:05:31 | 0:01:57 |
| 1/7/2011 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Fougera) | 16:17:40 | 0:01:15 |
| 1/7/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 17:09:52 | 0:00:00 |

287.   On January 12, 2011, Fougera followed Perrigo and increased its WAC pricing on Betamethasone Dipropionate to $39.99—slightly higher than Perrigo's WAC pricing. The next day, on January 13, 2011, CW-6 called T.P. again and they spoke for twelve (12) minutes.

### vi.   Clotrimazole Betamethasone Dipropionate Cream and Lotion

288.   Clotrimazole Betamethasone Dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of clotrimazole (a synthetic antifungal agent) and betamethasone dipropionate (a synthetic corticosteroid). CBD comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion"). These products are used to treat a variety of inflamed fungal skin infections such as ringworm, athlete's foot, and jock itch. In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

a) *March And April 2011—Actavis Raises Prices And Fougera And Taro Follow*

289.   In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

290.   On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices to customers by as much as 1100%. Notably, Actavis had not yet conveyed the proposed increases to its customers. In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

291.   Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. For example, on March 9, 2011—the same day that J.R. circulated the price increase proposal internally at Actavis—D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In that recap, D.H. reported that for CBD

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Further, D.H. reported: ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ The reference to ▮▮▮▮▮▮▮ is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion. Importantly, Taro had not yet raised its prices on those products.

292.   Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro

104

were in contact with one another to ensure that each competitor would follow the other's price increases.

293.   For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing executive, eight (8) times for a total of approximately fifty-two (52) minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

294.   On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream. By happenstance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

295.   Before the announcements went out, Perfetto e-mailed the Actavis sales executives, telling them to ███████ and to stick to the story that the price increase is ███████████████████████████████████████ One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's ██████████████████ In reality, Actavis knew the API █████████████ ██████████████████████ and were █████████ for the pricing of prescription medications such as CBD Cream.

296.   In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price

increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

297.   On March 30, 2011—just three business days after Actavis sent out its price increase notices for CBD Cream—Fougera sent out notices to its customers stating that it was raising prices for CBD Cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%. The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen (18) minutes.

298.   Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion. For some customers, Taro raised prices for CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%. The next day, H.M. called CW-6 and they spoke for eighteen (18) minutes.

299.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion—raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet, with this price increase, their gross profit percentage would soar to 96%. Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

300.   In furtherance of the conspiracy, Fougera refrained multiple times from taking customers that approached it for bids. For example, after Taro's increase, Wal-Mart, a Taro customer for CBD Cream and Lotion, asked Fougera to bid for that business. Kaczmarek cautioned ███████████████████████████████████ In an effort to conceal the reason for not bidding, Kaczmarek instructed his colleagues that the

███████████████████████████████████████████████

Likewise, when Rite-Aid approached Fougera, Fougera did not even consider making a competitive offer. Instead, a Fougera employee asked internally: ████████████████

████████████████   Kaczmarek determined that Fougera should opt for the latter.

301.   Shortly after pulling off one massive coordinated price increase, Taro wasted no time planning the next. In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive, detailed how Taro had already approached Fougera about raising CBD prices again:



Message

| From: | [/O=NYCUS MAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=▮▮] |
| Sent: | 5/6/2011 1:34:20 PM |
| To: | Walt Kaczmarek [/O=NYCUS MAIL/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WKaczmarek] |
| Subject: | RE: BD/BV creams/lotion |

Geez. BTW, ▮▮ told me Mitch from Taro called him to ask, "If we increase prices on CBD will Fougera follow"?  I told ▮▮ that Taro are idiots.

▮▮
Sr. Vice President, General Manager
Nycomed US Inc
P.O. Box 2006
60 Baylis Road
Melville, NY 11747

**b)** ***Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox***

302.    By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream. Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera. During these calls, Taro conveyed to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |

| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

303.   On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion—raising its WAC by 71% and increasing its contract prices across the board, in some cases by over 900%. At the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet, with this price increase, their gross profit percentage would soar to 96%. Fougera estimated that these increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

304.   The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

305.   In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

306.   On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because ███████████████████

███████████████████████████ At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto

said he was ███████████████████████████ and that Actavis █████████

███████ Aprahamian replied, ████████████████████████ The

following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call

lasting fourteen (14) minutes. Following his calls with Blashinsky, Perfetto instructed

Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012.

After that call, an Actavis employee suggested that Actavis should stick by their RFP

price and take the business because it was █████████████████████████

█████████ Aprahamian, however, responded simply and directly: ████████

### c)   *Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013*

307.   In the fall of 2012, a fourth competitor (Prasco) was entering the CBD

Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were

still the only competitors in the CBD Lotion market. Facing new competition on CBD

Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

308.   Starting in late August 2012, Sandoz began planning a 100% price increase

on CBD Lotion to take place in October, which—assuming ██████████████

██████—would bring in an estimated additional $3.9 million to Sandoz annually. In the

weeks leading up to its planned increase, Sandoz made repeated overtures to Taro to

secure that ████████ behavior, including the following calls:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |

| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
|---|---|---|---|---|---|---|
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

309.    On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling its WAC price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to poach Sandoz's customers. For example, when MMCAP e-mailed Taro on October 26, 2012 to request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to the customer's request.

310.    Taro also made plans to follow the Sandoz price increase. On January 4, 2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase. That same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes. The pair spoke again on January 7, 2013 for thirteen (13) more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of Sandoz for twenty-three (23) minutes.

311.    On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising WAC by approximately 80% and contract prices by approximately 60%.

111

312.    After Taro's increase was issued, news of it spread throughout Sandoz. One Sandoz employee remarked ████████████████████ Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing executive, specifically instructed Sandoz employees to ████████████████ for CBD Lotion bids, because ████████████████

### vii.  Fluocinonide Solution

313.    Fluocinonide Solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rash. Fluocinonide Solution comes in 20ml and 60ml bottles.

### a)  *Fougera Raises Prices In May 2011 And Taro Follows*

314.    In early 2011, the competitors in the Fluocinonide Solution market were Teva, Taro, and Fougera. All three competitors produced Fluocinonide Solution in 60ml bottles, while only Taro produced it in 20ml bottles.

315.    In the beginning of April 2011, Fougera's Fluocinonide Solution products had been on long-term backorder due to quality control issues with the tips of the bottles leaking. As a result, the market was split between Teva (76% market share) and Taro (19% market share) until Fougera returned to production. Fougera was working to re-launch its Fluocinonide Solution products by mid-May 2011.

316.    On April 21, 2011, Kaczmarek learned by e-mail that Teva was ████████████ Fluocinonide Solution; that is, Teva was stopping production and leaving

the market. This meant the only competitors in the market would now be Fougera and Taro.

317. Even though it was still on backorder due to supply problems, Fougera viewed Teva's exit as an opportunity to increase prices. In internal calculations of the expected benefit from the pricing action, Fougera assumed that ███████████████████ ████████████████ and that they would split the market 50/50. Fougera estimated that this would provide it with a yearly gain of $4.6 million.

318. On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide Solution by 100% from—$12.50 to $25.00—with the change effective the following day. That evening, Fougera also sent out contract price-change notifications to customers where it had existing contracts for Fluocinonide Solution. With those increases, the average net sales price jumped 800% from $2.50 to $20.

319. On May 13, 2011—three days after Fougera sent out its price changes— CW-6 and H.M. of Taro exchanged two calls, with one call lasting five (5) minutes.

320. One week later, on May 20, 2011, Taro followed Fougera's lead by substantially increasing its pricing for Fluocinonide Solution. Taro increased the WAC price for the 20ml and 60ml formulations by 200% and 400%, respectively. Taro also increased average net sales prices by 260% and by over 500% for the 20ml and 60ml formulations, respectively.

321. Following their respective price increases, the market share between Taro and Fougera stabilized to rough parity. By September 2011, Fougera had approximately 50% market share and Taro had approximately 48% market share.

**b)** *Fougera Raises Prices In February 2012 And Taro Follows*

322. On January 25, 2012, CW-6 and H.M. exchanged several calls. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:36:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:37:00 | 0:01:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 8:38:00 | 0:04:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 9:19:00 | 0:02:00 |
| 1/25/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 9:32:00 | 0:02:00 |

323. First thing the next morning, on January 26, 2012, Kaczmarek sent an e-mail to his Fougera colleagues stating, ███████████████████████████

███████████████████████████████████████████████

████████████████████████ The proposed price increase involved nearly tripling Fougera's WAC price and increasing associated contract prices in a little over two weeks' time.

324. This price increase opportunity was viewed as so pressing by Kaczmarek that he asked A.R., a Fougera business analyst, to put together a pricing analysis that evening while flying on a plane because she had a scheduled day off the next day.

325. First thing the next morning, on January 27, 2012, Kaczmarek called CW-6 and they spoke for twenty-two (22) minutes. CW-6 hung up and immediately called H.M. of Taro. The call lasted one (1) minute. A few minutes later, CW-6 called H.M. again and they spoke for twenty-one (21) minutes. Later that day, CW-6 called Kaczmarek twice. The calls lasted four (4) minutes and three (3) minutes, respectively.

326.   Later that evening, on January 27, 2012, Kaczmarek submitted the proposed price increase to the Fougera Pricing Committee. Now, the price increase had grown even larger. The plan was to raise Fougera's WAC price from $25 to $80.99 and increase its average net sales price from $18.08 to $58.57. This increase was estimated to bring in an additional $10.1 million in gross profit for the rest of 2012. Members of the Fougera Pricing Committee enthusiastically embraced the massive price hike, with one member responding: ▮▮▮▮▮▮

327.   On February 13, 2012, CW-6 called H.M. and they spoke for five (5) minutes. The next day, on February 14, 2012, Fougera formally raised its WAC and contract prices for Fluocinonide Solution as planned.

328.   The increases more than tripled Fougera's WAC price as well as direct and indirect contract prices for its customers. The increase was so dramatic, that third party data vendor Medi-Span—which tracks WAC prices—reached out to Fougera to confirm that the new WAC amount was not an error.

329.   On February 15, 2012, the day after the increases, CW-6 called H.M. again and they spoke for six (6) minutes. Later that day, Blashinsky, a senior Taro marketing executive, circulated an e-mail informing others within Taro that prices in the Fluocinonide Solution ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

330.   In furtherance of their price increase conspiracy, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share. Indeed, Taro refused to poach even very small customers. For example, Meijer requested that Taro submit a bid for Fluocinonide

Solution. Internally, Taro noted ███████████████████████████████ of

market share. Nonetheless, Taro declined to provide Meijer with a bid and instead falsely

claimed that Taro did not have inventory to supply them.

331.   Similarly, HD Smith asked Taro to bid for its Fluocinonide Solution

business after Fougera increased. The representative at HD Smith even stated that she

████████████████████████████████████████████ S.B., a Taro sales

executive, relayed this news to J.J., a senior Taro sales executive, who then chastised him

for even considering the offer:

From: ████████

Sent: 02/17/2012 02:15 PM EST

To: ████████

Subject: Re: Fluocinonide

We are raising our prices to send a message to Fougera that that is a good thing and we will
follow. Stealing share may send the wrong message.   Think.

████████

Vice President, Rx Sales

Taro Pharmaceuticals U.S.A., Inc.

████████

332.   While Taro planned and implemented corresponding price increases,

representatives of Taro and Fougera remained in contact, including but not limited to

exchanging the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/15/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 7:39:00 | 0:02:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Incoming | CW-6 (Fougera) | 6:00:00 | 0:03:00 |
| 2/16/2012 | Voice | D.S. (Taro) | Outgoing | CW-6 (Fougera) | 6:03:00 | 0:02:00 |
| 2/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 12:13:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |

| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |

333.  The day after the final calls detailed above, on March 9, 2012, Taro implemented its price increase, which essentially doubled its WAC and contract prices for both the 60ml and 20ml formulations of Fluocinonide Solution.

### viii. Erythromycin Base/Ethyl Alcohol Solution

334.  Erythromycin Base/Ethyl Alcohol Solution ("Erythromycin Solution") is a topical medication used to treat acne.

335.  In the summer of 2011, Defendants Fougera and Wockhardt were the only two competitors in the market for Erythromycin Solution. However, both manufacturers would experience intermittent supply issues that would require their exit from the market for periods of time. Because of these supply problems, extensive coordination was necessary between competitors in order to maintain a stable market.

336.  Between May 17 and May 19, 2011, Defendant Perrigo discussed internally whether to re-enter the Erythromycin Solution market. The next day, May 20, 2011, T.P. of Perrigo called CW-6 of Fougera and they spoke for seven (7) minutes. Immediately after that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The following Monday, on May 23, 2011, Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product within six months.

337.  On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Kaczmarek, stating, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

338.    Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales executive, three times, including one call lasting ten (10) minutes. Notably, these were the first phone calls ever between the two competitors according to available phone records. Indeed, CW-6 and M.C. were not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

339.    Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.C. did not have an independent relationship, CW-6 acted as the go-between—relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

340. On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

341. On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011. Wesolowski stated,

█████████████████████████████████████████████████████████

Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera. At the same time, CW-6 was speaking with M.C. of Wockhardt. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

342. The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera. The call lasted two (2) minutes. Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek:

**From:** ▮▮▮▮▮▮
**Sent:** Friday, November 18, 2011 10:59 AM
**To:** Walt Kaczmarek
**Subject:** Erythromycin Topical Solution

Walt,

FYI. I heard from a customer that Perrigo is planning to launch Erythromycin Topical Solution in the next few weeks.

Thanks, ▮▮▮▮

343. It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing. In response to CW-3's e-mail, Kaczmarek stated simply:

▮▮▮▮▮▮▮▮▮

344. On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four (4) minutes. Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution:

-----Original Message-----
From: ▮▮▮▮▮▮
Sent: Wednesday, November 30, 2011 12:37 PM
To: Walt Kaczmarek
Subject: Erythromycin TS Intel

FYI....Wockhardt will be out of erythro TS 60 ml for 18 – 24 months starting in January.  That leaves only us and Perrigo.  Perrigo has not launched yet but is shooting for end of year.

345. Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager. A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

346. A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher—indeed, approximately 200% higher—than the market WAC pricing at that time.

347. CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself. On these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

348. Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

349. At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team stating, ███████████████████████████████████

███████████████████████████ CW-3 responded with the following e-mail:

| | |
|---|---|
| **From:** | ███████████████ |
| **Sent:** | Monday, April 30, 2012 12:26 PM |
| **To:** | Walt Kaczmarek; ███████████████ |
| **Subject:** | RE: erythromycin sol |

Heard that Wockhart will be discontinuing sometime soon due to API issues (re-qualify new API supplier with the FDA) and will be out of the market for quite a while.

350. Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013. Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

351. The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing. That morning, Kaczmarek sent the following e-mail to his sales team:



-----Original Message-----
From: Walt Kaczmarek
Sent: Thursday, May 03, 2012 7:47 AM
To: National_Accounts
Cc:
Subject: FW: Usage Decision Notification for Backorder Material

Gents:

We are back in business on erythro topical.  Launch quantities listed below.  Let's get some market share.  Smart, targeted approach please.

Walt Kaczmarek
Senior Vice President, Commercial Operations
Fougera Pharmaceuticals Inc.

352. That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five (5) minutes and called A.F., a sales executive at Perrigo. Further, CW-6 called his contact at Perrigo, T.P., and the two competitors spoke for fifteen (15) minutes. Immediately after

hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

353.    The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the following e-mail regarding Erythromycin Solution to other Perrigo executives:

| From: | John Wesolowski |
|---|---|
| To: | |
| Sent: | 5/7/2012 9:07:29 AM |
| Subject: | FW: Daily Sales |
| Attachments: | 2012-05-04 Daily Sales.xlsx |

Fougera is coming back into the market on Ery sol. We will need to give up some market (25-35%) which will effect overall units and forecast. They are not in yet but the market is indicating they are very close. I think they are aware of our price increase so hopefully very little effect on overall ASP.

Thanks,

354.    On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team. Kaczmarek advised: ▮▮▮▮▮▮

s▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As he explained,

blanketing the market with offers is ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮

355.    Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, A.F. and T.P. As was his practice, after hanging up with T.P., CW-6 immediately reported back to Kaczmarek what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |

| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

356.    On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent

the following internal e-mail to his sales team, lying about the source of his information

to avoid putting evidence of illegal conduct into writing:

| From: | Walt Kaczmarek |
| Sent: | Monday, May 14, 2012 11:11 AM |
| To: | National_Accounts; ▮▮▮▮▮▮▮▮ |
| Subject: | updated erythro sol strategy |
| Attachments: | erythro sol pricing grid_5.14.12.xlsx |

All:

As you may be aware, we have been receiving customer intel to suggest that Perrigo took the entire market upon the exit of Wockhardt.  As such, new price points attached as well as phase 1 accounts (highlighted in green).

357.    Less than two months later, on June 7, 2012, Fougera recalled

Erythromycin Solution and again placed the product on back order. By that time, Fougera

had approached and secured approximately 12% market share on the product, including

several customers on its target list such as Rite Aid, Cardinal, Optisource, and

SUPERVALU.

358.   By August 2012, Fougera had resolved those supply issues. Around this same time, Defendant Sandoz had completed its acquisition of Fougera. As Fougera (now Sandoz) prepared to re-enter the Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

359.   After the Fougera acquisition was completed, CW-6 left the company for another position. At some point before he left Fougera, CW-6 introduced CW-3—who would be remaining at Sandoz after the acquisition—to T.P. at Perrigo. This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

360.   The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

361.   On September 5, 2012, S.G., a Sandoz sales executive, e-mailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens. Kellum responded, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On September 6, 2012, CW-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

362.   The next day, on September 7, 2012, CW-3 sent an internal e-mail including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers that Fougera had targeted when it re-launched Erythromycin Solution in May 2012. Not wanting to have a discussion in writing, CW-1 responded to CW-3 directly, stating, ▮▮▮▮▮▮▮▮▮▮▮▮

125

363.   On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three (3) minutes. CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz. The call lasted one (1) minute. Later that day, CW-3 called K.K. of Wockhardt. The call lasted one (1) minute.

364.   The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Wal-Mart and advised that they would be the only customers Sandoz would be bidding on at this time. That same day, K.K. of Wockhardt called CW-3 and they spoke for four (4) minutes.

365.   Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes, respectively. By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

### ix.   Nystatin Ointment

366.   Nystatin Ointment, also known by the brand name Mycostatin, is a topical antifungal medication used to treat fungal skin infections.

367.   In early 2011, Fougera and Perrigo were the only players in the market for generic Nystatin Ointment.

368.   On February 7, 2011, J.E., a Fougera sales executive, circulated internally a list of products and their potential for price increases. While Nystatin Ointment was one of the products deemed worthy of consideration, the initial conclusion was that its ███

███████████████████

369.   Undaunted, key Fougera employees turned to rival Perrigo for a creative solution to the problem of low prices and low profits on Nystatin Ointment. Between February 7 and February 28, 2011, CW-6 of Fougera and T.P. of Perrigo were in frequent communication with each other, exchanging twenty-seven (27) calls and three (3) text messages, with eleven (11) of the calls taking place on February 28, 2011. During these calls, the competitors hatched a plan for Fougera to leave the market temporarily, allowing Perrigo to significantly raise prices, at which point Fougera would return to the market at that new, higher pricing.

370.   By March 1, 2011, word of the plan formulated during those phone calls had begun to spread into the market, reaching J.E. at Fougera by way of a customer. Perplexed, J.E. e-mailed Kaczmarek, asking: ███████████████████████

███████████████████████████████████████████

███████████████████████████████████

371.   Kaczmarek responded in the affirmative: ████████████████

███████████████████████████████████████████

█████████████████████████████████████ In fact, other Fougera personnel were already preparing a draft letter announcing the discontinuation of the product.

372.   Fougera subsequently discontinued Nystatin Ointment effective March 15, 2011.

373.   By late March 2011, numerous large customers including Meijer, Morris & Dickson, Rite Aid, Giant Eagle, and NC Mutual, had switched their Nystatin Ointment business to the only remaining alternative in the market—Perrigo.

374.   With essentially the entire market transferred to Perrigo, and customers left with no alternative suppliers, the stage was set for the next phase of the plan. On June 1, 2011, Perrigo instituted a large WAC price increase on Nystatin Ointment. Indeed, the price of a 15gm tube increased by 493%, and the price of a 30gm tube increased by 269%.

375.   That same day, CW-6 of Fougera called T.P. of Perrigo. The two competitors spoke for six (6) minutes. Nine days later, on June 10, 2011, CW-6 and T.P.'s discussions intensified with the two competitors exchanging seven calls that day.

376.   As those phone calls were taking place—and less than three months after it had discontinued the product—Fougera was taking the first steps towards re-launch by starting to market the remaining inventory of Nystatin Ointment that it had on hand when it discontinued the product.

377.   On June 12, 2011, senior Fougera executive D.K. requested an update on discontinued items that the company might want to bring permanently back into its product line. J.S., a Fougera marketing executive, sent back a list the next morning, calling special attention to Nystatin Ointment: ███████████████████████████

█████████████████████████████████ Recognizing the lucrative opportunity presented by following Perrigo's price hike, D.K. replied, ████████████████████

████████████████████████████████████████

378.   But Fougera was not the only company that was motivated by the size of the price increase that Perrigo had managed to implement. Late in the evening on June 14, 2011, Perfetto, then a senior sales and marketing executive at Actavis, sent an e-mail to Aprahamian and other Actavis colleagues with the subject line: ███████████

██████████████████████████████████ The text that followed was simple and clear: ████████████

379.   The next day, Actavis marketing executive J.M. responded with some projections on the financial implications of Actavis entering the Nystatin market. The recent sharp WAC increase by Perrigo made the prospect of entry surprisingly irresistible. J.M. wrote: ████████████████████████████████████

██ J.M. estimated that if Actavis secured a 30% share of the current two-player market, the company would realize more than $3.8 million in sales.  Aprahamian agreed that the time was right to capitalize on the Perrigo price hike, saying: ████████████████

████████████████████████████████████████

████████████

380.   Meanwhile, Fougera continued selling off its previously stockpiled inventory of Nystatin Ointment and made plans to fully re-enter the market at the new higher WAC prices. On June 27, 2011, D.K. of Fougera e-mailed Kaczmarek asking:

████████████████████████████████████████

████████████████████████████████████████

████████

381.   Actavis made its move in early November 2011. On November 4, 2011, just days before the launch, Actavis executive D.M. opined in an e-mail to Aprahamian, Perfetto and other colleagues that conditions were favorable for a very successful launch, including the 187% increase in the price of Nystatin Ointment over the past year, and the fact that Fougera had not yet re-entered the market. Aprahamian inquired how much share Actavis could handle. In response, D.M., mindful of the fair share rules of the game, replied:

382.   On November 7, 2011, Actavis re-entered the market with WAC prices that exactly matched Perrigo's.

383.   On the day of the Actavis launch, the phone lines among the three competitors were alive with activity. In the morning, T.P. at Perrigo placed two calls to CW-6 at Fougera to discuss the Actavis development. After the second call, T.P. called M.D., an Actavis sales executive, setting off a chain of three more calls back and forth between them totaling more than twenty-three (23) minutes collectively. During these calls, the competitors discussed which customers Actavis should target to obtain its market share goals without eroding the high prices currently in the market.

384.   In the coming weeks, having coordinated its entry with market leader Perrigo, Actavis began collecting its share of accounts, winning business at Omnicare, Publix, and Rite Aid, among others.

385.   Meanwhile, unable to gear up its production for an immediate re-launch, Fougera set its sights on a June 2012 re-launch date for Nystatin Ointment.

386.   On June 15, 2012, a Fougera marketing executive provided Kaczmarek with WAC pricing data for Perrigo and Actavis and asked what Fougera's re-launch WAC prices would be. The competitors' prices were identical to the penny with each charging $14.00 for a 15gm tube, and $21.00 for a 30gm tube. Later that day, Kaczmarek announced to his colleagues that Fougera would also fall in line, saying:

387.   On June 21, 2012, Kaczmarek instructed CW-6 to gather intelligence on price points and ████████████ for Nystatin Ointment. CW-6 initially e-mailed Cardinal asking for contract pricing, emphasizing that Fougera did not ████████████

████████ Knowing that the most accurate source of competitor intelligence was the competitors themselves, however, CW-6 reached out directly to T.P. at Perrigo, initiating a call that lasted two (2) minutes that morning.

388.   The competitors moved forward to claim the market shares to which they had agreed each was entitled, all the while taking great care not to erode the lucrative market pricing. On June 22, 2012, for example, Aprahamian at Actavis rejected a colleague's suggestion to offer a competitive price on Nystatin Ointment to one customer by saying, ████████████████████████████████ On the same day, CW-6 sent the following message to another customer: ████████████

131

389.   On June 25, 2012, CW-6 asked Kaczmarek for Fougera's market share goal for Nystatin Ointment. Kaczmarek's reply acknowledged the importance of playing by the rules of the competitors' agreement: ▬▬▬▬▬▬▬▬▬▬

390.   That same day, CW-6 called T.P. at Perrigo, and they spoke for ten (10) minutes. Immediately after hanging up with T.P., CW-6 called Kaczmarek, and they spoke for three (3) minutes.

391.   With all decisions made and cleared with its competitors, Fougera re-entered the Nystatin Ointment market on June 29, 2012 at WAC prices identical to its competitors. Consistent with the fair share understanding in place between the three competitors, Fougera proceeded to claim its share of accounts over the coming weeks, including business at HEB, Giant Eagle, and Cardinal Health.

### 4)   G&W And Its Relationships

392.   Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years. During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped. These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

### i.   G&W/Fougera

393.   Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera. Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases. The two competitors conspired with regard to several products on which G&W and Fougera overlapped, some examples of which are discussed below.

394.   Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies. Indeed, when CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did, Kaczmarek, CW-6's supervisor at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

395.   One example of this involved Grauso's relationship with Perfetto, then a senior sales and marketing executive at Defendant Actavis. Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine (89) phone calls. Because CW-6 did not have a contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

396.   During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Orlofski of G&W.

397.   Grauso left G&W in December 2011 to take a position as a senior executive at Defendant Aurobindo. With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to

Grauso's former colleagues, Kurt Orlofski and Erika Vogel-Baylor. Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

398.    This worked well for the first few months of 2012. However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6. David Berthold, the Vice President of Sales at Defendant Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

399.    At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even though Grauso had left. No specific products were discussed at the meeting. The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

400.    After the dinner, Vogel-Baylor began to communicate directly with CW-6. Indeed, between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three (133) phone calls and text messages. During this time period, Vogel-Baylor was acting at all times at the direction of, or approval from, her superior Orlofski.

401.    The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and early 2012.

### a) *Metronidazole Cream and Lotion*

402.   Metronidazole 0.75% is a topical antibiotic commonly used to treat the skin lesions that result from rosacea. Among other formulations, it is manufactured as a cream ("Metro Cream," also known by the brand name "Metrocream") and as a lotion ("Metro Lotion," also known by the brand name "MetroLotion"). In 2013, the combined annual market for Metro Cream and Lotion in the United States exceeded $70 million.

403.   In 2011, Actavis, Fougera, G&W, and Harris Pharmaceutical ("Harris") each marketed a generic version of Metro Cream, and Actavis and Fougera shared the market for generic Metro Lotion.

404.   In early July 2011, Actavis initiated its plan to raise the prices of both products by reaching out to its rival G&W. On July 6, 2011, Mike Perfetto, then a senior sales and marketing executive at Actavis, called Grauso at G&W twice. The calls lasted four (4) minutes and twenty-one (21) minutes.

405.   The next day, on July 7, 2011, the conversation continued, with Perfetto initiating a six (6) minute call to Grauso.

406.   Confident that at least G&W was on board with the planned increase, Actavis raised the price of Metro Cream and Lotion effective July 22, 2011. The new WAC price for Metro Cream was $153.33 for a 45gm tube, an increase of 278%. The WAC price for Metro Lotion increased by 189% to $208.03 for a 59ml bottle.

407.   That same day, M.A., a Fougera marketing executive, e-mailed several colleagues, including Kaczmarek, with the precise details of the Actavis increase. Kaczmarek began at once assessing how Fougera would follow, mindful of the fair share

rules and the agreement among the competitors. He inquired of M.A. about G&W's current share of the market, saying: ████████████████████████████

408.    The next morning, on Saturday July 23, 2011, Fougera utilized one of its most reliable sources of information—the relationship between Fougera's CW-6 and Grauso at G&W. CW-6 called Grauso and the two competitors spoke for four (4) minutes. A few minutes later, CW-6 called Grauso again and they spoke for fourteen (14) minutes.

409.    Just after 9:00 a.m. on Monday, July 25, 2011, Kaczmarek cautioned his team at Fougera to consult with management before quoting a price to any customer on Metro Cream or Metro Lotion, saying: ████████████████████████████

████████████████████████████

410.    By 10:31 a.m. that morning, Kaczmarek had already decided on the exact amount by which Fougera should increase its price on these products to stay in lockstep with Actavis. He told his colleagues: ████████████████████████████

████████████████████████████

████████████████████████████ By early afternoon, a price increase announcement letter had already been drafted and circulated for comment, incorporating Kaczmarek's ████████████ formula.

411.    Meanwhile, CW-6 and Grauso continued their discussions that same morning. CW-6 initiated calls to Grauso at 9:55 a.m. and 12:21 p.m.

412.    Less than twenty (20) minutes after the second call with Grauso ended, CW-6 called his boss, Kaczmarek, to report the information he had obtained. A total of

eight calls were exchanged between CW-6 and Kaczmarek on the afternoon and early evening of July 25, 2011.

413.   During those calls—only 3 days after the Actavis increase and before G&W had even been able to follow—Kaczmarek informed the Fougera team ██████████

██████████████████████████████████████

414.   In the early afternoon of Monday, July 25, 2011, a large customer reached out to CW-6 at Fougera seeking a new source of supply for Metro Lotion and another product. CW-6 asked whether the request was the result of supply issues or ████████

████████████   The buyer, tongue-in-cheek, asked which answer would yield the better price. CW-6, following Kaczmarek's earlier instructions replied: █████████████

███████████████████

415.   That same day, Fougera informed its customers that it was increasing its pricing for both Metro Cream and Metro Lotion effective July 26, 2011, closely tracking Actavis's new prices. The new WAC price for Metro Cream was $151.80 for a 45gm tube. The new WAC price for Metro Lotion was $205.95 for a 59ml bottle.

416.   Customers quickly began to complain to Fougera about the sharp price increase, prompting one Fougera customer service representative to ask Kaczmarek for help in framing a response to a disgruntled customer that e-mailed protesting that the roughly 150% price hike was ████████

417.   Undaunted by the obvious dissatisfaction of its customers, Fougera's singular focus was on ensuring that the competitors all followed the price increases. In response to yet another customer inquiry about the price spike, Kaczmarek virtually

disregarded the news of the customer's displeasure, saying instead: ███████████

████████████████

418.   Kaczmarek did not have to worry for long, however, as G&W's plans to follow the Actavis and Fougera price increases on Metro Cream were already in full swing. On July 26, 2011—the day of the Fougera increase—Grauso of G&W called CW-6 of Fougera. The call lasted one (1) minute. CW-6 hung up and immediately called Kaczmarek.

419.   Meanwhile, less than ten minutes after ending his call with CW-6, Grauso brought Actavis into the conversation, initiating a two (2)-minute call to Perfetto. Orlofski of G&W similarly followed up with a text message to Perfetto at Actavis roughly a half hour after that. Grauso called CW-6 at Fougera again a few hours later, and the resulting call lasted seven (7) minutes. Within five minutes of the end of that call, Grauso had placed yet another call to Perfetto at Actavis, this one lasting five (5) minutes.

420.   By that evening, Grauso had spoken to Perfetto by phone for thirty-five (35) more minutes, and had sent him a text message, while CW-6 of Fougera had conferred twice more with his boss, Kaczmarek.

421.   Over the next two days, July 27 and July 28, 2011, Grauso spoke to Perfetto at Actavis four more times and to CW-6 at Fougera six (6) more times.

422.   With its competitors fully apprised, G&W raised the price of Metro Cream on July 28, 2011, following close on the heels of the Actavis and Fougera increases.

423.   As the news of yet another Metro Cream price increase hit the market, customers again scrambled to find more reasonably priced sources of supply. One large

customer reached out to Fougera and Actavis on the same day as the G&W increase seeking quotes. Fougera sales executive K.K. contacted Kaczmarek about the request, surmising both that the customer was currently supplied by G&W and that G&W must be implementing a price increase.

424.    Despite over a week of receiving nearly constant updates from G&W through CW-6, Kaczmarek remained coy about his knowledge of G&W's increase, saying:                         Then, to ensure that K.K. did not try to compete for the business, he added:

425.    Finally, just four days later on August 1, 2011, the remaining competitor, Harris, fell in line with an increase of its own on Metro Cream. The new Harris WAC price was $135.00, an increase of 437%.

426.    On August 2, 2011, a customer informed G&W that its increase would bump G&W from its primary position on Metro Cream, but only by a small margin considering the market-wide increases. Vogel-Baylor promised the customer a slight price adjustment in order to maintain the primary position but asked who the other competitor was. The customer responded that it was Harris.

427.    The following day, the customer followed up with Vogel-Baylor to let her know that Harris would not be fighting G&W for the primary position. The customer added that the Harris representative was upset about the outcome—not because it failed to win the primary position, but rather

139

### b)   *Calcipotriene Solution*

428.   Calcipotriene Solution ("Calcipotriene"), also known by the brand name
Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells. This topical
medication is prescribed for the treatment of chronic plaque psoriasis of the scalp.

429.   In early 2010, the market for generic Calcipotriene was shared by
Defendants Fougera, Hi-Tech, and Impax Pharmaceuticals, Inc. ("Impax"). Even with
three competitors in the market, pricing remained high and the product was "hugely
profitable" for the sellers.

430.   On July 23, 2010, however, Hi-Tech received a warning letter from the
FDA detailing numerous violations found during a recent manufacturing facility
inspection. Even though G&W was not in the Calcipotriene market at the time, Grauso
knew his contact at Fougera would be interested in the information. On July 28, 2010, he
forwarded a copy of the FDA letter to CW-6 at Fougera. Pleased with the news, CW-6
replied:

431.   By the end of July 2010, Hi-Tech had discontinued the product, leaving its
approximate 35% market share open for competitors to claim.

432.   One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several
phone calls, with one call lasting eight (8) minutes. During those calls, Grauso informed
CW-6 that G&W would soon be launching its own generic Calcipotriene. Shortly after
speaking with Grauso, CW-6 e-mailed Kaczmarek and other colleagues at Fougera
sharing the news that he had just learned from his competitor—G&W was launching that
week.

433.   G&W did, indeed, launch Calcipotriene that week—on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

434.   A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

435.   At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal e-mail advising the team to ███████████████████

████████████████████████████████████████████████████████

████████████████████████

436.   Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso and they spoke for five (5) minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

437.   Fougera acted quickly. Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

141

c)   *Fluocinolone Acetonide Cream and Ointment*

438.   Fluocinolone Acetonide ("Fluocinolone") is a steroid that reduces inflammation. In its topical formulations (cream – 0.025%, 0.01% and ointment – 0.025%), it is prescribed for the treatment of skin conditions such as eczema and psoriasis.

439.   In early 2011, Fougera had 100% share of the market for these products and was making plans to implement a price increase.

440.   At an October 3, 2011 meeting of the Fougera Pricing Committee, members discussed their confidence that they were nearly ready to execute the planned increase. Moreover, they discussed the possibility that Fougera could use the impending entry of a competitor into the Fluocinolone market to ensure the success of the price hike, saying: ███████████████████████████████████████████████

███████████████████████████

441.   The market intelligence that the Fougera Pricing Committee had when it convened was the result of at least a week's worth of preparatory conversations that CW-6 had in late September 2011 with the entering competitor—G&W. Between September 20, 2011 and September 27, 2011, CW-6 and Grauso at G&W exchanged five phone calls, speaking for a total of forty-six (46) minutes.

442.   The conversations between CW-6 and Grauso continued at a vigorous pace over the coming weeks as Fougera moved towards its price increase, and G&W planned for its launch. The two exchanged sixteen calls during October and November 2011:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 11:10:00 | 0:06:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 12:10:00 | 0:01:00 |
| 10/7/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 13:08:00 | 0:14:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:22:00 | 0:01:00 |
| 10/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:53:00 | 0:01:00 |
| 10/11/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:39:00 | 0:02:00 |
| 10/31/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:01:00 | 0:06:00 |
| 11/2/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:49:00 | 0:10:00 |
| 11/9/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:01:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 4:29:00 | 0:02:00 |
| 11/10/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 5:56:00 | 0:07:00 |
| 11/11/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 9:55:00 | 0:04:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Outgoing | CW-6 (Fougera) | 14:37:00 | 0:02:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 14:54:00 | 0:11:00 |
| 11/17/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 15:04:00 | 0:04:00 |
| 11/21/2011 | Voice | Grauso, Jim (G&W) | Incoming | CW-6 (Fougera) | 8:37:00 | 0:05:00 |

443.   On the morning of December 14, 2011, Fougera learned that G&W had launched Fluocinolone the preceding day and, importantly, that it had done so at nearly the same pricing as Fougera's current (pre-increase) price.

444.   D.K., a senior executive at Fougera, was quite displeased with the development considering Fougera's impending price increase, saying: ▆▆▆▆▆▆▆

▆▆▆▆▆   J.B., also a senior executive at Fougera, concurred: ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆

445.   Less than a half hour later, Kaczmarek called CW-6. The call lasted two (2) minutes. Immediately after hanging up, CW-6 placed a call to Grauso. They spoke for six (6) minutes. Later that day, the competitors exchanged two more calls lasting nine (9) minutes and eighteen (18) minutes, respectively.

446.   Having received some peace of mind from the conversations between CW-6 and Grauso, D.K. of Fougera sent an internal e-mail recommending that Fougera move forward with the planned price increase on Fluocinolone, adding ▮▮▮▮▮▮▮▮▮▮

447.   To solidify the plan, CW-6 and Grauso placed three more calls to each other that afternoon. Less than an hour after his final call with CW-6, Grauso initiated the first of three calls to his superior, Orlofski, to update him on the Fluocinolone discussions with Fougera. CW-6 also called to update his supervisor, Kaczmarek.

448.   Six more calls followed between CW-6 and Grauso in the days that followed between December 15, 2011 and December 21, 2011.

449.   At the conclusion of that series of calls, on December 22, 2011, Fougera increased WAC pricing on Fluocinolone Cream and Ointment by 200%.

450.   Fougera knew from its discussions with G&W that G&W would follow the price increase. On the morning of December 28, 2011, D.K. of Fougera instructed a co-worker to find out whether G&W had followed Fougera's price increase yet. The co-worker reported that the competitor had not.

451.   Shortly before noon that day, CW-6 and Grauso had a twenty (20) minute phone conversation. Immediately after that call ended, Grauso called his colleague at G&W, Vogel-Baylor.

452.    Less than a week later, on January 3, 2012, G&W followed through with its assurances to Fougera, increasing WAC prices on Fluocinolone Cream and Ointment to within pennies of Fougera's prices. D.K. was delighted by the news and agreed with a colleague's suggestion that Fougera would ███████████████████████ ██████████████████████████

453.    Fougera was satisfied with G&W's compliance and promptly gave up its Wal-Mart business to G&W, quoting intentionally high prices on this drug to allow the rival to ████████████ Specifically, Kaczmarek recommended giving G&W 30-35% share of the market, adding ██████████████████████████████ █████

454.    In early February 2012, the two companies continued to collaborate on allocating the market between themselves to give the new entrant its fair share. CW-6 called Orlofski on the morning of February 1, 2012, because his regular contact at G&W—Grauso—had left the company for employment at Aurobindo a few weeks earlier. Less than one hour later, Orlofski called CW-6 back. On February 8, 2012, Orlofski called Kaczmarek. Kaczmarek called Orlofski back on February 9, 2012, and the competitors exchanged two more calls the following day, including one call lasting over twenty-five (25) minutes.

455.    At the conclusion of these communications, on February 14, 2012, Fougera ceded another large customer to G&W, telling Cardinal that it would █████████ ██████████████████████

### d)   *Betamethasone Valerate Lotion*

456.   Betamethasone Valerate ("Beta Val"), also known by brand names such as Betamethacot, Beta-Val and Betacort Scalp Lotion, among others, is a medium strength topical corticosteroid prescribed for the treatment of skin conditions such as eczema and dermatitis, as well as allergies and rashes. It is manufactured in various formulations, including cream, lotion, and ointment.

457.   In mid-2011, two companies shared the market for Beta Val Lotion— Fougera with 79% market share and Teva with 21%.

458.   In early November 2011, however, Grauso at G&W contacted CW-6 with some important news about G&W's plans to enter the Beta Val Lotion market. Grauso called CW-6 late in the afternoon of November 9, 2011. They also spoke three times the next morning. Later that day, CW-6 informed his Fougera colleagues that G&W would be launching ████████████ and that he believed Teva had discontinued the product. He opined that, under those circumstances, Beta Val Lotion ████████████ ██ Kaczmarek responded: ████████████

459.   Fougera promptly began preparing for an even larger price increase than CW-6 had recommended. On December 13, 2011, CW-3, a Fougera sales executive, created a spreadsheet detailing Fougera's upcoming price increases, including a 200% increase in WAC pricing for Beta Val Lotion from $20.00 to $60.00 per 60ml bottle. The average net sales price for the product would go from $10.11 to $30.33.

460.   With the Fougera price increase details now firm, CW-6 began coordinating the price increase directly with G&W, initiating what became a series of

twelve phone calls with Grauso at G&W from December 14 through December 21, 2011, in the days leading up to Fougera's price increase for Beta Val Lotion.

461.    Fougera's new $60.00 WAC price went into effect on December 22, 2011.

462.    CW-6 and Grauso remained in close contact in the days that followed the Fougera price increase, as G&W also finalized plans for its Beta Val Lotion launch, including a twenty (20) minute call on December 28, 2011, Grauso's last day as a G&W employee. During these calls, the competitors discussed G&W's market share goals and identified customers for G&W to target as it launched.

463.    On January 9, 2012, Vogel-Baylor of G&W (who had just taken over for Grauso) distributed to her colleagues a ████████████ for the G&W launch of Beta Val Lotion, saying ████████████████████ That same day, she sent an e-mail to Wal-Mart announcing the G&W launch. On January 11, 2012, she followed up with a quote, offering to supply the product for $10.40, far below Fougera's newly increased average net sales price.

464.    Vogel-Baylor directed her colleagues at G&W to generate a nearly identical offer letter for another customer—Rite Aid—on January 10, 2012, offering a price of $10.20.

465.    Something had clearly been lost in translation after Grauso's departure, and CW-6 of Fougera set out to figure out what had happened. Late in the afternoon on January 11, 2012, CW-6 placed an urgent call to Grauso, who had recently started at Defendant Aurobindo. Grauso called him back quickly and the two spoke for five (5) minutes. Immediately upon ending that call, Grauso called his former colleague at G&W,

—

Vogel-Baylor, to convey Fougera's concerns about G&W's drastically underpriced offers. As soon as that call ended, Grauso called CW-6 of Fougera to confirm that he had addressed the problem.

466.   At 10:02 p.m. that same day, Vogel-Baylor e-mailed Orlofski with the news she had just received about Fougera:

Fougera raised their WAC & AWP on December 21st as follows:

- WAC - from $20.00 to $60.00
- AWP - from $24.00 to $72.00

I am trying to find out if the prices went up to. I will let you know but for now I would recommend increasing the WAC & AWP to:

- WAC from $30.00 to $60.15
- AWP from $36.00 to $72.25

467.   At 7:55 a.m. the following morning, Vogel-Baylor asked that the G&W team re-submit the Rite Aid proposal with a new price of $20.00, bringing it more in line with Fougera's new price. That same day, G&W also issued a revised price proposal to Wal-Mart, quoting the new price of $20.00.

468.   Vogel-Baylor explained the sudden about-face to a colleague by saying that she had revised the G&W launch pricing for this product ▮▮▮▮▮▮▮▮▮ The modified schedule included $30.00 for large chains, $32-$75 for small chains, and $38.53 for wholesalers, closely paralleling the new Fougera prices.

469.   One week later, on January 19, 2012, Vogel-Baylor announced to Orlofski that G&W had already reached its target market share for Beta Val Lotion: ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ By following Fougera's price increase, that 45% share equated to $1.6 million in total annual gross sales for G&W.

470.   In a February 17, 2012 e-mail exchange with a distributor, Orlofski explained G&W's rationale for not seeking additional market share on this product: ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

### e)   *Metronidazole .75% Gel*

471.   Metronidazole Topical .75% Gel ("Metro Gel .75%," also known by the brand name Metrogel) is a topical antibiotic prescribed for the treatment of skin lesions in patients suffering from rosacea.

472.   As of June 2011, there were three competitors in the market for Metro Gel .75%—Fougera, Sandoz, and Taro

473.   In the summer of 2011, Sandoz was seeking opportunities to increase prices on its products. In pursuit of that goal, on July 6, 2011, J.P., a product manager at Sandoz, sent an internal e-mail asking for information on any recent price increases instituted by rivals Taro and Fougera on a list of products on which the companies overlapped. The list included Metro Gel .75%. J.P. urged that obtaining such information would ██████████████████████████████████████████████

████████████████

474.   That same day, July 6, 2011, CW-4, a senior sales executive at Sandoz, exchanged three calls with D.S. at Taro, including one call lasting sixteen (16) minutes. During these calls, D.S. informed CW-4, among other things, that Taro would be raising

prices on Metro Gel .75%. Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase.

475.   Later that day, CW-4 responded to J.P.'s e-mail stating ███████████ ██████████████████████████████ She then listed out the competitive intelligence she had just gathered from D.S. Regarding Metro Gel .75%, including the notation ███████ ████████

476.   Over the coming months, Sandoz kept watch on the market, waiting to follow Taro's expected price increase on Metro Gel .75%.

477.   In the interim, on July 20, 2011, a fourth competitor, G&W, entered the Metro Gel .75% market. Despite only recently entering the market, G&W quickly got to work coordinating a price increase on Metro Gel .75%. For the increase to succeed, G&W would need to ensure that the other competitors in the market would follow—and follow they did.

478.   From January 29 to February 1, 2012, the ECRM held its Retail Pharmacy Generic Pharmaceuticals Conference in Atlanta, Georgia. Representatives from all four (4) competitors in the Metro Gel .75% market—Fougera, Sandoz, Taro, and G&W— were in attendance. These representatives included CW-6 and Kaczmarek of Fougera, CW-4 of Sandoz, D.S. of Taro, and Vogel-Baylor and Orlofski of G&W. Grauso, then at Aurobindo, was also in attendance.

479.   On February 2, 2012, the day after the conference concluded, G&W generated a price increase analysis for Metro Gel .75%, which included a 245% increase to the WAC price from $39.99 to $137.99. That same day, Vogel-Baylor used her former

colleague Grauso (then at Aurobindo) to convey information to CW-6 at Fougera

regarding the Metro Gel .75% price increase.

480.   For example, on February 2, 2012, Vogel-Baylor called Grauso and they

spoke for eight (8) minutes. Grauso hung up and immediately called CW-6 of Fougera.

The two men spoke for four (4) minutes. Immediately upon hanging up, Grauso called

Vogel-Baylor back and they spoke for eleven (11) minutes. Grauso then called CW-6

again and spoke to him for five (5) minutes. Grauso hung up, received a call from

Orlofski at G&W, and the two men spoke for thirteen (13) minutes. These calls, which all

occurred within the span of less than an hour, are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 9:29:00 | 0:08:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 9:36:00 | 0:04:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 9:40:00 | 0:11:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 10:14:00 | 0:05:00 |
| 2/2/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Orlofski, Kurt (G&W) | 10:19:00 | 0:13:00 |

481.   Later that evening, CW-6 e-mailed his boss at Fougera, Kaczmarek, asking

him to give him a call. CW-6 and Kaczmarek spoke by phone three times the following

day.

482.   On February 7, 2012, Vogel-Baylor e-mailed Orlofski her latest price

increase analysis for Metro Gel .75%. The next day, on February 8, 2012, Orlofski called

Kaczmarek at Fougera. The two competitors exchanged two more calls over the next few

days and finally connected on February 10, 2012 for a twenty-five (25) minute call.

483.    The communications intensified on February 14, 2012 as G&W made final preparations for its price increase announcement. As they had done previously, Vogel-Baylor and CW-6 used Grauso as the conduit to coordinate their plans on Metro Gel .75%. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 8:42:00 | 0:25:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 11:34:00 | 0:02:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 11:56:00 | 0:13:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Orlofski, Kurt (G&W) | 12:09:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:10:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 12:19:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 12:22:00 | 0:04:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 12:26:30 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Grauso, Jim (Aurobindo) | 13:25:08 | 0:00:00 |
| 2/14/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Grauso, Jim (Aurobindo) | 13:25:59 | 0:00:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:40:00 | 0:05:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | CW-6 (Fougera) | 13:44:00 | 0:06:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:49:00 | 0:04:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | CW-6 (Fougera) | 13:55:00 | 0:01:00 |
| 2/14/2012 | Voice | Grauso, Jim (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 14:39:00 | 0:08:00 |

484.    Similarly, the next day, on February 15, 2012, Vogel-Baylor called Grauso and they spoke for eleven (11) minutes. Less than ten minutes later, Grauso called Vogel-Baylor back and they spoke for forty-one (41) minutes. Grauso hung up the phone and

immediately called CW-6 at Fougera. That call lasted one (1) minute. The next day,

Vogel-Baylor instructed her team to generate price increase letters for Metro Gel .75%,

and to issue them by 1:00 p.m. on February 17, 2012.

485.    Even before G&W notified its customers of the increase, other competitors

in the market knew that G&W would be increasing prices and planned to do the same.

For example, on February 15, 2012, two days before G&W sent its notice letters to its

customers, Blashinsky, then a senior marketing executive at Taro, informed his

colleagues that prices had ▮▮▮▮▮▮▮▮▮▮ for Metro Gel .75% and one other

product. ▮▮▮▮▮▮▮▮ he added. B.S., a senior executive at Taro,

responded: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

486.    On February 17, 2012, Orlofski e-mailed Blashinsky of Taro asking if he

was going to the annual GPhA industry conference the following week. Orlofski stated,

▮▮▮▮▮▮▮▮▮ Blashinsky responded, ▮▮▮▮▮

▮▮▮▮▮ The next day, Orlofski e-mailed B.S., a senior Taro

executive, asking ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ B.S. replied, ▮▮▮▮▮

▮▮▮▮▮

487.    On February 17, 2012, G&W sent out letters notifying its customers of the

Metro Gel .75% price increase. That same day, Grauso called Vogel-Baylor and they

spoke for sixteen (16) minutes. Following the now normal pattern, Grauso hung up and

called CW-6 at Fougera. The two men spoke for five (5) minutes. Immediately upon hanging up, Grauso called Vogel-Baylor again. That call lasted two (2) minutes.

488.    On February 18, 2012, a GPO customer e-mailed Vogel-Baylor after receiving the Metro Gel .75% notice asking,



Vogel-Baylor responded,

Of course, Vogel-Baylor already knew that her competitors would follow G&W's price increase, but she could not tell the customer that. Ultimately, the customer negotiated a 45-day notice period and noted,

489.    On February 20, 2012, Blashinsky reiterated to his colleagues that were taking place in the Metro Gel .75% market, and that Taro

490.    From February 22 to February 24, 2012, the GPhA held its annual meeting in Orlando, Florida. Senior executives from all four competitors in the Metro Gel .75% market—Fougera, Sandoz, Taro, and G&W—were in attendance. These representatives included Kaczmarek and D.K., a senior executive at Fougera, R.T. of Sandoz, B.S. of Taro, and Orlofski of G&W. During the conference, the competitors were actively discussing and agreeing on the details of the Metro Gel .75% price increase.

491.    On February 22, 2012, the first day of the GPhA meeting, Orlofski e-mailed

B.S. again, stating ███████████████████████████████████████████████████

███████████████████████ B.S. replied, ███████████████████

492.    Immediately after meeting with Orlofski on February 22, B.S. e-mailed

Blashinsky regarding Metro Gel .75% stating: ███████████████████████

████████████ Blashinsky responded, ████████ B.S. replied, ████████████

████████ to which Blashinsky answered, ██████████████████████ B.S. further

inquired, █████████████████████████████ and Blashinsky replied, ████████

███████████████████████████ Of course, Fougera and Sandoz had not increased their

Metro Gel .75% pricing yet—but B.S. of Taro understood that they would based on his

conversation with Orlofski.

493.    Similarly, that same evening, on February 22, 2012, Kaczmarek of Fougera

(who was also at the GPhA conference) sent an e-mail to the Fougera Pricing Committee

stating: █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

494.    On March 5, 2012, CW-3, then a sales executive at Fougera, e-mailed

Kaczmarek predicting that ████████████████████████████████████ with one

customer that had already received a pre-increase price quote from Fougera. Kaczmarek

was unsympathetic, responding that he was willing to lose the customer in the interest of

maintaining the agreed-upon higher prices. He added that with respect to Fougera's price at another Metro Gel .75% customer, ███████████████████████████

495.  On March 9, 2012, Rite Aid e-mailed Sandoz asking for a bid on Metro Gel .75%. CW-4 of Sandoz forwarded the invitation to Kellum with the simple comment ████████████████ Kellum wasted no time in telling his colleagues that Sandoz should stay clear of the Rite Aid bid, as Sandoz intended to follow the price increase that he believed spawned the opportunity, saying: ███████████████████████

496.  One week later, when Rite Aid pressed again for a Sandoz bid, CW-4 contacted Kellum to verify that the decision was to decline. Kellum not only confirmed that fact, but also suggested a pretext: ██████████████████████ Consistent with this instruction, CW-4 responded to Rite Aid: ████████████████████████

████████████████████████████████

497.  Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

498.  On March 22, 2012, the day before Taro increased its price, Orlofski at G&W received two phone calls from a Taro employee[8] lasting twelve (12) minutes and two (2) minutes, respectively.

---

[8] Taro employees do not have their own individual extensions and calls from their office lines appear in the phone records as coming from the Taro main company number.

499.   Customers began to react immediately to the dramatic price hikes by seeking price quotes from the competitors. The competitors, however, refused to break ranks. On April 3, 2012, for example, Fougera received a request from a Taro customer to bid on Metro Gel .75% in light of the Taro increase. CW-6 relayed the information to Kaczmarek, saying: ███████████ Kaczmarek responded simply: ███████████

500.   The following day, on April 4, 2012, CW-6 sent Kaczmarek an updated market share breakdown for the Metro Gel .75% market. CW-6 expressed satisfaction that the market had arrived at an appropriate equilibrium in accordance with fair share principles, saying: ████████████████████████████████████

██████████████████████████

### ii.   G&W/Glenmark

501.   In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Glenmark. Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

502.   Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communication through e-mails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences. For example, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone. Indeed, between April

2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

503.    This Section will discuss a coordinated price increase on one product, Ciclopirox Cream. Below sections of this Complaint address additional collusion between the two competitors in March 2013 regarding Ciclopirox Cream as well as various formulations of a different product, Mometasone Furoate.

### a)    *Ciclopirox Cream—April 2012*

504.    Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine that prevents fungus from growing on skin. Ciclopirox Cream is used to treat skin infections such as athlete's foot and ringworm.

505.    In the summer of 2011, the market for Ciclopirox Cream was evenly split between four competitors—Perrigo with 26%; Paddock Laboratories, LLC ("Paddock")[9] with 30%; Fougera with 21%; and Glenmark with 21%. Defendant G&W was not in the market at this time.

506.    On September 21, 2011, however, Vogel-Baylor learned from a customer that Fougera had temporarily discontinued Ciclopirox Cream. Vogel-Baylor forwarded that information to her supervisor, Grauso, who then called CW-6 at Fougera twice to confirm the information. The two competitors also spoke again the next morning.

---

[9] Perrigo acquired Paddock in July 2011.

507.   G&W saw Fougera's exit as an opportunity to enter the market for

Ciclopirox Cream. After confirming Fougera's plans to exit, G&W began making plans

to enter the market.

508.   On October 28, 2011, Vogel-Baylor e-mailed Grauso regarding a meeting

she had with Rite Aid concerning G&W's upcoming launches. Regarding Ciclopirox

Cream, Vogel-Baylor noted that Rite Aid's current incumbent was Glenmark and stated

that ███████████████████████████████████

509.   Throughout January 2012, G&W began formalizing its strategy for the

Ciclopirox Cream launch and reached out to various customers to obtain incumbent

information, usage, and pricing intelligence.

510.   On February 3, 2012, Vogel-Baylor e-mailed Orlofski, a senior G&W

executive, notifying him that Ciclopirox Cream was now available in small quantities and

that several additional batches would be ready for shipment in the next few weeks. She

further stated that she needed to sit down with him to discuss which customers G&W

wanted to approach.

511.   On February 20, 2012, Orlofksi e-mailed Vogel-Baylor with a list of the

tasks that she was accountable for. One of those responsibilities was to secure

approximately 20% market share of Ciclopirox Cream per the company's launch plan.

512.   The next day, on February 21, 2012, Orlofski exchanged eight (8) text

messages with S.K., a high-level executive at Perrigo. Two days later, on February 23,

2012, the two competitors exchanged an additional ten (10) text messages.

513.   As of March 2012, Glenmark had 60% share of the Ciclopirox Cream market, Perrigo had 25%, and Fougera had the remaining share even as it was phasing out of the market.

514.   By March 19, 2012, G&W had secured the Ciclopirox Cream business at Walgreens. Walgreens was a Glenmark customer that accounted for slightly less than G&W's goal of 20% of the market for Ciclopirox Cream.

515.   On March 23, 2012, Vogel-Baylor asked C.M., a sales executive at G&W, to reach out to Publix to see if the customer would be interested in a bid for Ciclopirox Cream. C.M. responded: ███████████████████████████████████████ ████████████████████████████████████████████████ Vogel-Baylor responded: ████████████████████████████████ ████████████ C.M. replied: ██████████████████████████ ███████ Vogel-Baylor answered immediately stating: ██████████████ █████████████████████████████████████████████████

██████

516.   On March 27, 2012, C.M. advised Vogel-Baylor that G&W should put together a proposal for Publix and that the customer planned to award G&W the business before the upcoming RFP. That same day, while they were both at a Rite Aid event in Las Vegas, Nevada, Vogel-Baylor met CW-5, a senior executive at Glenmark, for the first time.

517.   Two days later, on March 29, 2012, Vogel-Baylor e-mailed CW-5 stating, ██████████████████████████████████████████████ and

asked the Glenmark executive to send his full contact information. The next day, CW-5 responded to Vogel-Baylor's e-mail, providing his contact information and adding, ▆▆▆

▆▆▆▆▆▆ N ▆▆▆▆▆▆ After exchanging a few more e-mails, the two then also exchanged several text messages.

518.   On April 2, 2012, CW-5 e-mailed Vogel-Baylor stating that he had forgotten his cell phone at home and was ▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆

519.   Throughout the month of April 2012, Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls. During these communications, and others over the next several months, G&W and Glenmark colluded to significantly raise, almost simultaneously, their contract pricing on Ciclopirox Cream.

520.   For example, on April 11 and April 12, 2012, Vogel-Baylor and CW-5 exchanged more than fifty (50) text messages and phone calls. In the early morning of April 12, 2012, Vogel-Baylor e-mailed her supervisor, Orlofski, recommending that G&W increase contract pricing for Walgreens and Publix. She suggested a direct price increase for Publix between 57% and 82% and between 233% and 408% for Walgreens, depending on the dosage size.

521.   On April 18, 2012, Vogel-Baylor e-mailed C.M. at G&W with specific pricing to submit for the upcoming Publix RFP. Regarding Ciclopirox Cream, Vogel-Baylor advised that because G&W was doing a price increase on the product, she was including increased pricing on the bid. Vogel-Baylor further stated that C.M. should

discuss this with her before submitting the bid. That same day, Vogel-Baylor exchanged at least twenty (20) text messages and phone calls with CW-5 of Glenmark.

522.    That same day, Glenmark also began sending out notices to its customers that it would be increasing its prices for Ciclopirox Cream.

523.    From April 24 to April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Glenmark, G&W, and Perrigo all attended, including S.K. of Perrigo, Orlofksi and Vogel-Baylor of G&W, and CW-5 of Glenmark.

524.    S.K. of Perrigo and Orlofski of G&W communicated several times by phone in advance of the conference, as well as on the day the conference began. Between April 19 and 24, 2012, Orlofski and S.K. exchanged at least fifteen (15) text messages. Orlofski also called S.K. once on April 24, 2012. The call lasted less than one (1) minute. Vogel-Baylor and CW-5 of Glenmark continued to communicate constantly throughout this time period. On April 24, 2012 alone, Vogel-Baylor exchanged eighty-eight (88) text messages with CW-5.

525.    That same day, April 24, 2012, Cardinal e-mailed G&W requesting a bid on Ciclopirox Cream. C.M., a sales executive at G&W, forwarded the request to Vogel-Baylor stating: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ G&W declined to bid on the opportunity.

526.    The next day, on April 25, 2012, Vogel-Baylor e-mailed C.M. asking him to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████

████████████████

527.   Two days later, on April 27, 2012, Vogel-Baylor requested that G&W prepare a price increase letter for Walgreens raising the prices for Ciclopirox Cream between 233% and 408% depending on the formulation.

528.   On May 21, 2012, Kroger, a Glenmark customer, e-mailed Vogel-Baylor asking if G&W would like to bid on Ciclopirox Cream. Vogel-Baylor declined to bid on the opportunity claiming that G&W could not handle the volume.

529.   On May 24, 2012, Vogel-Baylor e-mailed C.M. asking if he had heard whether Publix would accept the price increase on Ciclopirox Cream. C.M. responded that Perrigo had submitted low pricing on the RFP.

530.   By this time, Vogel-Baylor had been introduced to CW-6 at Fougera and was communicating with him directly (instead of through Grauso, as she had done previously). Vogel-Baylor knew that CW-6 had a relationship with T.P. at Perrigo, so she reached out to him that same day to have CW-6 act as a conduit between her and T.P. at Perrigo. Immediately upon hanging up with Vogel-Baylor, CW-6 called T.P. of Perrigo. After speaking with T.P., CW-6 hung up and immediately called Vogel-Baylor back. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Fougera) | 17:35:03 | 0:01:01 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:39:00 | 0:05:00 |
| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 17:43:00 | 0:02:00 |

| 5/24/2012 | Voice | CW-6 (Fougera) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:45:00 | 0:01:00 |
| 5/24/2012 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Fougera) | 17:46:02 | 0:00:44 |

531.   Later that day, Vogel-Baylor replied to her colleague C.M. stating, ████

████████████████████████████████████████████████   Vogel-Baylor

forwarded Perrigo's pricing to her supervisor, Orlofski.

532.   On June 4, 2012, G&W sent its price increase notice to Walgreens. In an

internal pricing spreadsheet, Perrigo listed its direct pricing at one of its customers on the

15gm, 30gm, and 90gm package sizes as $7.14, $11.22, and $19.39, respectively.

Notably, this pricing was even higher than the increased pricing G&W sent to Walgreens

on June 4, 2012.

533.   On June 6, 2012, Vogel-Baylor and CW-5 of Glenmark exchanged eight

phone calls. All of the calls lasted less than one (1) minute.

534.   On June 11, 2012, C.M. of G&W e-mailed Vogel-Baylor stating that he had

spoken with Walgreens and the customer had told him ████████████████████

████████████████████████████████████████████████   C.M. stated,

████████████████████████████████████████████████

████   Vogel-Baylor responded: ████████████████████████

████████████   That same day, Vogel-Baylor and CW-5 of Glenmark exchanged

more than eighty (80) text messages.

535.   Vogel-Baylor forwarded her exchange with C.M. to Orlofski. The next day,

on June 13, 2012, Vogel-Baylor exchanged eighteen (18) text messages with CW-5 of

Glenmark. Also on June 13, 2012, Orlofski sent a text message to S.R. of Walgreens. G&W ultimately retained the Walgreens business.

536.   Between June 15, 2012 and June 26, 2012, Vogel-Baylor and CW-5 continued to exchange multiple text messages each day. During that time period, the two competitors exchanged five-hundred and forty-five (545) text messages.

537.   On June 29, 2012, C.M. e-mailed Vogel-Baylor to advise her that MMCAP was requesting a bid on Ciclopirox Cream. Vogel-Baylor asked: ███████████

███████ C.M. replied: ███████████████████████████

██████████████████████████████████████ Vogel Baylor

responded: ██████████████ Vogel-Baylor later changed her mind and recommended to C.M. that he bid on the MMCAP business. As she explained: ██████████

█████████████████████████████████████

s██████████████████████

### 5)   Additional Collusive Relationships

538.   The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this time period. Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

539.   The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example. During his tenure at Fougera, CW-6 had only eight (8) calls with E.B., according to available phone records. However, Fougera

overlapped with Hi-Tech on the product—Lidocaine Ointment—and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012. This collusion is detailed in the following Section.

### i.   Lidocaine Ointment

540.   Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

541.   In late 2011, Hi-Tech began making plans to launch Lidocaine Ointment. At that time, Fougera was the sole generic manufacturer in the market.

542.   On November 21, 2011, A.R., a Fougera sales executive, forwarded an invitation to CW-6, among others, for a conference call on November 28, 2011 to discuss ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ referred to Fluocinolone Acetonide—a product on which Fougera and G&W overlapped and where CW-6 was colluding with Grauso of G&W at the same time. That anticompetitive conduct is discussed above in an earlier section of this Complaint.

543.   The next day, on November 22, 2011, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes. Immediately after hanging up, CW-6 called his supervisor, Kaczmarek, and they spoke for four (4) minutes. The November 2011 call between CW-6 and E.B. was the first time that the two competitors had ever spoken by phone—according to the available phone records. During these calls, the two competitors

discussed Hi-Tech's entry into the market and Fougera's plan to raise its prices before Hi-Tech entered.

544.   Fougera held its internal strategy meeting on November 28, 2011. A few days later, on December 2, and then again on December 5, 2011, CW-6 called E.B. The calls lasted one (1) minute each.

545.   Later that month, on December 22, 2011, and consistent with the competitors' discussions, Fougera increased WAC pricing for Lidocaine Ointment by 200%.

546.   Starting in February 2012, as Hi-Tech began preparing in earnest to enter the market, E.B. and CW-6 began speaking more frequently. On February 23, 2012, E.B. of Hi-Tech called CW-6 and they spoke for seven (7) minutes. Immediately upon hanging up, CW-6 called his supervisor, Kaczmarek, to report the conversation. That call lasted one (1) minute. An hour later, Kaczmarek called CW-6 back and they spoke for six (6) minutes. Further, on March 7, 2013, E.B. called CW-6 and they spoke for five (5) minutes. CW-6 called E.B. back a few minutes later. The call lasted one (1) minute. During these calls, the competitors discussed which customers Hi-Tech should target as it entered the Lidocaine market, as well as pricing.

547.   One week later, on March 13, 2012, Hi-Tech entered the Lidocaine Ointment market and matched Fougera's increased WAC pricing.

548.   After Hi-Tech entered, and consistent with fair share principles, Fougera gave up several of its Lidocaine Ointment customers to the new entrant. For example, on March 22, 2012, ABC e-mailed Fougera to advise that it had received an offer for

167

Lidocaine Ointment and asked whether Fougera wanted to bid to retain the business.

CW-3, then a sales executive at Fougera, asked Kaczmarek how to respond and he

directed that CW-3 ████████ to the new player.

549.   Similarly, on March 27, 2012, CW-6 advised Kaczmarek that Hi-Tech had

made an offer to another customer, Ahold, for Lidocaine Ointment. CW-6 suggested that

Fougera ███████████████████████████ to which Kaczmarek

replied: ████████

550.   On May 17, 2012, Wal-Mart e-mailed K.K., another Fougera sales

executive, to advise that Fougera was not the lowest bidder on its RFP for Lidocaine

Ointment and asked whether Fougera wanted to bid to retain the business. K.K.

forwarded Wal-Mart's request to Kaczmarek, asking how he should respond.

551.   First thing the next morning, Kaczmarek called CW-6 and they spoke for

ten (10) minutes. A few hours later, Kaczmarek called CW-6 again and they spoke for

three (3) minutes. Immediately upon hanging up, CW-6 called E.B. of Hi-Tech. The call

lasted one (1) minute. A half hour later, CW-6 called E.B. again. The call lasted one (1)

minute. That same morning, Kaczmarek responded to K.K.'s e-mail stating, ████████

████████████████████████████

552.   Later that day, Kaczmarek e-mailed the sales team regarding Lidocaine

Ointment and stated that Fougera had already given up CVS, ABC, and Rite Aid, which

accounted for 34% market share, and advised that Fougera was ███████████

████████ S.H., a Fougera sales executive, then reminded Kaczmarek that Fougera had

also given up HD Smith and Anda to Hi-Tech. Therefore, Kaczmarek recommended that

Fougera ███████████████████████████████████ The next day, on May 19,

2012, CW-6 called E.B., speaking for four (4) minutes—likely letting him know that

Fougera was now done conceding customers to the new entrant.

### 3. Focus On Price Increases Intensifies—Collusion From Late 2012 – 2016

#### a. Shifts In The Market Foster Collusion

553.  In late 2012 and early 2013, there were several changes in and among

various manufacturers of topical products—at both the corporate and personnel levels—

that facilitated and fostered a heightened focus on collusion among many of these

competitors.

554.  For example, in July 2012 Sandoz finalized its purchase of Fougera, a

specialty dermatology company, making Sandoz a much more prominent manufacturer of

topical products. Indeed, Sandoz publicly touted that the purchase positioned it "as the

new #1 in generic dermatology medicines both globally and in the U.S."

555.  As a result of the acquisition, most Fougera executives, including

Kaczmarek and CW-6, eventually lost their jobs. Indeed, out of the five Fougera sales

executives in place prior to the acquisition, CW-3 was the only one to retain a long-term

position with Sandoz.

556.  Because of Sandoz's size and the fact that it manufactured and sold a large

number of generic drugs, many competitors reached out to CW-3 when they learned he

had transitioned to Sandoz because they viewed this as a strategic opportunity to collude

on more overlapping products. In turn, and as discussed in further detail below, CW-3

would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

557.   Further, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions with competitors. In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo. One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro. And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

558.   As discussed below, these former colleagues—now competitors—would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

### 1) Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value

559.   As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else. Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products. The other key players in the topical space, Perrigo and Taro, were smaller companies.

560.   Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market. CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products. The mindset at Sandoz

was not to celebrate work accomplishments, but to move quickly from one launch to the next. As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

561.   In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line. Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections. As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable. CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

562.   Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition. For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform. Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and prove her value to Sandoz management.

### 2)  Key Relationships Emerge And Existing Relationships Strengthen

563.   The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products. For example, just as

his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors—Taro and Perrigo—with regard to overlapping products. Similarly, Perfetto would capitalize on his relationship with his former colleague Boothe to collude with respect to products on which Taro and Perrigo overlapped. Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition. Each of these relationships is explored in greater detail below.

### i.   Sandoz/Taro

#### a)   *CW-3's Relationships With Aprahamian And H.M. Of Taro*

564.    Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis. CW-3 and Aprahamian had known each other since 2006—when CW-3 worked at Cardinal and Aprahamian worked at ABC. The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

565.    Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again. For example, although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor). CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

172

566.    CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis. Three examples—Desonide Lotion, Ciclopirox Shampoo, and Betamethasone Valerate Ointment—are discussed in detail below. However, once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

567.    Aprahamian's move to Taro was a promotion. As Vice President of Sales and Marketing, Aprahamian had the power to set prices. Similarly, when Aprahamian told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

568.    Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Indeed, every time Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Kellum. The expectation was always that Sandoz would follow the increases—and Sandoz did.

569.    When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him. Many examples of this are discussed below in subsequent Sections of this Complaint.

570.     Although Sandoz consistently followed Taro's price increases, the company could not always do so right away. This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets. In the meantime, Kellum would order that Sandoz place the product on strict allocation—meaning that Sandoz would allocate product to a customer based on regular usage—so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

571.     Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers. Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid." CW-3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

572.     Aprahamian and CW-3 also coordinated on product launches. For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

573.     For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish. Aprahamian provided these price points so that Sandoz did not

launch at too low a price. Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

574.     CW-3 also colluded with H.M. of Taro. Shortly after the Fougera acquisition, CW-6—who would not be staying at Sandoz—provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz. According to available phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro. Notably, CW-3 and H.M. were not social friends. If they were communicating by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

575.     While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices. CW-3 considered H.M.'s information to be reliable. However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

576.     During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and Perfetto of Taro. In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

**b)** *CW-4's Relationship With D.S. Of Taro*

577.   As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products. However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

578.   CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations—both in person and over the phone—during which they discussed which manufacturers of topical products were responsible and which were not. D.S. reiterated what he had previously conveyed to CW-4—that ███████████████████ ███████ CW-4 understood this to mean that Taro wanted to maintain a fair market share balance and keep prices high. Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

579.   After these conversations, CW-4 felt more secure and less anxious about her new circumstances. CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

580.   During this time, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

581.   Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the

Fougera portfolio. At this time, there were several products where Fougera had less than its fair share.

582.    Shortly thereafter, CW-4 conveyed this information to D.S. at Taro. CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not be alarmed and would instead understand that it was only because Sandoz was looking for its "fair share" on that product. Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa. D.S. listened to what CW-4 said and did not disagree.

### ii.    CW-3's Relationship With T.P. Of Perrigo

583.    Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo. The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

584.    CW-3 and T.P. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped. CW-3 and T.P. generally spoke only by phone. They did not exchange e-mails or text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

585.    CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P.—that the competitors would not poach each other's customers and would follow each other's price increases.

586.    Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

587.    Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

588.    When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

589.    During this time, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

### iii.  Perfetto's Relationship With Boothe Of Perrigo

590.    Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives, Perfetto and Boothe, moved to Taro and Perrigo, respectively. As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

591.    Indeed, between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one hundred and nineteen (119) phone calls. During this time, the two former colleagues colluded on numerous overlapping products. Some examples of these products are discussed in detail below.

### 3)  Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors

592.    Soon after the Fougera acquisition, CW-3  informed Kellum that he could provide competitive intelligence on the Fougera product line. CW-3 then began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because CW-3 told them so.

593.    CW-3 conveyed competitive intelligence to Kellum and CW-1 through e-mails and phone calls. When communicating by e-mail, CW-3 disguised the true source of his information by stating that he had received it from a customer.  When CW-3 had

truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name in his e-mail. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer—or if CW-3 provided information relating to customers that he did not have responsibility for—it meant that CW-3 had gotten that information from a competitor.

594.    As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other relationships are explored in greater detail in subsequent Sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

595.    For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a ▮▮▮▮▮▮▮ in July 2013 to collude on products where Taro was a competitor. The ▮▮▮▮▮▮▮ employed a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

596.    Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Indeed, Kellum routinely admonished Sandoz employees for putting information that was too blatant into e-mails.

At one point, Kellum told CW-1 ███████████████████████████████████

███████████ Similarly, CW-3 became increasingly anxious about his behavior

and told CW-1 ████████████████████████████ CW-1 agreed with him.

### b. Taro Emerges As A Leader Among Generic Topical Manufacturers

#### 1) Increased Focus On Fair Share And Price Increases

597.    As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro. The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

598.    First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured.  To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales executives at the field level. This included compiling intelligence from not only customers, but from competitors as well.

599.    For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, e-mailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where ████████████████████████████ Taro then used that information to inform which products to bid on, with which customers, and at what price points to meet its fair share targets without eroding the market price.

600.    Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product

portfolio in 2013 and 2014. Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

601.   For example, in February 2013, Taro increased prices on several products, including Nystatin Triamcinolone—its highest grossing product. When an executive at Dr. Reddy's, another generic manufacturer, learned of the news, he sent an e-mail stating:

A senior sales and marketing executive at Dr. Reddy's responded,

602.   Similarly, in June 2014, Taro executed simultaneous, significant price increases on more than a dozen different products. The chart below, which was included in a Credit Suisse investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases.



Figure 1: Products where Taro has taken price increases recently

| Product | % of Taro sales | Recent Price increase vs. old price | Date of price increase |
|---|---|---|---|
| Clobetasol Propionate - Ointment | 1.4% | 21.6x | Jun-14 |
| Clobetasol Propionate - Cream | 1.8% | 17.8x | Jun-14 |
| Warfarin | 4.0% | 3.1x | Jun-14 |
| Fluocinonide | 3.7% | 3.1x | Jun-14 |
| Phenytoin Sodium ER | 1.2% | 3.1x | Jun-14 |
| Hydrocortisone Val - Cream | 2.8% | 1.4x | Jun-14 |
| Ketoconazole | 1.0% | 2.1x | Apr-14 |
| Carbamazepine - ER | 4.9% | 1.1x | Jun-14 |
| Ovide (g. Malathion) | 1.5% | 1.5x | May-14 |
| Hydrocortisone Val - Ointment | 3.9% | 1.1x | Jun-14 |
| Hydrocortisone Butyrate | 0.4% | 1.6x | Jun-14 |

Source: Price Rx, Credit Suisse research

603.    As a result of these June 2014 increases, Credit Suisse increased its target

pricing for Taro and its parent company Defendant Sun Pharmaceuticals from $85 to

$150 per share. As justification for the increase, Credit Suisse emphasized that there had

been zero rollbacks of Taro price increases in recent years:

### #1: Have previous price increases sustained for Taro?
Taro has approval for ~140 ANDAs in the US and we have already seen Taro taking price increase in more than 30 of these products. Some of these products we have highlighted in Fig 1. It is important to note (1) there have been multiple instances of price increase in these products and (2) there has been no roll-backs of prices even once so far in the last three years.

Figure 1: Taro has not rolled back price increase so far

| Product | Price increase since Mar-11 | # of instances of price increase | Remarks |
|---|---|---|---|
| Nystatin triam - Cream | 59x | 5 | No roll backs |
| Nystatin triam - Ointment | 45x | 5 | No roll backs |
| Clomipramine | 27x | 1 | No roll backs |
| Clobetasol Propionate - Cream | 21x | 2 | No roll backs |
| Clobetasol Propionate - Ointment | 18x | 2 | No roll backs |
| Fluocinonide - Cream | 17x | 3 | No roll backs |
| Fluocinonide - Liquid Lotion | 8x | 3 | No roll backs |
| Nystatin - Cream | 12x | 2 | No roll backs |
| Desonide Cream | 11x | 2 | No roll backs |
| Hydrocortisone Val - Ointment | 8x | 7 | No roll backs |
| Acetazolamide | 5x | 3 | No roll backs |
| Ketocanazole | 2x | 1 | No roll backs |

Source: Price Rx, Credit Suisse estimates.

604.    These price increases, and others taken by Taro in 2013 and 2014, resulted

in the accrual of significant profits to Taro.  Indeed, between 2008 and 2016, Taro's

profits increased by an astounding 1300%. As the graph below demonstrates, Taro's

financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian

began at Taro and positioned the company as a price-increase leader.



605.   Taro's success in implementing these increases—and in obtaining its fair share on the products it manufactured—depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

606.   For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred and eighteen (618) phone calls and text messages with his contacts at Defendants Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, Hi-Tech, and Perrigo. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| M.D. (Actavis) | 50 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| Orlofski, Kurt (G&W) | 45 | 7/24/2013 | 6/10/2016 |
| M.C. (Wockhardt) | 27 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 23 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| M.B. (Actavis) | 13 | 5/13/2014 | 8/22/2015 |
| S.R. (Amneal) | 12 | 6/6/2014 | 4/29/2016 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| E.B. (Hi-Tech) | 10 | 6/6/2014 | 7/11/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| Vogel-Baylor, Erika (G&W) | 6 | 3/27/2014 | 9/24/2015 |
| Boothe, Doug (Perrigo) | 6 | 11/15/2016 | 8/23/2017 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| G&W Labs | 4 | 1/8/2014 | 3/6/2017 |
| R.H. (Greenstone) | 3 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| Wesolowski, John (Perrigo) | 2 | 5/9/2014 | 5/9/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |
| Glenmark Pharmaceuticals | 1 | 10/17/2018 | 10/17/2018 |

607.   Similarly, between January 2013 and February 2018, Perfetto exchanged at least six hundred and ninety (690) phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, Greenstone, Amneal, and Lannett. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Orlofski, Kurt (G&W) | 160 | 1/25/2013 | 9/1/2016 |
| Boothe, Douglas (Perrigo) | 130 | 3/5/2013 | 7/29/2016 |
| T.D. (Actavis) | 79 | 2/19/2013 | 4/14/2017 |
| Dorsey, Mike (Actavis) | 89 | 1/2/2013 | 5/12/2017 |
| Grauso, Jim (Glenmark) | 58 | 2/10/2014 | 2/3/2018 |

| Blashinsky, Mitchell (Glenmark) | 51 | 4/2013 | 4/29/2017 |
|---|---|---|---|
| M.B. (Actavis) | 31 | 2/25/2013 | 2/5/2017 |
| Grauso, Jim (Aurobindo) | 20 | 1/17/2013 | 1/16/2014 |
| M.C. (Wockhardt) | 24 | 1/9/2013 | 12/7/2017 |
| M.P. (G&W) | 18 | 7/2/2013 | 4/22/2017 |
| Falkin, Marc (Actavis) | 7 | 12/13/2013 | 1/17/2017 |
| T.G. (Ranbaxy) | 5 | 1/17/2014 | 1/30/2014 |
| M.P. (Sandoz) | 4 | 3/7/2017 | 3/8/2017 |
| Hatosy, Robin (Greenstone) | 4 | 11/21/2013 | 2/20/2017 |
| Boyer, Andy (Actavis) | 3 | 3/12/2013 | 4/30/2013 |
| Vogel-Baylor, Erika (G&W) | 2 | 3/21/2014 | 3/21/2014 |
| L.P. (Actavis) | 1 | 3/15/2013 | 3/15/2013 |
| S.R. (Amneal) | 1 | 4/7/2014 | 4/7/2014 |
| K.S. (Lannett) | 1 | 4/24/2015 | 4/24/2015 |
| M.T. (Ranbaxy) | 1 | 6/30/2016 | 6/30/2016 |
| C.V. (Perrigo) | 1 | 1/3/2014 | 1/3/2014 |

608.    Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro apart as a leader in the topical space. Some examples of how these relationships manifested themselves regarding specific products are described in detail below.

> **i.     Setting the Stage For Future Collusion—Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed**

609.    The collusive relationship between Aprahamian and CW-3 dated back to Aprahamian's days at Actavis. Indeed, two of the first examples of collusion between the two competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone Valerate Ointment—both products where Sandoz was entering the market and Actavis, acting through Aprahamian, agreed to cede share to the new entrant. A third product—Desonide Lotion—involved Sandoz increasing price while Actavis was out of

the market and Actavis re-entering later at the higher price, in coordination with Sandoz. These agreements set the stage for how collusion would work between the two competitors when Aprahamian moved to Taro. These products are discussed in greater detail below.

### a)   *Desonide Lotion*

610.    Desonide Lotion, also known by various brand names such as DesOwen and LoKara, among others, is a topical steroid that treats a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

611.    Between 2009 and 2011, Actavis and Fougera were the only two generic manufacturers of Desonide Lotion. In those years, the competitors instituted WAC price increases that were in lockstep with one another. For example, on June 1, 2009, Fougera increased WAC pricing by roughly 90% and Actavis followed and matched on September 1, 2009. Similarly, on July 22, 2011, Actavis increased WAC pricing by nearly 200% and Fougera followed three (3) days later, on July 25, 2011.

612.    Following the increases, and consistent with fair share principles, the competitors declined opportunities to bid on each other's business so as not to take advantage of the price increases. For example, when CW-3, then a Fougera sales executive, asked CW-6, his colleague at Fougera, whether Walgreens had accepted the 2011 price increase, CW-6 responded:

| | |
|---|---|
| From: | ▮▮▮▮▮▮ |
| Sent: | Tuesday, August 09, 2011 5:15 PM |
| To: | ▮▮▮▮▮ |
| Subject: | RE: Walgreens - Metro - Desonide Price Increase |

We didn't ask them to accept.  Just gave it to them.  They bid it out, but found no takers as far as we know.

613.    As of August 2012, the market for Desonide Lotion was split evenly between the two competitors with Sandoz at 56% market share and Actavis at 44%.

614.    On August 23, 2012, Kellum circulated a list of Fougera products that he recommended taking price increases on, including Desonide Lotion.

615.    Between August 25 and August 28, 2012, the NACDS held its Pharmacy and Technology Conference in Denver, Colorado. Representatives from Defendants Actavis and Sandoz attended the conference, including CW-3 and Kellum of Sandoz and Aprahamian, then a senior pricing executive at Actavis.

616.    At the conference, Aprahamian approached CW-3 and told him that Actavis was having supply issues on Desonide Lotion and would be exiting the market for a period of time. CW-3 then passed this information along to Kellum because he knew Kellum was interested in raising the price on Desonide Lotion and would view Actavis's temporary exit from the market as a positive development.

617.    J.P., a product manager at Sandoz, was tasked with putting together information for the potential price increases, including on Desonide Lotion. On September 12, 2012, J.P. e-mailed CW-1, a senior pricing executive at Sandoz, and Kellum asking for input on the rationale for the price increases. Regarding Desonide Lotion, Kellum responded: "We believe they will follow based on past experience."

618.  One month later, in October 2012, Kellum asked CW-3 to reach out to

Aprahamian to get more specific information regarding Actavis's supply issues on

Desonide Lotion. On October 17 and 18, 2012, CW-3 exchanged several calls with

Aprahamian. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:18:00 | 0:03:00 |
| 10/17/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 16:43:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:08:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:09:00 | 0:06:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 10:30:00 | 0:01:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:02:00 | 0:02:00 |
| 10/18/2012 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 14:07:00 | 0:06:00 |

619.  Later that evening on October 18, 2012, CW-3 sent the following e-mail to

Kellum and other Sandoz colleagues reporting what he had learned from Aprahamian:

**From:** ▮
**Sent:** Thursday, October 18, 2012 05:31 PM
**To:** ▮        Kellum, Armando; ▮
**Subject:** Desonide Lotion

All-

After positive initial lab results Desonide Lotion is expected to release in mid-December.  We should be able to retain
current market share as Actavis is experiencing an issue due to changing their API supplier.  The customer I spoke with
did not have a potential release date at this time.

Thanks, ▮

620.  As would become his customary practice, CW-3 referred to his source

vaguely as a ▮▮▮▮▮ because he wanted to avoid putting anything incriminating in

writing. Further, CW-3 knew that Kellum understood that his true source for the information was not a customer, but rather his contact at Actavis, Aprahamian.

621.    After confirming their own ability to supply, Sandoz decided to move forward with a price increase on Desonide Lotion. In November 2012, Sandoz generated a price increase analysis for the product. In that analysis, Sandoz assumed ███████

████████████████████████████████████████████

622.    On December 5, 2012, Sandoz raised its WAC prices for Desonide Lotion by 75%. On the day before and the day of the price increase, CW-3 called Aprahamian twice, letting him know the details of the increase. The calls lasted seven (7) minutes and two (2) minutes, respectively. Several months later, on May 10, 2013, Sandoz again increased WAC pricing for Desonide Lotion—this time by 11%.

623.    On August 22, 2013, Actavis finally re-entered the Desonide Lotion market and matched Sandoz's increased pricing. That same day, CW-3 received a text message from A.G., a sales executive at Actavis.

624.    On August 26, 2013, CW-3 notified the rest of the Fougera sales team that Actavis had re-entered the market. In response, CW-1 sarcastically recommended reducing all Desonide prices by 75%.

625.    Instead of cutting prices Kellum recommended that Sandoz ███████ s███████████████████████████████ Kellum noted that ███████

████████████████████████████████████

626.    Sandoz proceeded to concede several of its Desonide Lotion customers to Actavis in order to allow Actavis to regain its market share without eroding the high

market pricing. For example, in a December 2013 Business Review, Sandoz noted that it

had ██████████████████████████████████████████████████████████

Several months later, in a Fougera Business Review, Sandoz further stated that the

Desonide Lotion ███████████████████ and that Sandoz planned to ██████████

█████████████████████████████████████████

### b)  *Ciclopirox Shampoo*

627.   Ciclopirox Shampoo, also known by the brand name Loprox, is used to

treat seborrheic dermatitis, an inflammatory skin condition of the scalp. As of the

summer of 2012, the three competitors in the market were Perrigo, Actavis, and Taro.

628.   After the Sandoz acquisition of Fougera was finalized in July 2012, Sandoz

engaged in a review of the Fougera product line to determine whether there were any

Fougera products for which Sandoz should considering re-entering the market. One such

product was Ciclopirox Shampoo.

629.   To that end, on September 4, 2012, J.P., a product manager at Sandoz, e-

mailed the sales team, including CW-3, asking for market pricing on Ciclopirox

Shampoo, among other products. The next day, on September 5, 2012, S.G. a Sandoz

sales executive, also followed up with CW-3 and asked him to provide J.P. with the

requested information.

630.   The following morning, on September 6, 2012, CW-3 reached out to his

contacts at both Taro and Perrigo to discuss Ciclopirox Shampoo. He then reported the

results of those conversations to both J.P. and S.G. at Sandoz, either that same day or the

next day. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 10:32:00 | 0:11:00 |
| 9/6/2012 | Voice | H.M. (Taro) | Outgoing | CW-3 (Sandoz) | 10:57:15 | 0:02:49 |
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 11:27:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | J.P. (Sandoz) | 8:58:00 | 0:01:00 |
| 9/7/2012 | Voice | CW-3 (Sandoz) | Outgoing | S.G. (Sandoz) | 8:59:00 | 0:02:00 |

631.   On November 26, 2012, J.R., a marketing executive at Sandoz, e-mailed CW-3 and others at Sandoz regarding the Ciclopirox Shampoo re-launch. J.R. stated that Sandoz planned to re-launch the (former Fougera) product on December 3, 2012 and planned to target 12% market share due to limited supply. J.R. asked CW-3 about current pricing and told him that they should discuss which customers to target to achieve Sandoz's market share goal.

632.   The next day, on November 27, 2012, J.R. sent another e-mail about the re-launch reiterating that Sandoz was targeting 12% share and stating that ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

633.   Thereafter, CW-3 set out to coordinate Sandoz's entry with Aprahamian of Actavis. The next day, November 28, 2012, CW-3 called Aprahamian and they spoke for nine (9) minutes. First thing the following morning, on November 29, 2012, CW-3 called Aprahamian again and they spoke for ten (10) minutes. A few hours later, Aprahamian called CW-3 back and they spoke for three (3) minutes.

634.  That same day, J.R. e-mailed CW-3, copying CW-1, asking for pricing information on Ciclopirox Shampoo. Not wanting to put anything in writing, CW-3 responded: ███████████ First thing the next morning, CW-3 exchanged two calls with CW-1, with one lasting five (5) minutes and the other lasting twelve (12) minutes, during which CW-3 conveyed the requested pricing information he had received from competitors.

635.  Later that evening, R.T., a senior sales and marketing executive at Sandoz, sent an internal e-mail asking if Sandoz had sent out offers for Ciclopirox Shampoo. The next day, on November 30, 2012, J.R. responded that offers had been sent to Wal-Mart and HD Smith—both Actavis customers—and that Sandoz was considering approaching McKesson—a Perrigo customer.

636.  That same morning, CW-3 called T.P. of Perrigo twice, to alert him to the fact that Sandoz would be approaching McKesson. The calls lasted two (2) minutes and one (1) minute, respectively. Later that day, CW-1 confirmed that Sandoz had sent an offer to McKesson for Ciclopirox Shampoo.

637.  On December 3, 2012, Sandoz officially re-launched Ciclopirox Shampoo.

638.  On December 4 and December 5, 2012, CW-3 called Aprahamian twice. The calls lasted seven (7) minutes and two (2) minutes, respectively. Also, to close the loop, on December 5, 2012, M.D., an Actavis sales executive, called T.P. of Perrigo and the two competitors spoke for seventeen (17) minutes.

639.   Within three days of its entry, by December 6, 2012, Sandoz had already secured the Ciclopirox Shampoo business at HD Smith (from Actavis) and McKesson (from Perrigo).

### c)   *Betamethasone Valerate Ointment*

640.   Betamethasone Valerate Ointment ("Betamethasone Valerate") is a corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rash.

641.   In early January 2013, Sandoz began making plans to re-enter the market for Betamethasone Valerate and targeted February 15, 2013 as its re-launch date. At that time, Actavis was the only other generic competitor in the market.

642.   On January 21, 2013, Sandoz held a Commercial Operations call during which the Betamethasone Valerate re-launch was discussed. During that call, CW-3 noted that Sandoz was seeking 40% of the market—which was typical (and consistent with fair share principles) for a second entrant in a two-player market—and was looking for price points and customer information.

643.   On February 4, 2013, CW-3 called Aprahamian, who at that time was still at Actavis. The call lasted one (1) minute.  The next day, February 5, 2013, CW-3 spoke with Aprahamian two more times—with one call lasting twenty-three (23) minutes. Immediately after each call with Aprahamian, CW-3 called Kellum or CW-1 to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 10:14:00 | 0:23:00 |

| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 10:38:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 10:39:00 | 0:01:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 11:24:00 | 0:03:00 |
| 2/5/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 11:27:00 | 0:01:00 |

644.    During these calls, Aprahamian provided CW-3 with Actavis's non-public

pricing for Betamethasone Valerate at its largest customers, as well as the percentage of

the market that each customer represented. The purpose of providing this specific

information was so that Sandoz would be able to price as high as possible while still

obtaining business from specific, agreed-upon customers that represented an agreed-upon

market share. CW-3 took the following contemporaneous notes in his Notebook, placing

check marks next to Rite Aid and Walgreens, two of the customers that he and

Aprahamian agreed that Sandoz would target. These notes are pictured below:

645.   Later in the evening on February 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail, including to CW-3, stating: ███████████████

████████████████████████████████████████████████████

███████████████████████████████

646.   Two days later, on February 7, 2013, C.P., a pricing analyst at Sandoz, sent an internal e-mail, including to CW-3, stating that Sandoz planned to send an offer to Walgreens shortly and would send offers to additional targets once they received feedback from Walgreens. CW-3 responded: ██████████████████████████

647.   On February 13, 2013, CW-3 called Aprahamian and they spoke for nearly sixteen (16) minutes. That same day, on February 13, 2013, Rick Rogerson, a senior pricing executive at Actavis, discussed ceding the Walgreens account to Sandoz, stating in an internal e-mail: ███████████████████████████████

███████████████████ In response, Aprahamian confirmed that Actavis would be ceding the Walgreens business, stating ████████████████████████

██████████████████

648.   Two days later, on February 15, 2013, Sandoz re-entered the market and published WAC pricing that matched Actavis's WAC pricing. That same day, on February 15, 2013, Sandoz was awarded the Betamethasone Valerate business at Walgreens.

649.   On February 19, 2013, Sandoz bid on the Betamethasone Valerate business at Rite Aid. That same day, CW-3 called Aprahamian to let him know. The call lasted less than one (1) minute. On February 28, 2013, Rite Aid awarded the business to Sandoz.

650.   On March 15, 2013, Sandoz bid on the Betamethasone Valerate business at Cardinal. A few weeks later, on March 27, 2013, Cardinal awarded the business to Sandoz. These three accounts—Walgreens, Rite Aid, and Cardinal—accounted for approximately 32% of the Betamethasone Valerate market.

651.   On April 1, 2013, Sandoz held a Commercial Operations call during which they discussed, among other items, the status of the Betamethasone Valerate re-launch. CW-3's notes from that call reflect that Sandoz had been able to secure three customers, but was ███████ one additional customer, OptiSource, to reach its original 40% market share goal:

Comm Ops          4/1/13

BetamethUal
 - RA, WAG, CAN
   -OptiSource - Shooting For 40%sh

The next day, April 2, 2013, CW-3 called and spoke with Aprahamian twice, with one call lasting six (6) minutes.

652.   On April 4, 2013, Sandoz submitted an offer to Optisource for its Betamethasone Valerate business. Four days later, on April 8, 2013, Optisource awarded Sandoz the business.

### ii.   Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap

653.   In March 2013, Aprahamian followed his former colleague, Perfetto, to Taro and assumed a senior sales and marketing position. The product overlap between

Sandoz and Taro was much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

654.   Indeed, immediately upon moving to Taro, and even before, Aprahamian and CW-3 began colluding on several products on which Sandoz and Taro overlapped— Nystatin Triamcinolone Cream and Ointment, Fluocinonide Ointment, and Lidocaine Ointment. The collusion on these products is discussed in detail below.

a)   ***Nystatin Triamcinolone Cream and Ointment***

655.   Nystatin Triamcinolone ("NT") Cream and Ointment is used for the treatment of cutaneous candidiasis, such as yeast infections and thrush.

656.   By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

657.   Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700% on certain formulations.

658.   Not surprisingly, during this time, NT Cream and Ointment were Taro's highest grossing products and represented approximately 14.1% of the company's consolidated net sales for the year ending March 31, 2013.

659.   Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro. On November 12, 2012—before Aprahamian had joined Taro—CW-3 of Sandoz called H.M., a Taro sales executive, three times with one call lasting four (4) minutes, to alert him to the fact that Sandoz might be entering the market. That same day, CW-3 e-mailed

M.A., a Sandoz marketing executive, regarding NT Ointment asking, █████████████

███████████████████████████████████ M.A. responded that Sandoz

planned to launch all three package sizes.

660.   Two days later, on November 14, 2012, B.S., a senior Taro executive, sent

an internal e-mail to other senior executives at Taro and Sun recommending price

increases on several products where Taro was exclusive, including NT Cream and

Ointment. B.S. explained that ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

661.   Sandoz's launch dates for NT Cream and Ointment would get pushed back,

but CW-3 continued to keep H.M informed. On January 4 and 7, 2013, CW-3 called

H.M. of Taro. The calls lasted five (5) minutes and thirteen (13) minutes, respectively.

One week later, on January 14, 2013, Taro held a Sales and Marketing conference call.

During that call, Perfetto, then a Taro senior executive, informed the team that it was a

███████████████████████████ that Taro was ███████████████

███████████ on NT Cream, and that the company should ███████████

███████████

662.   Two days later, on January 16, 2013, Perfetto e-mailed J.J., a senior Taro

sales executive, advising that it was ████████████████████████

█████████████████████████████ and asked J.J. to put together a list of

Taro's top 10 customers. J.J. then forwarded the request along internally stating, ███████

████████████████████████████████████████████████████

663.    On February 12, 2013, Taro increased WAC pricing on NT Cream by 25%.

664.    On February 28, 2013, CW-3 e-mailed M.A. of Sandoz asking for an
updated target launch date for NT Ointment. M.A. responded: ████████ That same
day, CW-3 called H.M. of Taro to keep him updated on Sandoz's plans, and they spoke
for eleven (11) minutes. Two days later, on March 2, 2013, the two competitors
exchanged three (3) text messages.

665.    The following Monday, March 4, 2013, Taro held a Sales and Marketing
conference call. During that call, Perfetto informed the team that Sandoz was ████████

████████████████████████

666.    On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an
internal e-mail to the sales team, including to CW-3, requesting ████████████
regarding pricing for certain products that Sandoz was planning to re-launch, including
NT Cream and Ointment.

667.    One week later, on March 18, 2013, Aprahamian started at Taro. Over the
next several days, Aprahamian and CW-3 exchanged several calls. These calls are
detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

668.     On March 19, 2013, D.P. sent CW-3 a ████████████ stating ████

████████████████████████████ CW-3 understood from this e-mail that

D.P. was asking him to call his contact at Taro to obtain pricing.  CW-3 responded: ████

████████████████████████████████████████████████████████

███████████████████████

669.     True to his word, on March 22, 2013, after the series of phone calls

referenced above, CW-3 ███████████████████████████████████████

████████████████████ Although CW-3 said his information came from ████████

the true source was Aprahamian at Taro. CW-3 also shared the file with Kellum and CW-

1, a Sandoz senior pricing executive. Kellum and CW-1 understood at the time that CW-3

obtained this information directly from Taro.

670.     The file attached to CW-3's e-mail, which is pictured below, contained

Taro's non-public contract pricing at several customers for several products, including

specific price points for NT Cream and Ointment at Cardinal and Rite Aid. Notably, CW-

3 did not have responsibility for either of those customers—which was a clear signal to

his superiors that CW-3 had received the information from a competitor rather than a

customer.

| Product | Size | NDC | Comments | CAH | Rite Aid | Walgreens | Winn Dixie | Comments |
|---|---|---|---|---|---|---|---|---|
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 15 gram tube | 00168-0268-15 | Prasco entered 8/6/2012 | | | | $ 30.00 | Actavis pricing |
| Betamethasone Dipropionate Ointment(Augmented) 0.05% | 50 gram tube | 00168-0268-50 | Prasco entered 8/6/2012 | | | | $ 45.00 | Actavis pricing |
| Desoximetasone Cream 0.25% | 15 gram tube | 00168-0180-15 | Taro Price Increase 2-12-13 | $ 17.00 | | $ 6.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 60 gram tube | 00168-0180-60 | Taro Price Increase 2-12-13 | $ 36.00 | | $ 24.00 | | Taro pricing |
| Desoximetasone Cream 0.25% | 100 gram tube | 00168-0180-99 | Taro Price Increase 2-12-13 | $ 96.50 | | $ 43.00 | | Taro pricing |
| Nystatin Cream 100,000 U/g | 15 gram | 00168-0054-15 | | $ 8.00 | $ 5.25 | | | Taro pricing |
| Nystatin Cream 100,000 U/g | 30 gram | 00168-0054-30 | | $ 12.00 | $ 7.75 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 15 gram | 00168-0081-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 30 gram | 00168-0081-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Cream | 60 gram | 00168-0081-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 15 gram | 00168-0089-15 | Taro Price Increase 2-12-13 | $ 55.00 | $ 50.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 30 gram | 00168-0089-30 | Taro Price Increase 2-12-13 | $ 79.00 | $ 71.00 | | | Taro pricing |
| Nystatin-Triamcinolone Ointment | 60 gram | 00168-0089-60 | Taro Price Increase 2-12-13 | $113.00 | $101.00 | | | Taro pricing |

The pricing information had been provided directly by Aprahamian for the express purpose of allowing Sandoz to price as high as possible when entering the market.

671. On the morning of April 15, 2013, Aprahamian called CW-3 and they spoke for eighteen (18) minutes. A few minutes after hanging up, CW-3 called Aprahamian back. The call lasted one (1) minute. During these calls, CW-3 told Aprahamian that Sandoz would be entering the market for NT Cream shortly. Later that day, Taro held a Sales and Marketing conference call. The minutes from the conference call stated:

672. On that same day, April 15, 2013, Sandoz held its own Commercial Operations call during which they discussed NT Cream. During that call, Sandoz identified ABC, Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch. CW-3's contemporaneous notes from that call are pictured below:

673.    Later that same day, on April 15, 2013, CW-3 called Aprahamian to further discuss the NT Cream launch. The two competitors spoke for nine (9) minutes. CW-3's contemporaneous notes from that call are pictured below:



674.    On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare. Aprahamian also told CW-3 that Taro would not defend these customers. CW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

675.    After hanging up with Aprahamian, CW-3 immediately called Kellum to report his conversation with the competitor. The call lasted one (1) minute. First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five (5) minutes.

676.    From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida. Representatives from Taro, including Aprahamian and Perfetto, and Sandoz, including D.P. and R.T., a senior sales and marketing executive, attended.

677.    The following day, on April 24, 2013, Aprahamian called CW-3 twice. The calls lasted one (1) minute and five (5) minutes, respectively. On April 25, 2013, CW-3 called Aprahamian. The call lasted one (1) minute. That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

678.    On the day of Sandoz's re-entry, Rite Aid e-mailed Taro stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business. H.M. of Taro forwarded the request to his colleagues J.J., Perfetto, and Aprahamian stating: ███████████████████████████████

████████ Aprahamian responded: █████████████████████████

679.    The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight (8) minutes. Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian e-mailed H.M. on April 27, 2013 asking him to call him Monday morning and stating, ████████████████████████████████████████

680.    Also on April 26, 2013, Omnicare e-mailed Taro indicating that it had received an offer for NT Cream and gave Taro the opportunity to match the pricing. D.S. forwarded the request to Aprahamian who responded, █████████████████

█████████████████████████████████████

681.    That same day, Perfetto sent an internal e-mail to J.K. and M.K., two senior Taro executives, and others including Aprahamian, reporting that over the last two days,

Sandoz had approached several of Taro's customers, including ABC, Rite Aid and Omnicare. Perfetto concluded: ███████████████████████████

682.   On May 8, 2013, Perfetto sent an internal e-mail to Taro executives advising that Walgreens was moving its NT Cream business to Sandoz and stating that ████████████████████████████████████ That same day, Aprahamian called CW-3 and they spoke for eight (8) minutes. CW-3 called Aprahamian back later that day and they spoke for another nine (9) minutes.

683.   On May 28, 2013, NC Mutual e-mailed Taro stating that it had received an offer from Sandoz and asked whether Taro planned to lower its price to retain the business. E.G., a Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed, stating: ██████████████████████████████████ ████████████████████████████ Two days later, on May 30, 2013, Aprahamian called CW-3. The call lasted one (1) minute.

684.   On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer gains and losses for May 2013 for various products. With respect to Nystatin Triamcinolone Cream, Taro noted that it lost the business at Omnicare because it was ███████████████████ and the Walgreens business was ████████████████

685.   Despite Sandoz's entry, prices for NT Cream remained extremely high. Around this same time, K.S., a policy executive at Taro, actually sent an internal e-mail to J.J., Perfetto, and Aprahamian asking whether there had ██████████████████████ ██████████████████████████████ because ██████████████████ s███████████████████████████████████████████ J.J. replied

that Kaiser had begun ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in order to provide some financial relief to its patients.

686.   Following Sandoz's re-launch into the NT Cream market, Sandoz executives began discussing a larger ▮▮▮▮▮▮▮ which involved ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The rationale was simple—allow Taro to grow these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in coordination with Taro. Sandoz referred to NT Cream as ▮▮▮▮▮▮ for the success of this suggested approach and further noted that it would ▮▮▮▮▮▮▮▮▮▮▮▮—meaning that it would help Taro increase its profitability on other products in repayment for Taro's willingness to give up its market share to Sandoz on its most lucrative product.

687.   Indeed, the following chart from a Credit Suisse Investor report illustrates the success of such an approach—depicting the price increases taken by Taro on NT Cream while Sandoz was out of the market and Sandoz's re-entry at the higher price:



Figure 2: Competition followed Taro in past price increases

Source: Price Rx, Company data, Credit Suisse research

688.   In November 2013, Sandoz began readying to re-enter the NT Ointment

market. Sandoz executives, including Kellum, wanted to mirror the NT Ointment launch

after the NT Cream launch by targeting the same customers as it had for NT Cream.

Kellum specifically discussed this approach with CW-1.

689.   On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several

calls during which they discussed NT Ointment. CW-3 then reported what he discussed

on those calls to CW-1. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

690.   During his calls with Aprahamian, CW-3 took the following

contemporaneous notes in his Notebook regarding NT Cream and Ointment:



691.   On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the

same customers that it had targeted on NT Cream—ABC, Walgreens, Rite Aid, and

Omnicare. CW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to demonstrate this. As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

692.    On November 22, 2013, Aprahamian called CW-3 and they spoke for seven (7) minutes. That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing. Per the competitors' agreement, Sandoz submitted offers to ██████████████████████████████████████████

693.    The next day, on November 23, 2013, P.G., a senior Sandoz executive, e-mailed Kellum and D.P. regarding the NT Ointment re-launch. P.G. asked who the other competitors were in the market and how much share Sandoz planned to target. D.P. responded: ████████████████████████████████████████████

████████████████████████████████████████████████

████

694.    By December 2013, Sandoz had—as agreed—targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

**b)    *Fluocinonide Ointment***

695.    Fluocinonide Ointment, also known by the brand name Lidex, is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, psoriasis, and vitiligo. It is one of the most widely prescribed dermatological drugs in the United States.

696.   In early 2013, the Fluocinonide Ointment market was split evenly between Teva with 50% share and Taro with 42% share.

697.   On February 12, 2013, Taro increased pricing on several products, including Fluocinonide Ointment. The increase included a 15% increase to WAC.

698.   On February 21, 2013, M.A., a Sandoz marketing executive, e-mailed Kellum and other Sandoz executives to advise that Taro had increased pricing on several products for which Sandoz was re-entering the market, including Fluocinonide Ointment. That same morning, CW-3 of Sandoz called H.M. of Taro and they spoke for (9) minutes. Immediately after hanging up with H.M., CW-3 called his supervisor, Kellum, and they spoke for four (4) minutes.

699.   One week later, on February 28, 2013, McKesson e-mailed Taro stating that it had received an unsolicited bid on Fluocinonide Ointment and asked whether Taro wanted to bid to retain the business. Later that day, CW-3 called H.M. again and the two competitors spoke for eleven (11) minutes. First thing the next morning, on March 1, 2013, CW-3 called his boss Kellum, and they spoke for five (5) minutes.

700.   On March 2, 2013, CW-3 and H.M. exchanged three (3) text messages. That same day, E.G., a Taro sales executive, forwarded the customer request along internally and attached a spreadsheet indicating that McKesson was Taro's largest customer

701.   Two days later, on March 4, 2013, M.L., a Taro pricing executive, forwarded the McKesson request to Perfetto and other Taro executives suggesting that Taro reduce its pricing by 20% and retract the price increase to retain the business.

Perfetto responded that he was okay with this approach, but posed a question: ███

████████████████████████████████████████████████

█████████████████████████

702.    On March 5, 2013, M.L. confirmed that Taro supplied all three wholesalers and Perfetto responded by asking J.J., a senior Taro sales executive, ███████████

████████████████████████████████████████████████

████████████████████████████ After confirming that Taro was primary on all three, J.J. replied, ████████████████████████████████

████████████████████████████████████████

703.    Looking for a creative way to communicate with Sandoz that Taro would rather it approach ABC or Cardinal instead of McKesson, Perfetto reached out to his former colleague at Actavis, Aprahamian, who he knew had a relationship with CW-3 at Sandoz.[10] Perfetto asked Aprahamian to speak with CW-3 about Fluocinonide Ointment. The two exchanged calls, and Aprahamian reported back to Perfetto what they discussed. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/4/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 15:18:00 | 0:14:00 |
| 3/5/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Aprahamian, Ara (Actavis) | 8:01:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 8:05:00 | 0:02:00 |
| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 12:07:00 | 0:11:00 |

---

[10] Aprahamian was in the process of leaving Actavis at this point, but would not formally begin working at Taro until two weeks later—on March 18, 2013.

| 3/5/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:52:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | CW-3 (Sandoz) | 10:50:00 | 0:04:00 |
| 3/6/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 13:24:00 | 0:03:00 |

704.    At the same time, CW-3 was reporting back to CW-1, a Sandoz senior pricing executive, what he had discussed with Aprahamian. Shortly after that discussion, CW-1 e- mailed Kellum and F.R., a Sandoz pricing executive, regarding Fluocinonide Ointment stating that he had ███████████████████████████████████

███████████████████████████████████████████████████████████

Kellum responded, ████████████████████████████ Less than an hour later, Kellum called CW-3 and they spoke for twenty-three (23) minutes. Later that day, CW-3 called Aprahamian. The call lasted less than one (1) minute.

705.    Having identified ABC as its target, CW-1 then asked CW-3 to contact Taro and obtain price points for the customer. Following this directive, CW-3 exchanged several calls with Aprahamian who, in turn, spoke with Perfetto and then relayed the information back to CW-3. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
| --- | --- | --- | --- | --- | --- | --- |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:20:06 | 0:00:30 |
| 3/8/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Actavis) | 12:27:00 | 0:04:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | Perfetto, Mike (Taro) | 12:47:00 | 0:01:00 |
| 3/8/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 12:49:00 | 0:09:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Incoming | Perfetto, Mike (Taro) | 14:16:00 | 0:03:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:01:00 |
| 3/11/2013 | Voice | Aprahamian, Ara (Actavis) | Outgoing | CW-3 (Sandoz) | 14:25:00 | 0:05:00 |

706. After speaking with Aprahamian for the last time on March 11, 2013, CW-3 called CW-1 and left him the following voicemail:



707. In accordance with the agreement between the two competitors, Sandoz bid on Fluocinonide Ointment at ABC and Taro promptly conceded the business.

### c) *Lidocaine Ointment*

708. Lidocaine Ointment ("Lidocaine" or "Lido"), also known by brand names such as Xylocaine Topical Solution, among others, is an anesthetic used to temporarily numb and relieve pain from minor burns, skin abrasions, insect bites, and other painful conditions affecting mucous membranes.

709. As detailed above, in late 2011 Fougera raised its price on Lidocaine Ointment in advance of Hi-Tech's entry into the market in March 2012, and the two companies conspired to allocate customers to Hi-Tech in the months that followed.

710. One year later, in March 2013, Taro began preparing to re-launch into the Lidocaine Ointment market. At that time, Sandoz (which by that point had acquired Fougera) had approximately 56% market share and Hi-Tech had 42%.

711. On March 18, 2013, the same day that Aprahamian started at Taro, Perfetto sent an internal e-mail, welcoming Aprahamian to the team and listing potential topics for a Monday call. One of those topics was ▮▮▮▮▮▮▮▮▮▮▮▮

712.    Over the next several days, Aprahamian and CW-3 of Sandoz exchanged

several calls, including a call on March 19, 2013 lasting sixteen (16) minutes and a call

on March 21, 2013 lasting twelve (12) minutes.

713.    Later in the day on March 21, 2013, after Aprahamian's conversations with

CW- 3, J.J., a senior Taro sales executive, sent an internal e-mail listing Lidocaine

Ointment usage numbers by competitor at various customers and stating:

The

next day, on March 22, 2013, Aprahamian called CW-3 again. CW-3 returned the call

and the two competitors spoke for seventeen (17) minutes.

714.    During these calls in March 2013, Aprahamian informed CW-3 that Taro

would be re-entering the Lidocaine Ointment market. CW-3, in turn, provided

Aprahamian with non-public price points that Sandoz was charging to its customers for

the product.

715.    Armed with this competitively sensitive information, on or about March 23,

2013, Taro re-launched Lidocaine Ointment and matched Sandoz and Hi-Tech WAC

pricing. Over the next two weeks, Aprahamian and CW-3 exchanged numerous calls

during which they discussed, among other things, the allocation of customers to the new

entrant, Taro. These calls are listed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/25/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:14:00 | 0:05:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 6:49:00 | 0:06:00 |
| 3/28/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:51:00 | 0:01:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 9:51:00 | 0:05:00 |
| 3/29/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:06:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:12:00 | 0:06:00 |
| 4/2/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 12:56:00 | 0:06:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:15:00 | 0:02:00 |
| 4/4/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 10:16:00 | 0:06:00 |

716.    Although Aprahamian wanted CW-3 to tell him which customers to target, CW-3 had a difficult time obtaining that guidance from Kellum.  Aprahamian told CW-3 that Taro would be taking two customers from Sandoz—CW-3 understood that to mean that Taro planned to take one wholesaler and one retailer.

717.    On April 5, 2013, J.R., a senior Sandoz marketing executive, sent an internal e-mail asking, ███████████████████████████████

████████████████  CW-3 responded: ███████████████████

████████████████████████████████████████████ J.R. replied by asking Kellum, ███████████████  Kellum answered by providing his understanding of the conversations between CW-3 and Taro: ███████████

████████████████████████████████████

Later that day, J.R. sent another e-mail to others at Sandoz stating: ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆

718.   On April 8, 2013, Taro held a Sales and Marketing conference call.

According to the meeting minutes, Perfetto reported the following: ▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and

▆▆▆▆▆▆▆▆▆ The next day, on April 9, 2013, CW-3 called Aprahamian and

they spoke for seven (7) minutes.

719.   On April 15, 2013, Aprahamian and CW-3 exchanged three calls, including

one lasting eighteen (18) minutes and another lasting nine (9) minutes. Later that day,

Aprahamian sent an internal e-mail attaching a ▆▆▆▆▆▆▆▆ The

Summary detailed that, consistent with fair share principles, Taro's ▆▆▆▆ was

▆▆▆▆▆ and they had achieved ▆▆▆ share.  For pricing, Taro matched ▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆

720.   The next day, on April 16, 2013, CW-3 called Aprahamian. Aprahamian

returned the call and the two competitors spoke for eleven (11) minutes. At the same

time, J.J. of Taro called E.B., a senior Hi-Tech sales and marketing executive, and they

spoke for eight (8) minutes. Throughout the rest of April, CW-3 and Aprahamian would

exchange at least ten more phone calls.

721.   In June 2013, Taro circulated a spreadsheet detailing its gains and losses for

May 2013 for various products. With respect to Lidocaine Ointment, Taro noted that it

did not bid at Omnicare because ▆▆▆▆▆



722.   By January 2014, Sandoz held a ███████████████ which included a presentation on ██████████████████████████ The presentation contained a slide titled, ██████████████ which included Taro, and identified the Lidocaine Ointment launch as a key launch for Taro. Sandoz described Taro's ████████████████ as a ██████████████████

723.   Throughout 2014, Sandoz was careful not to disrupt the market balance it had achieved with Taro and Hi-Tech with regard to Lidocaine Ointment. For example, in March 2014 Sandoz created a list of products to target at Wal-Mart in 2014. With regard to Lidocaine Ointment, CW-3 responded that Sandoz had ████████████████ ████████████████████████████████████████ ██████████████████████

### iii.   Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013

724.   In addition to coordinating with Sandoz to allocate the market on several products on which the two competitors overlapped, as detailed above, Aprahamian and Perfetto also began planning significant price increases on a number of products starting in early 2013.

725.   Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at the competitor companies. The two men capitalized on these relationships

216

to coordinate price increases and avoid competing with each other in the markets for those overlap drugs.

726.   One early example occurred in May 2013, when Taro increased its pricing on twelve (12) different products (the "May 2013 Increases"). As result of these price increases, Taro anticipated approximately $110 million in additional revenue. These products, their corresponding WAC increases, and Taro's competitors for each product are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

### a)   *Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases*

727.   In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products—Sandoz, Perrigo, Actavis, Mylan, and Glenmark— to discuss the increases and limit competition between them. Indeed, Taro began

communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

728.    For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six (6) minutes. During that call, the two competitors discussed the price increases that Taro was planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



729.    Immediately upon hanging up with Aprahamian, CW-3 called another competitor, T.P. of Perrigo, and they spoke for five (5) minutes. During that call, CW-3 discussed the May 2013 Increases with T.P. and T.P. told CW-3 that he already knew about them. When CW-3 hung up with T.P., he immediately called Aprahamian back. The call lasted one (1) minute. A few minutes after hanging up with Aprahamian, CW-3 called his superior Kellum. Later that morning, Aprahamian called CW-3 and they spoke for another six (6) minutes.

730.    Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two competitors spoke for fifteen (15) minutes. Immediately upon hanging up, Aprahamian called CW-3 of Sandoz and they spoke for six (6) minutes. Mylan and

Sandoz were competitors with Taro on the product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013 Increase products.

731.    The following Monday, April 8, 2013, Mylan circulated a list of products that it wanted to focus on to increase its market share. For Clomipramine, Mylan noted:

| Clomipramine | Remove – Just picked up CVS Taro price increase item |
|---|---|

The fact that Clomipramine was a ▮▮▮▮▮▮▮▮▮▮ had come directly from M.A.'s conversation with Aprahamian, because Taro had not yet publicly announced its price increase on this product and would not do so for several more weeks.[11]

732.    At the same time, Taro was communicating with Blashinsky of Glenmark. On both April 2, 2013 and April 9, 2013, a Taro employee—likely Perfetto—called Blashinsky from his office phone. The calls lasted twenty-eight (28) minutes and twenty-three (23) minutes, respectively. Also on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting seven (7) minutes. Sandoz and Glenmark were competitors with Taro on the product Alclometasone Dipropionate Cream ("Alclometasone Cream"), one of Taro's May 2013 Increase products.

---

[11] The collusive relationship and interactions between Taro, Sandoz, and Mylan with regard to the drug Clomipramine are addressed in greater detail in UHS's initial action. Although UHS does not seek relief relating to Clomipramine in this Complaint, the collusive interactions are part of the larger pattern of conduct involving Taro, Sandoz, and Mylan, and are discussed herein to provide context for the larger price increase strategy that Taro was employing at this time, and to provide further support for the allegations herein.

733.   Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several

calls with Aprahamian and Blashinsky. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

734.   During these calls, the three competitors discussed, among other things,

Taro's planned price increase on Alclometasone Cream. During at least one of those

calls, CW-3 recorded the following contemporaneous notes in his Notebook:



735.   At the same time, Perfetto and Aprahamian were communicating frequently

with their contacts at Perrigo and Actavis. Further, Perrigo and Actavis were also

speaking directly with each other during this time period. Perrigo and Actavis had at least

two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

736.  While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors. For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned. A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

737.   By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases. That same day, S.G., a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets—a drug on Taro's list.  S.G. stated, ███████████

████████████████████████████████████████████████████

████████████████████████

738.   After receiving the e-mail, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively. On those calls, D.S. explained that Taro did not have any long-term supply issues. After hanging up with D.S. for the second time, CW-4 responded to S.G.'s e-mail stating: ███████████

████████████

739.   At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Kellum in a separate e-mail stating, ████████████

███████████████████████████—likely referring to the impending Taro price increase. To that, Kellum responded simply, ██████

740.   In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases. Some of these communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

741.    Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida. Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark attended. The attendees included Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and Blashinsky of Glenmark.

742.    One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases. The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products.

743.    During this time, Aprahamian and Perfetto continued to communicate with their competitors. For example, on April 30, 2013, Aprahamian and CW-3 exchanged two calls lasting fourteen (14) minutes and two (2) minutes, respectively. During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products on which Taro had increased prices. CW-3's notes from those phone calls are detailed below. The notes also include references to the other competitors on these products. For example, CW-3 listed "Alclo Cream – T & G," which stood for Taro and Glenmark:



744.    After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.

745. At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases. Some of these calls, which surround the calls with CW-3, are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

**b)** **_Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases_**

746. Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases. Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve. Indeed, rather than compete, these competitors began working to implement price increases of their own.

747.   For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them. The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER. Kellum e-mailed CW-4 stating, ███████████

████████████████████████████████████████████████████

██████████████ CW-4 replied: █████████████████████████

By ████████████ Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

748.   That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, M.B., a sales executive at Actavis, also refused to bid, stating: █████████████████████████████████████

████████████████████████████

749.   Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products. C.P., a pricing analyst at Sandoz, responded internally stating, ██████████████████████

██████████████████████████████████████████████████

█████████████████ To that, Kellum responded: ██████████████

████████████████████████████████████████

750.   At the same time, Taro was confident based on its conversations with competitors that its increases would stick. For example, when Kaiser gave Taro push

back on the May 2013 Increases, including asking for ███████████████

████████████████████████████ Aprahamian saw no need for explanation

and in an internal e-mail responded simply, ████████████████████████

███████ Ultimately, Aprahamian's approach yielded results and Taro retained the

business at the higher pricing.

751.   Similarly, on May 8, 2013, Cardinal e-mailed D.S. of Taro stating that

regarding Desonide, ████████████████████████████████████████

████████████████████████ D.S. forwarded the e-mail internally and

Aprahamian responded, █████████████████████████████████████

███████████████████████████████████████████ Perfetto added,

███████

752.   Further, by the time the May 2013 Increases were publicly announced,

Taro's competitors were already well on their way to implementing comparable price

increases of their own. For example, by May 1, 2013, the day that Taro published its

increased WAC pricing, Actavis had already conducted its own price increase analysis

for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

753.   Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz

Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz

products on Taro's May 2013 Increase list. The power point presentation that Kellum

submitted to the Committee contained no detailed price increase analysis and noted

simply that Sandoz should increase because Taro had raised prices on those products:

| Product | Strength(s) | Competitors | | Comment |
|---|---|---|---|---|
| | | Active | Market Share* | Taro raised price on May 1, 2013. |
| Alcometasone Cream | 15g, 45g, 60g | Glenmark | 82% | |
| | | Taro | 14% | |
| | | Sandoz | 4% | |
| Betameth Cream/Lotion | 0.05% 0.1% | Taro | 35% | Taro raised price on May 1, 2013. |
| | | Actavis | 35% | |
| | | Sandoz | 30% | |
| Carbamazepine XR Tabs | 200mg, 400mg | Taro | 55% | Taro raised price on May 1, 2013. |
| | | Sandoz | 45% | |
| Clomipramine Caps | 25 mg, 50mg, 75mg | Sandoz | 65% | Taro raised price on May 1, 2013. |
| | | Mylan | 33% | |
| | | Sandoz | 2% | |

754.   Over the next several months, and consistent with their ongoing understandings, Taro's competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark— followed Taro's May 2013 Increases with increases of their own. Several of these competitor price increases, and their corresponding dates, are detailed in the chart below:[12]

| Drug | Competitors | Lead/Followed | Date |
|---|---|---|---|
| Alclometasone Diproproprionate Cream | Sandoz | Followed | 5/10/13 |
| | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Betamethasone Diproprionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diproprionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
| | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
| | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
| | Sandoz | Re-entered and Matched | 1/17/14 |

---

[12] This list, which is likely not exhaustive, is based on the information available to date.

| Terconazole Cream | Actavis | Followed | 6/5/2013 |
|---|---|---|---|

755.   Consistent with past practice, the competitors also often spoke before they followed with a price increase. By way of example, and as detailed in the chart above, Sandoz followed Taro's price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013. The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |

| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

756.    Similarly, Sandoz followed the Taro price increases on Betamethasone

Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013. In

the days leading up to the Sandoz price increase, Aprahamian exchanged several calls

with CW-3, including a call on July 23, 2013 that lasted three (3) minutes. During that

call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several

Taro products, including the Betamethasone products. CW-3's contemporaneous notes

from that call are detailed below:



757.    Lastly, Perrigo followed the Taro price increases on Desonide Cream and

Ointment on May 21, 2013, and Actavis re-entered the Desonide Cream market and

matched the competitors' pricing on August 15, 2013. The chart below details at least some of the communications between the three competitors in the days surrounding these market events:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

758.    Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own. For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream. Aprahamian asked D.S., a Taro sales executive, why Econdisc was looking for a bid and D.S. replied: ███████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████ Aprahamian responded: ████████████████

Consistent with Aprahamian's directive, Taro subsequently declined to bid on the business.

759.   The competitors continued to communicate about the May 2013 Increase products even after the competitors had followed the increases. These open lines of communication were important to ensure that the competitors did not run afoul of the delicate market share balance they had achieved with each other.

760.   For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that Taro's Carbamazepine ER product was being held up at the border. As a result, Sandoz would likely be receiving requests from Taro customers for the product. By conveying this to CW-4, D.S. was sending the message that Taro would lose customers if Sandoz sold too much and Taro would have no choice but to compete to get its market share back. This would disrupt the market and cause prices to deteriorate across the board.

761.   After speaking with D.S., CW-4 sent an internal e-mail, including to Kellum, stating: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Kellum responded in agreement: ████████████████████████████

████████████████████████